# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF ILLINOIS

### EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE SUBPOENA TO PLITEK, LLC | ) ) ) ) | No.    `FILED: APRIL 28, 2008` |
| THE PROCTER & GAMBLE COMPANY, | ) ) | `08CV2415          TG` |
| Movant, | ) ) ) ) ) ) ) | Judge   `JUDGE SHADUR` `MAGISTRATE JUDGE DENLOW` Magistrate Judge |

**DECLARATION OF SCOTT R. MAYNARD IN SUPPORT OF THE PROCTER & GAMBLE COMPANY'S MOTION TO ENFORCE PLITEK, LLC'S COMPLIANCE WITH RULE 45 SUBPOENA**

HOWREY LLP
321 North Clark Street
Suite 3400
Chicago, IL 60610
312-595-1239

HOWREY LLP
4 Park Plaza, Suite 1700
Irvine, CA 92614
Telephone: (949) 721-6900
Facsimile: (949) 721-6910

## DECLARATION OF SCOTT R. MAYNARD

I, Scott R. Maynard declare as follows:

1.      I am an attorney at the law firm of Howrey LLP, counsel of record for The Procter & Gamble Company ("P&G") in the above captioned matter.  I am a member in good standing of the State Bar of California and will be submitting an application to be admitted *pro hac vice* to appear in this matter before this Court.  I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.      On page 2 of P&G's Memorandum of Points and Authorities there are photographs of containers sold by P&G and Kraft Food Holdings, Inc. ("Kraft") with their lids removed to expose their peelable seals and vent valves.

3.      Attached as Exhibit 1 to my declaration is a true and correct copy of the complaint filed by Kraft in the case titled *Kraft Food Holdings, Inc. v. The Procter & Gamble Company*, Case No. 07C0613S, (W.D. Wis.) ("Wisconsin Action").

4.      Attached as Exhibit 2 to my declaration is a true and correct copy of the P&G's Answer and Counterclaim filed in the Wisconsin Action.

5.      Attached as Exhibit 3 to my declaration is a true and correct copy of U.S. Patent 7,074,443.

6.      Attached as Exhibit 4 to my declaration is a true and correct copy of a print out of a web page I obtained from Plitek, LLC's (Plitek) web site, located at www.plitek.com, on March 19, 2008, relating to Piltek's PLI-VALV® Package Degassing System.

7.      Attached as Exhibit 5 to my declaration is a true and correct copy of a print out of a web page I obtained from Plitek's web site on March 19, 2008 regarding Plitek's Design Support services.

8.      Attached as Exhibit 6 to my declaration is a true and correct copy of U.S. Patent No. 7,178,555.

9.      Attached as Exhibit 7 to my declaration is a true and correct copy of Kraft's Initial Disclosures in the Wisconsin Action in which Kraft discloses Plitek as a party likely to have discoverable evidence.

10.      Attached as Exhibit 8 is a true and correct copy of the subpoena *decus tecum* served on Plitek.

11.      Attached as Exhibit 9 is a true and correct copy of Plitek's objections and responses to the subpoena at issue.

12.      Attached as Exhibit 10 is a true and correct copy of a letter dated March 10, 2008 sent from Scott R. Maynard to Dean J. Lurie of the law firm Stone, Pogrund & Korey, LLC.

13.      On March 11, 2008, Dean J. Lurie and his Partner, Mr. Korey, telephoned me to meet and confer regarding Plitek's responses to P&G's subpoena.

14.      During the March 11, 2008 telephone conference Messrs. Lurie and Korey represented that Plitek would stand by its objections to P&G's subpoena.

15.      During the March 11, 2008 telephone conference I requested that Messrs. Lurie and Korey provide me with dates and times when they would be able to discuss the matter in more detail and with additional members of my law firm who also represent P&G in the Wisconsin Action.

16.      During the March 11, 2008 telephone conference Messrs. Lurie and Korey stated that they would not meet and confer any further regarding Plitek's responses to P&G's subpoena.

17.      Attached as Exhibit 11 is a true and correct copy of a March 11, 2008 letter sent by Dean J. Lurie to Ben Davidson, a partner at Howrey LLP and counsel for P&G, regarding the March 11, 2008 telephone conference between myself and Messrs. Lurie and Korey.

2

18.     Attached as Exhibit 12 is a true and correct copy of the protective order in place in the Wisconsin action.

Executed on April 28, 2008, at Irvine, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Scott R. Maynard

JUDGE SHADUR
MAGISTRATE JUDGE DENLOW

# Exhibit 1



# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

KRAFT FOODS HOLDINGS, INC.,

    Plaintiff,

v.

THE PROCTER & GAMBLE COMPANY,

    Defendant.

07 C 0613 S

Case No. _____
Jury Trial Demanded

## COMPLAINT AND DEMAND FOR JURY TRIAL

For its Complaint against defendant The Procter & Gamble Company ("Defendant"),

plaintiff Kraft Foods Holdings, Inc. ("Kraft") alleges as follows:

### PARTIES

1.    Kraft is a Delaware corporation with its principal place of business in Northfield,

Illinois.

2.    On information and belief, Defendant is a an Ohio corporation with its principal

place of business in Cincinnati, Ohio.

### JURISDICTION AND VENUE

3.    This Court has subject matter jurisdiction over this action as it arises under the

federal patent laws of the United States of America. 28 U.S.C. §§ 1331 and 1338(a). The Court

has personal jurisdiction over Defendant because Defendant has systematic and continuous

contacts with the State of Wisconsin and with this judicial district such that the exercise of

jurisdiction over Defendant does not offend traditional notions of fair play and substantial

justice.

4. Venue is proper in this judicial district because on information and belief Defendant manufactures, sells and/or distributes infringing products that are sold in this district. 28 U.S.C. § 1331, 1391(b), (c), and 1400(b).

## INFRINGEMENT OF U.S. PATENT NO. 7,074,443

5. On July 11, 2006, the United States Patent & Trademark Office duly and legally issued United States Patent No. 7,074,443 (the "'443 Patent"), entitled "Vented Can Overcap." Kraft is the owner by assignment of the '443 Patent, a true and correct copy of which is attached as Exhibit A.

6. On information and belief, Defendant has infringed and continues to infringe the '443 Patent by, among other things, making, using, offering for sale, and/or selling, or inducing others to make, use, offer for sale, and/or sell, plastic containers containing Defendant's Folgers brand coffee within the United States that are within the scope of one or more claims of the '443 Patent. Defendant is therefore liable for infringement of the '443 Patent. 35 U.S.C. § 271.

7. Defendant's acts of infringement have caused and are continuing to cause monetary damage to Kraft in an amount to be determined at trial. In addition to monetary damages, Defendant's infringement has caused and will, unless enjoined, continue to cause irreparable harm to Kraft's business.

8. On information and belief, to the extent any marking was required by 35 U.S.C. § 287, such requirements have been met and Kraft is entitled to recover damages for infringement occurring prior to the filing of this action in an amount to be proven at trial.

## PRAYER OF RELIEF

WHEREFORE, Kraft prays for the following relief:

1. Judgment in favor of Kraft finding that Defendant has directly and/or indirectly infringed the '443 Patent;

2. A preliminary and permanent injunction enjoining Defendant and its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and

all others acting in concert or privity with any of them, from any further infringement of the '443 Patent.

3.      An award of damages, attorneys' fees, costs and expenses as permitted by law;

4.      An award of pre-judgment and post-judgment interest; and

5.      For all other relief to which the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Kraft requests a trial by jury of any and all issues so triable by right.

Dated:    10/26/07

Anthony A. Tomaselli
QUARLES & BRADY LLP
33 East Main Street, Suite 900
Madison, WI 53703
Telephone: (608) 283-2491
Facsimile: (608) 294-4930

**ATTORNEYS FOR PLAINTIFF**
**KRAFT FOODS GLOBAL, INC.**

OF COUNSEL:

Claude M. Stern
Evette D. Pennypacker
Michael D. Powell
QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

US007074443B2

## (12) United States Patent
Thomas et al.

(10) Patent No.: US 7,074,443 B2
(45) Date of Patent: Jul. 11, 2006

(54) VENTED CAN OVERCAP

(75) Inventors: Jeffrey A. Thomas, Cortlandt Manor, NY (US); Jeffrey Alan Zimmermann, Purdys, NY (US); Piras DeCletr, Sleepy Hollow, NY (US); Mete Bruncaj, Briarcliff Manor, NY (US)

(73) Assignee: Kraft Foods Holdings, Inc., Northfield, IL (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 348 days.

(21) Appl. No.: 10/298,565

(22) Filed: Nov. 19, 2002

(65) Prior Publication Data
US 2004/0096552 A1    May 20, 2004

(51) Int. Cl.
B65D 51/16    (2006.01)
(52) U.S. Cl. .................... 426/118; 426/131; 426/595; 220/203.01; 220/203.29
(58) Field of Classification Search .............. 426/106, 426/118, 131, 395, 594–595; 220/202, 203.01, 220/203.09, 203.29
See application file for complete search history.

(56) References Cited

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 933,103 A | * | 9/1909 | Norton | 220/373 |
| 1,766,473 A | * | 6/1930 | Hilis | 53/432 |
| 1,857,013 A | * | 5/1932 | Gee | 215/260 |
| 2,054,054 A | * | 9/1936 | March | 220/800 |
| 3,077,409 A | * | 2/1963 | Baselt | 426/118 |
| 3,613,938 A | * | 10/1971 | Westcott | 220/785 |
| 3,799,427 A | * | 3/1974 | Goglig | 383/103 |
| 3,850,330 A | | 11/1974 | Koontz et al. | |

| | | | | |
|---|---|---|---|---|
| 4,210,255 A | * | 7/1980 | Pan | 220/203.15 |
| 4,215,537 A | * | 7/1980 | Caccavale | 220/215 |
| 4,234,100 A | | 11/1980 | Chabot | |
| 4,315,578 A | * | 2/1982 | Ludwig, Jr. | |
| 4,444,219 A | * | 4/1984 | Hollenstein | 137/246 |
| 4,522,298 A | * | 6/1985 | Weisberger | 206/216 |
| 4,705,183 A | * | 11/1987 | Rehn | 220/366.1 |
| 5,242,869 A | * | 9/1993 | Hartmapf | 215/260 |
| 5,445,291 A | * | 8/1995 | Daniel | 220/366.1 |
| 5,558,243 A | | 9/1996 | Chu | |
| 5,683,544 A | * | 11/1997 | Boltos et al. | |
| 5,699,632 A | | 12/1997 | Hsieh et al. | |
| 5,782,266 A | * | 7/1998 | Domke | 137/551 |
| 5,862,442 A | * | 11/1999 | Urquhart et al. | 137/246 |
| 6,068,154 A | | 5/2000 | Grabber | |
| 6,089,271 A | * | 7/2000 | Pasi | 137/854 |
| 6,662,827 B1 | * | 12/2003 | Clougherty et al. | 137/859 |

FOREIGN PATENT DOCUMENTS

EP    0 638 274 A1    5/1994

* cited by examiner

Primary Examiner—Drew Becker
(74) Attorney, Agent, or Firm—Stites & Harbison PLLC; Marvin Petry

(57)    ABSTRACT

Packaging for a can containing ground roasted coffee packed under atmospheric pressure and having a flexible peel-off lid which is vented to allow the escape of a buildup of carbon dioxide gases. A spacing structure prevents the vent valve in the lid from being closed by contact with the plastic overcap. The spacing structure may include bosses on the overcap which engage the vent valve or a pocket in the overcap which allows the flexible lid to reach a maximum height without engaging the overcap. A permanently opened passageway may be provided between the plastic overcap and the rim of the can to further facilitate the escape of carbon dioxide.

25 Claims, 6 Drawing Sheets



EXHIBIT

A

**U.S. Patent**     Jul. 11, 2006     Sheet 1 of 6     US 7,074,443 B2



## FIG. 1
### PRIOR ART



FIG. 2
PRIOR ART

FIG. 3
PRIOR ART



FIG. 4



FIG. 5

FIG. 6

FIG. 7

FIG. 11

FIG. 12



FIG. 8



FIG. 10

**U.S. Patent**    Jul. 11, 2006    Sheet 6 of 6    US 7,074,443 B2



*FIG. 9*

US 7,074,443 B2

1

## VENTED CAN OVERCAP

### FIELD OF THE INVENTION

This invention relates to a canned product which generates a gaseous pressure buildup, and to an improved arrangement for venting such gases.

### BACKGROUND OF THE INVENTION

Historically, ground roast coffee packaged in a can has been vacuum packed. Recently, it has been found desirable to freshly package roast ground coffee in cans or other rigid or semi-rigid gas impervious packages under atmospheric pressure as contrasted to the prior vacuum packaged cans. Additionally, it has also been found desirable to close off the top of the can with a flexible peel-off easy opening seal or lid, whether the coffee was packed under a vacuum or atmospheric pressure. Examples of such peel-off easy opening lids are shown in the Bolton et al U.S. Pat. No. 5,688,544.

Packaged ground roast coffee gives off carbon dioxide which, in a sealed confined space will generate a pressure buildup within the container. In the case of vacuum packed ground roast coffee, this generation of carbon dioxide causes no problem because the pressure buildup simply tended to reduce the negative pressure within the sealed container. However, if the product is freshly packaged initially at atmospheric pressure without extensive degassing, then generated carbon dioxide will cause a pressure buildup in the can above atmospheric pressure. In atmospheric pressure packed ground roasted coffee cans now on the market, this pressure buildup caused by the generated carbon dioxide is dealt with by simply placing a vent valve in the top of the can. If the can is of a type having a flexible peel-off seal, the vent valve will be built directly into the flexible peel-off lid.

It is also highly desirable, if not a commercial necessity, to include with any coffee can a plastic overcap which is intended primarily to protect the coffee product within the package after the main airtight seal has been opened.

A problem has developed, however, in the case of a ground roast coffee can having a vented peel-off lid and a plastic overcap. It has been found that as the gas pressure builds up within the can it tends to dome the flexible lid upwardly and eventually against the overcap. This creates several problems. First, the constant extension of the flexible lid in its domed condition deforms the flexible lid, causing a wrinkled appearance which is unacceptable to the consumer. Additionally, the materials used to seal the vent valve to the lid, including silicon-based oils, would tend to be expelled from the valve opening and onto the surface of the overcap. This creates a visual blemish which is also unacceptable to the consumer. Additionally, if the valve is sufficiently blocked, the gas within the can can cause the can itself to bulge outwardly, which again is unacceptable to the consumer.

While a primary problem has been blockage of the vent valve in the flexible easy-off lid, an additional problem arises in that gases which do escape through the lid may not be able to escape from the space between the lid and the overcap. It is true that the overcap is simply snapped over the chime of the can in a non-airtight manner. However, the surfaces of the overcap which engage the chime of the can, generally along the top and outer periphery of the chime, while not forming a hermetic seal, clearly form a closure

2

which resists escape of any generated gases which might exit from the vent valve into the space between the lid of the can and the overcap.

Thus, a need exists for an improved arrangement for venting gases created within a can wherein the product is packed under atmospheric pressure and is of the type which generates gases sufficiently to cause a pressure buildup, especially when such a can is used in combination with an overcap.

### BRIEF SUMMARY OF THE INVENTION

It is a purpose of the present invention to provide a new and improved arrangement for venting gases which build up in a package of the type wherein the product is packaged under atmospheric pressure in a can having a flexible lid with a vent valve and an overcap. More specifically, it is the purpose of the present invention to provide such an improvement for the fresh packaging of ground roast coffee in a can under atmospheric pressure. The term "can" is intended to encompass various types of containers and packages, including the usual cylindrical cans as well as rectangular cans, thin metallic cans of any shape and non-metallic cans.

In accordance with the present invention, an arrangement is provided for preventing the vent valve to be closed off by contact with the overcap. This arrangement comprises a spacing structure preferably formed in or on the bottom of the overcap, which prevents the vent valve in the lid from being closed by contact with the plastic overcap. In one preferred embodiment, this is achieved by providing bosses on the lower, internal surface of the overcap which will engage the flexible lid as it moves upwardly so as to limit such upward movement to such a height that the vent valve remains unblocked and the vented gases are permitted to flow therethrough. Preferably the bosses engage the vent valve in such a way as to block its upward movement while not occluding the vent valve opening. The bosses can take many different shapes such as thin ribs, rectangular cross sections and the like.

In another preferred embodiment, the spacing structure may take the form of a pocket formed in the bottom of the overcap and of such a depth that it allows the flexible lid to reach its maximum height caused by the gas buildup without the flexible lid or the vent valve engaging the overcap.

Additionally, the present invention may include a permanently open passageway at the interface between the overcap and the chime of the coffee can which will allow the escape of any built-up gases which have passed through the vent valve into the space between the flexible lid and the overcap.

In a preferred embodiment, this permanently open passageway between the overcap and the chime of the can can be provided by providing some raised bosses on the inside surface of the plastic overcap precisely where it engages the chime of the can. A series of such bosses, arranged side-by-side, would thereby provide a permanently open passageway between the bosses.

Thus, it is an object of the present invention to provide a new and improved arrangement for venting built-up gases in a can containing a product which generates gases and which can includes a flexible lid and an overcap.

It is another object of the present invention to provide a new and improved arrangement for venting gases from a can of the type described which includes a structure for preventing blockage of a vent valve in the flexible lid.

It is still another object of the present invention to provide an improved venting arrangement in a package of the type described which includes a structure for forming a perma-

| 3 | 4 |

nently open passageways between the interface of the overcap and the chime of the coffee can.

These and other objects of the present invention will become apparent from the detailed description of the preferred embodiments.

## BRIEF DESCRIPTION OF THE DRAWINGS

Preferred embodiments of the present invention are illustrated in the accompanying drawings, wherein:

FIG. 1 is a cross-sectional view through a prior art package illustrating the problem solved by the present invention;

FIG. 2 is a plan view of the vent valve on the flexible lid of FIG. 1;

FIG. 3 is a greatly enlarged cross sectional view of a vent valve of FIGS. 1 and 2, taken along line 3—3 of FIG. 2;

FIG. 4 is a cross sectional view through a package, similar to FIG. 1, but showing the features of the present invention;

FIG. 5 is a top plan view of the overcap of FIG. 4;

FIG. 6 is a partial cross sectional view taken along line 6—6 of FIG. 5;

FIG. 7 is a partial cross sectional view taken along line 7—7 of FIG. 5;

FIG. 8 is a partial plan view of an overcap similar to FIG. 5 but showing a modification of the present invention;

FIG. 9 is a cross sectional view through a package, similar to FIG. 4, but showing a modification of the present invention;

FIG. 10 is a partial plan view of the overcap of FIG. 9;

FIG. 11 is a partial cross sectional view taken along line 11—11 of FIG. 9; and

FIG. 12 is an enlarged view of the upper right-hand portion of FIG. 4, more clearly illustrating certain features of the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring now to the drawings, like elements are represented by like numerals throughout the several views.

FIG. 1 illustrates a conventional can 10 which packages a product 11, for example ground roast coffee, under atmospheric pressure. The normal condition of the can is shown in solid lines. The top of the can is sealed by a flexible peel-off lid 12 formed of a flexible foil material, which lid is hermetically sealed around its periphery to a ledge 14 which is integral with the can 10. In a manner known per se, the easy peel-off lid 12 has a pull tab 15. When a product such as ground roasted coffee is packaged at atmospheric conditions, the carbon dioxide which is naturally given off by the product will cause a gaseous buildup within the interior of the can 10. It is therefore necessary to provide a vent in the form of a vent valve 16 which will permit the built-up carbon dioxide to escape to the space above the flexible lid 12.

A conventional can includes a chime 13 with inner edge 13a and a plastic overcap 20. The overcap engages the chime at contact lines 21 and 22. While these contact lines are not intended to provide a hermetic seal, they do to some extent restrict the flow of gas. The primary purpose of the overcap is to provide some protection for the product after the lid 12 has been removed. The overcap 20 also includes a lower part 23 which hangs below the chime and is not in contact with it.

The can 10 may be of any suitable material such as metal, plastic, composite materials, cardboard or other suitable

materials. Between the time that a can such as that shown in FIG. 1 is initially sealed, until the time that the consumer removes the lid 12, carbon dioxide is being generated within the hermetically sealed interior of the can. Initially, as the carbon dioxide tries to escape through the vent valve 16, the resistance offered by the vent valve 16 would be greater than the resistance offered by upward bending of the flexible lid 12. Eventually, this condition is reached as shown in dotted lines in FIG. 1 whereat the flexible lid 12 has been moved up to a domed position 12' and the vent valve 16 has been moved up against the bottom of the overcap 20 as shown at 16'. At this point, the downward force of the overcap would lead to close off the vent valve 16. This presents two problems. First, the lid 12 will remain in the domed position 12' and thus become deformed, causing a wrinkled appearance which is not acceptable to the consumer. Second, if the vent valve 16 includes a silicone-based oil, such oil will be expelled from the valve and onto the overcap 20. This causes a stain which tends to spread, causing a visual blemish. Additionally, in the case of rectangular cans, thin metallic cans of any shape, and non-metallic cans, a further buildup could cause the sides of the can 10 to bulge outwardly, as represented by dotted lines 10'. Such a bulged out can is also unacceptable to the consumer.

The vent valve is a commercial product made by Plitek, LLC. Referring to FIG. 2, the vent valve is divided into two outer portions 50 which are completely adhered to the top of lid 12 and a central portion 51 which includes a channel therein for the flow of the built-up gases out both ends of the channel, as shown by the arrows in FIG. 2.

The valve 16 is shown in greater detail in FIG. 3. The flexible lid 12 would preferably have openings formed therein in the form of slits 52 of a type as shown in FIG. 14 of the Bolton U.S. Pat. No. 5,688,544. The width of the slits is highly exaggerated in greatly enlarged FIG. 3. In practice, there could be approximately seven small slits, all located in the central portion of the vent valve 16. FIG. 2 illustrates a plurality of slit openings in the lid 12 within a central area designated at 60. Referring to FIG. 3, the vent valve 16 includes an upper membrane 53 of metallic polyethylene terephthalate (PET). Below the membrane 53 is a polyethylene terephthalate valve flap 57 which is adhered by synthetic rubber adhesive 54 to a natural PET base 56 which is in turn adhered to the flexible lid 12 by a pressure sensitive adhesive 56. The inner space between the valve flap 57 and the flexible lid 12 just above the slits 52 is filled with a silicone-based oil with graphite suspension. In practice, gas escaping through the flexible lid 12 will flow through an opening in the valve flap 57 and then outwardly through the ends of central portion 51 between the valve flap 57 and the membrane 53. The portions 50 and 51 are indicated by vertical dotted lines in FIG. 3.

Solutions to the problem described above are illustrated in FIGS. 4–12.

Referring to FIGS. 4–7, there is provided an overcap 30. A vent valve 16 of the type described in FIGS. 2 and 3 is superimposed in dotted lines on FIG. 5. Formed on the underside of the overcap 30 (and referring also to FIGS. 6 and 7, there are provided a plurality of thin rib bosses 31, 32 and 33. Referring to FIGS. 4 and 5, a highly domed position of the lid 12, the vent valve 16 will engage the thin rib bosses 31, 32 and 33, thus keeping the vent valve 16 spaced beneath the actual undersurface of the overcap 30. By providing three bosses 31, 32 and 33, and by placing them at 120° from each other around the center of the overcap, it is assured that at any given rotational position, while one of the thin ribs might well engage and prevent gas from flowing through

US 7,074,443 B2

5

one end of the central channel portion 51, the other end thereof will always be unobstructed for the flow of the escaping built-up gases.

The rib bosses 31–33 are all identical, and one of them is shown in detail in FIGS. 6 and 7. In a preferred embodiment, each rib boss would have a thickness of approximately 0.01 inches, a height of 0.04 inches and a width at its bottom of approximately 0.01 inches.

FIG. 8 illustrates a modification of the present invention. In this case, there is provided an overcap 40 which differs from the overcap 30 in that the thin rib bosses 31, 32 and 33 have been replaced by square cross section bosses as shown at 41, 42 and 43 in FIG. 8. These could for example have a side dimension of 0.06 inches and a depth, the same as in FIGS. 4–7, of approximately 0.04 inches. The bosses may also have other polygonal or round shapes. Referring to FIG. 8, it is noted that the three bosses 41, 42 and 43 are arranged in a triangular pattern, positioned at the top side of the overcap 40. Here, the vent valve 16 is turned relative to its orientation in FIGS. 4 and 5. However, owing to the arrangement of the bosses 41, 42 and 43, even though one of them, in this case 43, engages the central portion 51, the other two bosses 41 and 42 are so situated as to permit gas to flow out through the other end of central portion 51.

In the package of FIG. 4, the flexible lid 12, upon original sealing of the can, would be in the downwardly curved position as shown in solid lines in FIG. 1. However, FIG. 4 is intended to illustrate in solid lines only the position when the carbon dioxide has caused sufficient upward movement of the flexible lid 12 to the height whereat the vent valve 16 has engaged the bosses 31, 32 and 33.

FIGS. 9 and 10 illustrate another embodiment of the present invention. In this embodiment, an overcap 45 includes a pocket 46 which is sufficiently deep that the vent valve 16, even in its uppermost domed position, will never engage the bottom of pocket 46 and hence will not engage the bottom of overcap 45. The location and depth of pocket 46 must be selected so that in the uppermost position of the lid 12 and valve 16, there is an open passageway through the vent valve 16, below the edges of the pocket 46 and out toward the periphery of the can. The pocket would preferably have a height of between ¼ and ½ inch.

As noted above, the contact lines 21 and 22 between the chime of the can and the interior of the overcap 30, 40, 45, while not forming a hermetic seal, do offer some resistance to the flow of gases. Referring to FIGS. 11 and 12, with the vent valve 16 unblocked (by the use of bosses 31–33 or 41–43, or pocket 46), permitting free flow of the carbon dioxide out of the can and into the space between the flexible lid 12 and the overcap 30, 40, 45, it is possible that the gases can build up to a pressure sufficient to pass beyond contact lines 21 and 22. However, in order to facilitate the flow of gases out of the space between the overcap 30, 40, 45 and the lid 12, the present invention further includes providing a permanently opened passageway from this inner space to the surrounding exterior. For this purpose, raised elongated bosses 35 and 36 are provided on the top and side of the interior of the overcap 30, 40, 45 where the overcap engages the chime 13 at contact lines 21 and 22. Gases entering this inner space between lid 12 and overcap 30, 40, 45 now have a permanently opened passageway for flowing out of this space. This flow from the vent valve 16 up and around the chime 13 is shown by arrows at the upper right hand portion of FIG. 2 and by arrows A in FIG. 7.

Although the invention has been described in considerable detail, it will be apparent that the invention is capable

6

of numerous modifications and variations, apparent to those skilled in the art, without departing from the spirit and scope of the invention.

What is claimed is:

1. A can containing a food product which creates a gas buildup, the top of the can comprising a flexible lid having a vent valve to vent built-up gases, an overcap covering the lid and engaging the sides of the can around the periphery thereof, the overcap including a spacing structure inward from an inner edge of the periphery which prevents the vent valve from being blocked by gases when the lid is pushed toward the overcap by gases built-up within the can.

2. A can according to claim 1, said spacing structure comprising a plurality of bosses on the overcap positioned to be engaged by the flexible lid to block further upward movement thereof, and to allow gases passing through the vent valve to flow toward the periphery of the can.

3. A can according to claim 2, wherein the bosses are positioned to engage the vent valve without occluding gas flow therethrough.

4. A can according to claim 3, wherein there are three bosses which are arranged equiangularly about the center of the overcap.

5. A can according to claim 4, wherein the bosses, viewed in plan view, are thin ribs extending along radii of the overcap.

6. A can according to claim 4, wherein the bosses are, in plan view, rectangular.

7. A can according to claim 1, wherein the spacing structure comprises a pocket formed in the bottom of the overcap which is of sufficient depth to allow the flexible lid to reach a maximum height of the lid caused by the gas buildup without the flexible lid or the vent valve engaging the overcap.

8. A can according to claim 1, wherein the product is ground roast coffee.

9. A can according to claim 1, including a permanently opened passageway from the space between the lid and overcap around the top rim of the can to the exterior.

10. A can according to claim 9, said passageway being formed between raised bosses formed in the overcap where the overcap engages the top rim of the can.

11. A can according to claim 1, wherein the lid does not contact the overcap to block the valve from opening when gases build up within the can.

12. The can of claim 1, wherein the flexible lid is a peelable lid.

13. The can of claim 1, wherein the flexible lid comprises flexible foil.

14. A can containing a food product which creates a gas buildup, the top of the can comprising a flexible lid having a vent valve to vent built-up gases and a chime around the periphery of the top, an overcap covering the lid, and a lower portion extending down along the sides of the can and engaging the sides of the can around the periphery thereof, and including a permanently opened passageway from the space between the lid and the overcap to the exterior, said passageway extending over the chime and down inside the lower portion of the overcap to empty out along the side of the can, said passageway being formed between raised bosses formed in the overcap which engage the top rim of the can.

15. A can containing roast ground coffee packed at atmospheric pressure and generating a carbon dioxide gas buildup,

US 7,074,443 B2

7

a flexible lid hermetically sealing the top of the can and including a vent valve allowing the escape of built-up carbon dioxide, and

an overcap covering the top of the can and engaging the can around the upper rim thereof, the overcap including a spacing structure inward from an inner edge of the rim which prevents the vent valve from being blocked by the overcap when the lid is pushed up toward the overcap by the pressure of the built-up carbon dioxide.

16. A can according to claim 15, said spacing structure comprising a plurality of bosses on the overcap positioned to be engaged by the flexible lid to block further upward movement thereof, and to allow gases passing through the vent valve to flow toward the periphery of the can.

17. A can according to claim 16, wherein the bosses are positioned to engage the vent valve without occluding the flow of carbon dioxide therethrough.

18. A can according to claim 17, wherein there are three bosses which are arranged equiangularly about the center of the overcap.

19. A can according to claim 18, wherein the bosses, viewed in plan view, are thin ribs extending along the radii of the overcap.

20. A can according to claim 18, wherein the bosses are, in plan view, rectangular.

21. A can according to claim 15, wherein the spacing structure comprises a pocket formed in the bottom of the

8

overcap which is of sufficient depth to allow the flexible lid to reach a maximum height of the lid as caused by the carbon dioxide buildup without the flexible lid or the vent valve engaging the overcap.

22. A can according to claim 15, including a permanently opened passageway from the space between the lid and overcap around the top rim of the can to the exterior.

23. A can containing a food product which creates a gas buildup, the top of the can comprising a flexible lid having a vent valve to vent built-up gases, an overcap covering the lid and engaging the sides of the can around the periphery thereof, the overcap including a spacing structure which prevents the vent valve from being blocked by the overcap when the lid is pushed toward the overcap by gases built-up within the can; said spacing structure being positioned such that said spacing structure is not engaged by the valve when the lid is pushed toward the overcap by the gases built-up within the can.

24. A can according to claim 23, wherein the spacing structure is circular.

25. A can according to claim 23, wherein the product is ground roast coffee.

*   *   *   *   *

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| KRAFT FOODS HOLDINGS, INC., | Case No. 07C0613S |
| Plaintiff, | |
| v. | |
| THE PROCTER & GAMBLE COMPANY, | **ANSWER, COUNTERCLAIMS, AND THIRD-PARTY COMPLAINT OF THE PROCTER & GAMBLE COMPANY;** |
| Defendant | **DEMAND FOR JURY TRIAL** |
| | |
| THE PROCTER & GAMBLE COMPANY, | |
| Counterclaim Plaintiff | |
| v. | |
| KRAFT FOODS HOLDINGS, INC. | |
| Counterclaim Defendant | |
| and | |
| KRAFT FOODS GLOBAL, INC. | |
| Third-Party Defendant | |

Defendant and Counterclaim Plaintiff, The Procter & Gamble Company ("P&G"),

answers the Complaint of Plaintiff Kraft Foods Holdings, Inc. ("KFH") and asserts its

Counterclaim and Third-Party Claim against KFH and Third-Party Defendant Kraft Foods

Global, Inc. ("KFG"), as follows:

## THE PARTIES

1.     P&G admits that KFH is a Delaware Corporation and that it has a principal place

of business in Northfield, Illinois.  P&G otherwise denies the allegations of paragraph 1.

2.    Admitted.

## JURISDICTION AND VENUE

3.    P&G admits that Plaintiffs purports to allege a cause of action under the patent laws of the United States.  P&G admits that Plaintiffs purports to invoke subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).  P&G admits that it is subject to personal jurisdiction in this Court with respect to the claims asserted in the Complaint.  P&G denies the remaining allegations of paragraph 3, including that it has committed any acts of infringement.

4.    P&G also admits that venue exists in this judicial district under 28 U.S.C. 1331, 1391(b), (c), and 1400(b).  P&G denies the remaining allegations in paragraph 4 of the Complaint.

## ALLEGED INFRINGEMENT OF U.S. PATENT NO. 7,074,443

5.    P&G admits that U.S. Patent No. 7,074,443 (the "'443 Patent"), entitled "Vented Can Overcap," issued on July 11, 2006.  P&G further admits that the face of the '443 Patent lists KFH as the "Assignee."  P&G is without knowledge or information sufficient to form a belief as to the truth of KFH's allegation that it is owns the patent.  P&G denies the remaining allegations of paragraph 5 of the Complaint.

6.    P&G denies the allegations of paragraph 6 of the Complaint.

7.    P&G denies the allegations of paragraph 7 of the Complaint.

8.    P&G denies the allegations of paragraph 8 of the Complaint.

## RESPONSE TO PRAYER FOR RELIEF

P&G denies that Plaintiffs are entitled to any of the relief they have requested.

## FIRST AFFIRMATIVE DEFENSE

### (Invalidity)

Each claim of the '443 Patent is invalid and/or unenforceable for failure to comply with the requirements of patentability stated in Title 35, United States Code, and particularly the requirements of one or more of 35 U.S.C. §§ 101, 102, 103, and 112.

## SECOND AFFIRMATIVE DEFENSE

### (Non-Infringement of the '443 Patent)

P&G has not infringed, and currently does not infringe any valid claim of the '443 Patent directly, indirectly, contributorily, by inducement, under the doctrine of equivalents, or in any other manner.

## THIRD AFFIRMATIVE DEFENSE

### (Prosecution history estoppel)

Plaintiffs are estopped by the doctrine of prosecution history estoppel from asserting infringement under the doctrine of equivalents for one or more of asserted claims.

## FOURTH AFFIRMATIVE DEFENSE

### (Marking)

Plaintiffs and/or their licensees have failed to mark articles patented under the '443 Patent in a manner sufficient to give notice under 35 U.S.C. Section 287 thereby barring any recovery of damages for the period before Plaintiffs commenced this action.

## PRAYER FOR RELIEF ON KFH'S COMPLAINT

WHEREFORE, P&G prays that Plaintiffs take nothing by their Complaint, and that P&G be awarded judgment in this action, costs of suit incurred herein, and such other relief as the Court deems just and proper.

## COUNTERCLAIMS

For its counterclaims and third-party claim against KFH and KFG, P&G alleges as follows:

## THE PARTIES

1.    P&G is an Ohio corporation with its principal place of business in Cincinnati, Ohio.

2.    KFH is a Delaware corporation with a principal place of business in Northfield, Illinois.

DM_US:20847607_1

3.    KFG is a Delaware corporation with a principal place of business in Northfield, Illinois.

4.    On information and belief, KFG is a wholly-owned subsidiary of Kraft Foods Inc., a Virginia Corporation, which is engaged, through its subsidiaries, in the manufacture and sale of packaged foods and beverages in the United States, including Maxwell House brand ground, roast coffee in 39-ounce plastic containers. On information and belief, KFH is a wholly-owned subsidiary of KFG.

5.    KFH is the assignee of record of the '443 Patent, issued to Jeffrey A. Thomas, Jeffrey Alan Zimmermann, Prias DeCleir, and Mete Bruncaj ("Assignors"). On information and belief, the Assignors, working either directly or indirectly for KFH in collaboration with members of the Global Technology & Quality Group of Kraft Foods Inc., designed and made plastic containers for ground, roast coffee beginning in about 2002 and assigned the rights to those designs to KFH. On information and belief, KFH licensed KFG to manufacture, distribute, offer for sale and sell Maxwell House brand coffee sold in 39-ounce containers using technology developed for KFH by the Assignors. On information and belief, KFG manufactures, markets, and sells Maxwell House brand coffee in 39-ounce plastic containers designed, developed, and made by the Assignors and licensed to KFG by KFH.

## JURISDICTION AND VENUE

6.    Paragraphs 1 through 5 are incorporated herein by reference.

7.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, including 35 U.S.C. § 271 *et seq.* The Court additionally has jurisdiction over P&G's counterclaims because they arise under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202 and 28 U.S.C. § 1338(a). There is a justiciable controversy concerning the validity, enforceability, and infringement of the '443 Patent, which Plaintiffs allege is being infringed and causing irreparable harm to their business.

8.    The Court has personal jurisdiction over KFH and KFG based on their filing of this lawsuit. The Court also has personal jurisdiction over KFH and KFG because they have systematic and continuous contacts with the State of Wisconsin and with this judicial district such that the exercise of jurisdiction over them does not offend traditional notions of fair play and substantial justice. On information and belief, KFH licenses KFG to sell and/or distribute infringing products in this district and KFG sells and/or distributes infringing products in this district.

9.    Venue with respect to KFH and KFG is proper in this district pursuant to 28 U.S.C. §§ 1331, 1391(b), (c) and 1400(b).

## COUNT I

### (Declaratory Relief of Invalidity of '443 Patent Against Kraft Foods Holding, Inc. and Kraft Foods Global, Inc.)

10.    Paragraphs 1 through 9 are incorporated herein by reference.

11.    An actual controversy exists between P&G and KFH and KFG as a result of KFH and KFG's assertion in the Complaint that they own the '443 Patent, that P&G allegedly infringes this patent, and that the alleged infringement is causing irreparable harm to their business.

12.    On information and belief, the asserted claims of the '443 Patent are invalid for failure to comply with the requirements of patentability stated in Title 35, United States Code, and particularly one or more of the requirements of 35 U.S.C. §§ 101, 102, 103, and 112.

13.    The claims of the '443 Patent are based on an application filing date identified by the patent as November 19, 2002. On information and belief, one or more of the claimed inventions of the '443 Patent are invalid under 35 U.S.C. § 102(g) based on prior invention by P&G's inventors, including P&G inventors who were awarded United States Patent 7,169,419 ("the '419 Patent"), entitled "Packaging System To Provide Fresh Packed Coffee." A true and correct copy of the '419 Patent is attached hereto as Exhibit A. On information and belief, P&G's inventors made one or more of the inventions claimed in the '443 Patent in this country

and did not abandon, suppress, or conceal the inventions. Based on the assertion of infringement by KFH and KFG, the '419 Patent discloses one or more of the inventions claimed in the '443 Patent.

## COUNT II

### (Declaratory Relief of Non-Infringement Against Kraft Foods Holding, Inc. and Kraft Foods Global, Inc.)

14.    Paragraphs 1 through 13 are incorporated herein by reference.

15.    KFH and KFG assert in their Complaint that P&G infringes the '443 Patent. P&G does not infringe and has not infringed any valid claims of the '443 Patent.

## COUNT III

### (Infringement of U.S. Patent No. 7,169,419 By Kraft Foods Holding, Inc. and Kraft Foods Global, Inc.)

16.    Paragraphs 1 through 15 are incorporated herein by reference.

17.    On January 30, 2007, the United States Patent & Trademark Office ("USPTO") duly and legally issued the '419 Patent to inventors David Dalton, Kerry Weaver and Thomas Manske, Jr. These inventors have assigned all rights and interest in the '419 Patent to P&G. KFG has infringed and continues to infringe the '419 Patent. The infringing acts include at least manufacturing, using, selling, and/or offering to sell 39-ounce plastic containers of Maxwell House brand coffee. KFG is liable for infringement of the '419 Patent pursuant to 35 U.S.C. § 271.

18.    KFG's acts of infringement have caused and are causing damage to P&G. P&G is entitled to recover from KFG the damages sustained by P&G as a result of KFG's infringement in an amount to be proven at trial. KFG's infringement of P&G's rights under the '419 Patent also is causing, and will continue to cause, irreparable harm to P&G, for which there is no adequate remedy at law, unless KFG is enjoined by this Court.

19.     Upon information and belief, KFG's infringement of the '419 Patent is willful and deliberate, entitling P&G to increased damages under 35 U.S.C. § 284 and attorney fees incurred in prosecuting this action under 35 U.S.C. § 285.

20.     On information and belief, KFG is the alter ego of KFH and they are jointly and severally liable for directly infringing the '419 Patent.  On information and belief, KFH is a wholly-owned subsidiary of KFG and has substantially the same management and ownership, is commonly controlled by that management and ownership, and shares substantially the same business purpose with respect to the procurement of infringing technology for storing ground, roast coffee in plastic containers, the defense of litigation relating to this infringement, and the assertion of patent infringement claims relating to this technology.  On information and belief, KFH and KFG do not maintain corporate formalities with respect to their development and procurement of technology and intellectual property and the conduct of litigation regarding to intellectual property relating to plastic containers used for storing ground, roast coffee.  KFH pursues this lawsuit as "KRAFT FOODS GLOBAL, INC.," as indicated on page 3 of its Complaint.  KFH also considers itself synonymous with "Plaintiff Kraft Foods Global, Inc.," as it states in its Corporate Disclosure Statement.  In identifying the parent corporation of the plaintiff, Kraft Foods Global, the Corporate Disclosure Statement states that "Kraft Foods Global, Inc. is a wholly owned subsidiary of Kraft Foods, Inc., a publicly traded company."  Any attempt by KFG and KFH to rely on the fiction of being separate corporate entities would be inequitable in that it could allow KFH to accuse P&G as an alleged infringer in a litigation in which it may avoid having to answer for its own infringement of P&G's related '419 Patent on preexisting technology.

21.     On information and belief, KFH, during the process of developing technology described in its patents relating to the storing of ground, roast coffee in plastic containers, including the '443 Patent, has infringed the '419 Patent by making or using one or more of the claimed inventions of the '419 Patent.

22.     On information and belief, KFH, with knowledge of the '419 Patent, actively induced and encouraged KFG's infringement of the '419 patent by licensing KFG to use technology that infringes the '419 Patent by making, selling, and offering to sell ground, roast coffee in plastic containers that infringe the '419 Patent, and by making designs and information for practicing that technology available to KFG.

23.     On information and belief, KFH's infringement of the '419 Patent is willful and deliberate, entitling P&G to increased damages under 35 U.S.C. § 284 and attorney fees incurred in prosecuting this action under 35 U.S.C. § 285.

## PRAYER FOR RELIEF AS TO COUNTS I -III

WHEREFORE, P&G prays for judgment and seeks relief against KFH and KFG as follows:

(a)     That the Court determine and declare that one or more of the claims of the '443 Patent is invalid;

(c)     That the Court determine and declare that the claims of the '443 Patent are not infringed by P&G;

(b)     For preliminary and permanent injunctions enjoining the aforesaid acts of infringement by KFH and KFG, and their officers, agents, servants, employees, subsidiaries and attorneys, and those persons acting in concert with KFH and KFG, including related individuals and entities, customers, representatives, dealers, and distributors;

(c)     For an award of actual damages against KFH and KFG;

(d)     For an award of pre-judgment and post-judgment interest, according to proof against KFH and KFG,

(e)     For an award of enhanced damages pursuant to 35 U.S.C. § 284 against KFH and KFG;

(f)     For an award of attorney fees pursuant to 35 U.S.C. § 285 or as otherwise permitted by law against KFH and KFG;

(g)     For all costs of suit against KFH and KFG; and

(h)    For such other and further relief as the Court may deem just and proper.

DATED: 31 October 2007    Respectfully submitted,

By_____

Paul F. Linn
Charles J. Crueger
Michael Best & Friedrich, LLP
100 East Wisconsin Avenue
Suite 3300
Milwaukee, WI 53202-4108

Of Counsel:
Mark D. Wegener (application to practice in this
district pending)
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, DC 20004
Telephone: (202) 383-0800
Facsimile: (202) 383-6610

William C. Rooklidge (application to practice in
this district pending)
Greg C. Cordrey (application to practice in this
district pending)
Ben M. Davidson (application to practice in this
district pending)

HOWREY LLP
2020 Main Street, Suite 1000
Irvine, CA 92614
Telephone: (949) 721-6900
Facsimile: (949) 721-6910

## JURY DEMAND

P&G demands a jury trial on all issues that are triable by right to a jury.

DATED: 31 October 2007    Respectfully submitted,

By _____

Paul F. Linn
Charles J. Crueger
Michael Best & Friedrich, LLP
100 East Wisconsin Avenue
Suite 3300
Milwaukee, WI 53202-4108

Of Counsel:
Mark D. Wegener (application to practice in this
district pending)
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, DC 20004
Telephone: (202) 383-0800
Facsimile: (202) 383-6610

William C. Rooklidge (application to practice in
this district pending)
Greg C. Cordrey (application to practice in this
district pending)
Ben M. Davidson (application to practice in this
district pending)

HOWREY LLP
2020 Main Street, Suite 1000
Irvine, CA 92614
Telephone: (949) 721-6900
Facsimile: (949) 721-6910



US007169419B2

(12) **United States Patent**
    Dalton et al.

(10) Patent No.: **US 7,169,419 B2**
(45) Date of Patent: ***Jan. 30, 2007**

(54) **PACKAGING SYSTEM TO PROVIDE FRESH PACKED COFFEE**

(75) Inventors: **David Andrew Dalton**, Loveland, OH (US); **Kerry Lloyd Weaver**, Florence, KY (US); **Thomas James Manske, Jr.**, Mason, OH (US)

(73) Assignee: **The Procter and Gamble Company**, Cincinnati, OH (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 19 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: 10/726,309

(22) Filed: Dec. 2, 2003

(65) **Prior Publication Data**

US 2004/0137110 A1    Jul. 15, 2004

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 10/155,338, filed on May 24, 2002.

(60) Provisional application No. 60/295,666, filed on Jun. 4, 2001.

(51) Int. Cl.
    B65D 83/00    (2006.01)
    B65D 85/00    (2006.01)

(52) U.S. Cl. .................. 426/110; 426/118; 426/127

(58) Field of Classification Search ............ 426/110, 426/118, 127, 126, 395, 396, 398; 220/495.03, 220/227, 366.1
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 3,944,127 A | * | 3/1976 | Bauke et al. | 206/205 |
| 4,890,752 A | * | 1/1990 | Ota et al. | 215/384 |
| 4,966,780 A | * | 10/1990 | Hargraves et al. | 426/118 |
| 5,085,034 A | * | 2/1992 | Haas | 53/452 |
| 5,160,767 A | * | 11/1992 | Genske et al. | 428/35.9 |
| 6,733,803 B1 | * | 5/2004 | Vidigaer | 426/62 |

OTHER PUBLICATIONS

Macks' Standard Handbook for Mechanical Engineers (10th Edition). McGraw Hill (1996) [retrieved from online Aug. 18, 2004] Table 6.12.1 URL <http://www.knovel.com/knovel2/Toc.jsp?SpaceID=162&BookID=346>.*
"The Blow Molding Process". 2000. [retrieved from Internet on Aug. 10, 2004] URL <http://www.oxfordsource.com/Home/Design/Blow_Molding/blow_molding.html>.*

* cited by examiner

*Primary Examiner*—Arthur L. Corbin
(74) *Attorney, Agent, or Firm*—Ingrid N. Hackett; Carl J. Roof; Peter D. Meyer

(57) **ABSTRACT**

A packaging system useful for roast and ground coffee, having a container with a closed bottom, an open top, and a body enclosing a perimeter between the bottom and the top. An annular protuberance is disposed upon the body and is continuously disposed around the perimeter of the body proximate to the top. The protuberance forms a surface external to the body. The surface is substantially perpendicular to the longitudinal axis of the container. A flexible closure is removeably attached and sealed to the protuberance so that the closure seals the interior volume of the container.

**18 Claims, 10 Drawing Sheets**





EXHIBIT
A



Fig. 1



Fig. 2



Fig. 3



Fig. 4



Fig. 5



Fig. 6

**U.S. Patent**        Jan. 30, 2007        Sheet 4 of 10        US 7,169,419 B2



Fig. 7



Fig. 7A



Fig. 8



Fig. 8A



Fig. 9



Fig. 9A



Fig. 10



Fig. 11



Fig. 12



Fig. 13

US 7,169,419 B2

1

# PACKAGING SYSTEM TO PROVIDE FRESH PACKED COFFEE

## CROSS REFERENCE TO PRIOR APPLICATIONS

This application is a continuation-in-part of U.S. patent application Ser. No. 10/155,338, filed on May 24, 2002 (currently pending), which claims the benefit of U.S. Provisional Application Ser. No. 60/295,666, filed Jun. 4, 2001.

## FIELD OF THE INVENTION

The present invention relates to a packaging system useful for packing fresh roast and ground coffee. The present invention still further relates to a more convenient, light-weight container that provides increased strength per mass unit of plastic for the transport of freshly roast and ground coffee.

## BACKGROUND OF THE INVENTION

Packages such as cylindrical cans for containing a particulate product under pressure, such as roast and ground coffee, are representative of various articles to which the present invention is applicable. It is well known in the art that freshly roasted and ground coffee evolves substantial amounts of oils and gases, such as carbon dioxide, particularly after the roasting and grinding process. Therefore, roast and ground coffee is usually held in storage bins prior to final packing to allow for maximum off gassing of these volatile, natural products. The final coffee product is then placed into a package and subjected to a vacuum packing operation.

Vacuum packing the final coffee product results in reduced levels of oxygen in the headspace of the package. This is beneficial, as oxygen reactions are a major factor in the staling of coffee. A common package used in the industry is a cylindrical, tin-plated, and steel stock can. The coffee is first roasted, and then ground, and then vacuum packed within a can, which must be opened with a can opener, common to most households.

Packing coffee immediately after roasting and grinding provides substantial process savings, as the coffee does not require storage to complete the off-gas process. Also, the off-gas product usually contains high quantities of desirable volatile and semi-volatile aromatic compounds that easily volatilize and prevent the consumer from receiving the full benefit of the coffee drinking process. Furthermore, the loss of these aromatic compounds makes them unavailable for release in a standard container, thereby preventing the consumer from the full reception of the pleasurable burst of aroma of fresh roast and ground coffee. This aroma burst of volatile compounds is much more perceptible in a pressurized package than in a vacuum packed package.

It is therefore an object of the present invention to provide a handled package for roast and ground coffee that provides a lighter weight, fresher packing, easier-opening, peelable seal), and "burpable" closure alternative to a standard heavy can.

## SUMMARY OF THE INVENTION

The present invention relates to a fresh packaging system for roast and ground coffee.

The present invention also relates to a method for packing coffee using the fresh packaging system for roast and ground coffee.

2

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an exploded perspective view of a preferred embodiment of the fresh packing system in accordance with the present invention;

FIG. 2 is an exploded perspective view of an alternative embodiment of the fresh packing system;

FIG. 3 is a cross-sectional view of an exemplary closure and one-way valve assembly for the fresh packing system;

FIG. 4 is a cross-sectional view of an exemplary overcap assembly for a fresh packing system;

FIG. 5 is an expanded, cross-sectional view of the region labeled 5 in FIG. 4 of the overcap in an applied position;

FIG. 6 is an expanded, cross-sectional view of the region labeled 5 in FIG. 4 of the overcap in an expanded position;

FIG. 7 is an elevational view of an alternative embodiment of the fresh packing system;

FIG. 7A is a bottom planar view of the embodiment of FIG. 7;

FIG. 8 is a perspective view of an alternative embodiment of the fresh packing system;

FIG. 8a is a perspective view of an alternative embodiment of the fresh packing system;

FIG. 9 is an isometric view of an alternative exemplary overcap for use with a fresh packing system;

FIG. 9a is a bottom planar view of the alternative exemplary overcap of FIG. 9;

FIG. 10 is a cross-sectional view of the region labeled 10 in FIG. 9 in contact with a fresh packaging system;

FIG. 11 is a perspective view of an alternative embodiment of the fresh packaging system;

FIG. 12 is a cross-sectional view of FIG. 11 along line 12—12; and,

FIG. 13 is a cross-sectional view of another exemplary overcap assembly for a fresh packing system.

## DETAILED DESCRIPTION OF THE INVENTION

The present invention is related to a fresh packaging system for roast and ground coffee. The packaging system comprises a container comprising a closed bottom, and open top and a body having an enclosed perimeter between the bottom and the top where the top, bottom, and body together define an interior volume. A flexible closure is removably attached and sealed to a protuberance disposed around the perimeter of the body proximate to the top. The container bottom and body are constructed from a material having a tensile modulus number ranging from at least about 35,000 (2,381 atm) pounds per square inch to at least about 650,000 pounds per square inch (44,230 atm), which provides a top load capacity of at least about 16 pounds (7.3 Kg).

The invention is more generally related to a method for the packing of coffee using the container of the present invention. The method steps include filling the container system described above with roast and ground coffee, flushing the container with an inert gas, and sealing the container with a flexible closure.

The invention is also related to an article of manufacture that provides the end user with beneficial coffee aroma characteristics. The article comprises a closed bottom, an open top, and a polyolefin body forming an enclosed perimeter between said bottom and top together defining an interior volume. The body includes a protuberance continuously disposed around the perimeter of the body proximate to the top. A flexible closure is removably attached to the protuberance so that the closure forms a seal with the

3

protuberance. Roast and ground coffee is contained within the interior volume and, the article of manufacture has an overall coffee aroma value of at least about 5.5. (A method for measuring the overall coffee aroma value is described in the Test Methods section, infra.)

The purpose of the present invention, inventive method, and article of manufacture is to provide a useful benefit to the user that includes, but is not limited to, providing a roast and ground coffee with a perceived more fresh and aromatic flavor. Such a container system of the present invention also provides an easy to use and low cost means of delivery of a roast and ground coffee to an end user.

Preferably, but optionally, the container has a handle element disposed thereon. More preferably the handle element is integral with the body of the container. This handle element facilitates gripping of the container system by the end user. This gripping is particularly useful for users with small hands or hands in a weakened condition due to illness, disease, or other medical malady.

Optionally, but preferably, the present invention features a one-way valve located within the closure to release excess pressure built up within the container due to the natural off gas process of roast and ground coffee. It is also believed that changes in external temperature and altitude can also cause the development of pressure internal to the container. The one-way valve is selected to release coffee off gas in excess of a predetermined amount however, remains sealed after such a release, thereby retaining an aromatically pleasing amount of off gassed product within the container.

Another optional, but preferred, feature of the present invention is an overcap placed over the closure. The overcap can comprise a dome, or cavity, that allows positive, outward deformation of the closure due to the pressure build-up within the container. The overcap is preferably air tight and flexible to allow for easy application to a closure, either with, or without, a closure, and by the end user, after end user removal, of a closure. A flexible overcap can also allow the end user to remove excess air by compressing the dome, thereby releasing excess ambient air from the previously open container (burping). However, the overcap can also exhibit less flexibility or be inflexible. The overcap also provides for a tight seal against the rim of the container after opening by the end user. This tight seal prevents pollution of the rim, resulting in an undesirable expectoration of the overcap after application. The overcap can also optionally allow for stacking several container embodiments when the closure and the dome portion of the overcap are at a point of maximum deflection. The overcap also optionally has a vent to allow for easy removal of vented off gas product trapped between the closure and overcap assemblies, but still allows for "burping."

In a preferred embodiment, the overcap can have a rib disposed proximate to and along the perimeter of the overcap defining an inner dome portion and an outer skirt portion. The rib forms a hinge-like structure so that outward deflection of the inner dome portion caused by deflection of the closure due to coffee off gassing causes the rib to act as a cantilever for the skirt portion. Thus, outward deflection of the dome portion causes the skirt portion to deflect inwardly on an outer portion of the container wall, resulting in an improved seal characteristic and improves retaining forces of the overcap with respect to the container.

The Container

Referring to FIG. 1, fresh packaging system 10, generally comprises a container 11 made from a compound, for example, a polyolefin. Exemplary and non-limiting com-

4

pounds and polyolefins that can be used for producing the present invention include polycarbonate, linear low-density polyethylene, low-density polyethylene, high-density polyethylene, polyethylene terephthalate, polypropylene, polystyrene, polyvinyl chloride, co-polymers thereof, and combinations thereof. It should be realized by one skilled in the art that container 11 of the present invention can take any number of shapes and be made of any number of suitable materials. Container 11 generally comprises an open top 12, a closed bottom 13, and a body portion 14. Open top 12, closed bottom 13, and body portion 14 define an inner volume in which a product is contained. Also, closed bottom 13 and body portion 14 are formed from a material having a tensile modulus ranging from at least about 35,000 pounds per square inch (2,381 atm) to at least about 650,000 pounds per square inch (44,230 atm), more preferably from at least about 40,000 pounds per square inch (2,721 atm) to at least about 260,000 pounds per square inch (17,692 atm), and most preferably ranging from at least about 95,000 pounds per square inch (6,464 atm) to at least about 150,000 pounds per square inch (10,207 atm). Tensile modulus is defined as the ratio of stress to strain during the period of elastic deformation (i.e., up to the yield point). It is a measure of the force required to deform the material by a given amount and is thus, a measure of the intrinsic stiffness of the material.

It is preferred that bottom portion 13 be disposed concave inwardly, or recessed, towards the inner volume so that undesirable deflections caused by pressure increases within the inner volume are minimized. If the bottom 13 expands outwardly sufficiently, causing the bottom 13 to concave outwardly, then the container 11 will develop what is generally referred to in the art as "rocker bottom." That is, if the bottom 13 deflects outwardly so that the container system 10 will not be stable while resting on a flat surface, fresh packaging system 10 will tend to rock back and forth.

As shown in FIG. 7A, a plurality of protrusions 40 can be disposed on the closed bottom 13 of container 11 about the longitudinal axis of container 11. In a preferred embodiment, protrusions 40 form an oblique angle with the closed bottom 13 of container 11. If the container 11 assumes a cylindrical shape, it is believed that protrusions 40 can be rectilinearly disposed about the diameter of the closed bottom 13 of container 11. However, one of skill in the art would realize that protrusions 40 could be disposed on the closed bottom 13 of container 11 in any geometrical arrangement. Without wishing to be bound by theory, it is believed that protrusions 40 can protrude past the geometry of the closed bottom 13 of container 11 upon an outward deflection of the closed bottom 13 of container 11. In this way container 11 can maintain a stable relationship with other surfaces should "rocker bottom" be realized upon the development of an outward pressure from within container 11. While the preferred embodiment utilizes four protrusions 40 disposed on closed bottom 13, it should be realized by one of skill in the art that virtually any number of protrusions 40 could be disposed on closed bottom 13 to yield a stable structure upon outward deflection of closed bottom 13. Additionally, protrusions 40 could be a square, triangular, elliptical, quad-lobe, pentaloid, trapezoidal, arranged in multiply nested configurations, provided in an annular ring about closed bottom 13, and combinations thereof.

Again referring to FIG. 7A, an annular ring 42, or any other raised geometry, including interrupted geometrical configurations, can be disposed on closed bottom 13 of container 11. Annular ring 42 could be dimensioned to facilitate nesting, or stacking, of multiple embodiments of containers 11. In other words, annular ring 42 could be

US 7,169,419 B2

| 5 | 6 |

designed to provide serial stacking of a container 11 onto the overcap 30 of the preceding, or lower, container 11. Without wishing to be bound by theory, it is believed that the facilitation of nesting by the use of annular ring 42 disposed on closed bottom 13 of container 11 provides enhanced structural stability.

It is also believed that the closed bottom 13 of container 11 could be designed, in what is known to those of skill in the art, as a quad lobe, or pentaloid. Again, without desiring to be bound by theory, it is believed that such a quad lobe, or pentaloid, design could provide enhanced ability to resist the deformation of closed bottom 13 of container 11 due to internal pressures developed within container 11.

Referring again to FIG. 1, container 11 can be cylindrically shaped with substantially smooth sides. Handle portions 15 are respectively formed in container body portion 14 at arcuate positions. A plurality of anti-slip strips 16 can be formed at a predetermined interval within handle portions 15. Handle portions 15 are formed as would be known to one skilled in the art to provide a gripping surface at a most efficacious position to enable users with small hands or debilitating injuries or maladies to grip container portion 11 with a minimum of effort. Further, container 11 can be readily grasped by hand due to the configuration described above. Additionally, container 11 can have a protuberance 17 in the form of a rim like structure disposed at the open end of container 11. Protuberance 17 can provide a surface with which to removeably attach closure 18 and provide a locking surface for skirt portion 32 of overcap 30.

In an alternative embodiment as shown in FIG. 2, container 11a is parallelpiped shaped with substantially smooth sides. Handle portions 15a are respectively formed in container body portion 14a at arcuate positions. A plurality of gripping projections 16a are formed at a predetermined interval within handle portions 15a. Corresponding closure 18a and overcap 30a are fitted on container 11a as would be known to one skilled in the art.

In an alternative embodiment, as shown in FIG. 7, handle portions 15b are preferably be symmetrical. Without desiring to be bound by theory, it is believed that symmetrical handle portions 15b could prevent inversion of the handle portions 15b upon an increase in pressure from within container 11b. It is believed that symmetrically incorporated handle portions 15b provides for the uniform distribution of the internal pressure, developed within container 11, throughout handle portion 15b.

As is also shown in the alternative embodiment of FIG. 7, all portions of handle portions 15b are presented as either parallel to the longitudinal axis of container 11b or perpendicular to the longitudinal axis of container 11b. Without desiring to be bound by theory, it is believed that handle portions 15b, arranged to provide all component portions of handle portions 15b to be either parallel or perpendicular to the longitudinal axis of container 11b, could be less susceptible to bending forces due to internal pressures developed within container 11b. This could aid in the prevention of catastrophic failure of the container due to the pressures generated internally to container 11b.

Further, providing container 11b with handle portions 15b in a recessed configuration with respect to the body portion 14b of container 11b could require less force from the end user to maintain a firm grip on handle portions 15b of container 11b. Additionally, recessed handle portions 15b could aid in the prevention of an end user supplying extraneous force to the external portions of container 11b thereby causing catastrophic failure or deformation of container 11b.

Referring again to FIG. 1, container 11 exhibits superior top load strength per mass unit of plastic. With the present invention, filled and capped containers can be safely stacked one upon another without concern that the bottom containers will collapse or be deformed. Often, containers are palletized, by which several containers are stacked in arrays that take on a cubic configuration. In the order of 60 cases, each weighing about 30 pounds (13.6 Kg) can be loaded onto a pallet. In certain instances, these pallets can be stacked one upon another. It will be appreciated that the bottommost containers will be subjected to extraordinary columnar forces. Traditionally, polymeric containers are not capable of withstanding such high column forces. Thus, to avoid collapsing or buckling of these stacking situations, the top load resistance of each container should be at least about 16 pounds (7.3 Kg) when the containers are in an ambient temperature and pressure environment. More preferably, each container should exhibit a top load resistance of at least about 48 pounds (21.8 Kg) in accordance with the present invention.

In the present invention, top load resistance is the amount of force an empty container can support prior to the occurance of a deflection parallel to the longitudinal axis of the container of greater than 0.015 inches. By way of a non-limiting example, a cylindrical container comprising a laminate structure (as detailed infra), having an average overall mass of 39 grams, an average internal volume of approximately 950 cubic centimeters, an average wall thickness of approximately 0.030 inches, and an average diameter of approximately 100 millimeters is considered not to have a top load resistance greater than 16 pounds (7.3 Kg) when the container deflects more than 0.015 inches in a direction parallel to the longitudinal axis when a 16 pound load is placed thereupon. As is known to one of skill in the art, top load resistance can be measured using a suitable device such as an Instron, model 550R1122, manufactured by Instron, Inc., Canton, Mass. The Instron is operated in a compressive configuration with a 1000 pound load cell and a crosshead speed of 1.0 inch/minute. The load is applied to the container through a platen that is larger than the diameter of the subject container.

As shown in FIG. 7, the body portion 14b of container 11b can have at least one region of deflection 43 placed therein to isolate deflection of the container 11b due to either pressures internal to container 11b or pressures due to forces exerted upon container 11b. As shown, at least one region of deflection 43 could generally define rectilinear regions of container 11b defined by a cylindrical wall. However, one of skill in the art would realize that at least one region of deflection 43 incorporated into body portion 14b could assume any geometry, such as any polygon, round, or non-uniform shape. Without wishing to be bound by theory, it is believed that a purely cylindrical container 11b, having a uniform wall thickness throughout, will resist compression due to pressure exerted from within container 11b or external to container 11b. However, without desiring to be bound by theory, it is believed that when applied forces exceed the strength of the container wall of purely cylindrical container 11b, deflection could be exhibited in an undesireable denting or buckling. Any non-uniformities present in a purely cylindrical container 11b, such as variations in wall thickness, or in the form of features present, such as handle portions 15b, can cause catastrophic failure upon a differential pressure existing between regions external to container 11b and regions internal to container 11b.

However, the incorporation of at least one region of deflection 43 is believed to allow flexion within the body

US 7,169,419 B2

7

portion 14b of container 11b. Thus, it is believed that body portion 14b can deform uniformly without catastrophic failure and can resist undesirable physical and/or visual effects, such as denting. In other words, the volume change incurred by container 11b due to internal, or external, pressures works to change the ultimate volume of the container 11b to reduce the differential pressure and thus, forces acting on the container wall. It is also believed, without desiring to be bound by theory, that the incorporation of a solid or liquid, or any other substantially incompressible material, can provide substantial resistance to the inward deflection of at least one region of deflection 43. For example, the inclusion of a powder, such as roast and ground coffee, could provide resistance to the inward deflection of at least one region of deflection 43, thus enabling at least one region of deflection 43 to remain substantially parallel to the longitudinal axis of container 11b and thereby providing an effective increase in the top load capability of container 11b. The peelable laminate seal also deflects with external pressure changes further reducing the pressure load on the container.

In a non-limiting, but preferred embodiment, container 11b has at least one region of deflection 43 that can be presented in the form of rectangular panels. The panels have a radius that is greater than the radius of container 11b. The panels are designed to have less resistance to deflection than that of the region of container 11b proximate to the rectangular panels. Thus, any movement exhibited by the panels is isolated to the panels and not to any other portion of container 11b.

As shown in FIG. 1, without desiring to be bound by theory, it is believed that the chime should be sufficient to allow container 11 to compress under vacuum by adapting to base volume changes and will improve the top loading capability of container 11. However, it is further believed that the chime should be as small as is practicable as would be known to one of skill in the art.

As shown in FIG. 7, the body portion 14b of container 11b can also have at least one rib 45 incorporated therein. It is believed that at least one rib 45 can assist in the effective management of isolating the movement of at least one panel 43 by positioning at least one rib 45 parallel to the longitudinal axis of container 11b and proximate to at least one panel 43 in order to facilitate the rotational movement of at least one panel 43 upon an inward, or outward, deflection of at least one panel 43. Further, it is believed that at least one rib 45 can also provide added structural stability to container 11b in at least the addition of top load strength. In other words, at least one rib 45 could increase the ability of container 11b to withstand added pressure caused by the placement of additional containers or other objects on top of container 11b. One of skill in the art would be able to determine the positioning, height, width, depth, and geometry of at least one rib 45 necessary in order to properly effectuate such added structural stability for container 11b. Further, it would be known to one of skill in the art that at least one rib 45 could be placed on container 11b to be parallel to the longitudinal axis of container 11b, annular about the horizontal axis of container 11b, or be of an interrupted design, either linear or annular to provide the appearance of multiple panels throughout the surface of container 11b.

Additionally, container 11b can generally have a finish 46 incorporated thereon. In a preferred embodiment, the finish 46 is of an annular design that is believed can provide additional hoop strength to container 11b and surprisingly, can provide a finger well 44 to assist the user in removal of

8

overcap 30. Further, it is possible for one of skill in the art to add ribs 47 to finish 46 in order to provide further strength to container 11b in the form of the added ability to withstand further top loading. In a preferred embodiment, ribs 47 are disposed parallel to the horizontal axis of container 11b and perpendicular to finish 46.

Referring to FIGS. 11 and 12, it was found that a container 11e provided with a protuberance 17a that is at least substantially outwardly facing from body portion 14 and substantially perpendicular to the longitudinal axis of container 11e can have less induced structural stress caused by a vacuum internal to container 11e in the junction 80 proximate to the interface of protuberance 17a and body portion 14. Without desiring to be bound by theory, it is believed that such forces exerted on an outwardly facing protuberance 17a would cause an increase in the radius of curvature of protuberance 17 with respect to body portion 14, thereby reducing the overall vacuum induced stresses on the container 11e. Reducing vacuum-induced stresses can facilitate producing container 11e with a smaller overall wall thickness.

In addition, it can be desirable for container 11e to be provided with at least a substantially outwardly facing protuberance 17a so that static vertical loads (TL) are transferred through the body portion 14 rather than through protuberance 17a. Without desiring to be bound by theory, it is believed that transferring the forces exerted by a load (TL) positioned on top of container 11e through body portion 14 rather than upon protuberance 17a can reduce overall stresses at junction 80 of protuberance 17a with body portion 14. This reduction in stresses at junction 80 can facilitate producing container 11e with a smaller overall wall thickness.

Further, container 11e can be combined with an overcap (not shown) that can substantially direct the forces exerted by a load to body portion 14 rather than to protuberance 17a. It is believed that any stress at junction 80 caused by a load positioned on top of container 11e having such an overcap (not shown) disposed thereon can be reduced because the deflection of the cantilevered protuberance 17a is restrained. This can result in lower concentrations of stress at junction 80.

Returning again to FIG. 1, the container 11 is preferably produced by blow molding a polyolefinic compound. Polyethylene and polypropylene, for example, are relatively low cost resins suitable for food contact and provide an excellent water vapor barrier. However, it is known in the art that these materials are not well suited for packaging oxygen-sensitive foods requiring a long shelf life. As a non-limiting example, ethylene vinyl alcohol (EVOH) can provide such an excellent barrier. Thus, a thin layer of EVOH sandwiched between two or more polyolefinic layers can solve this problem. Therefore, the blow-molding process can be used with multi-layered structures by incorporating additional extruders for each resin used. Additionally, the container of the present invention can be manufactured using other exemplary methods including injection molding and stretch blow molding.

In a preferred embodiment in accordance with the present invention, container 11 of FIG. 1, container 11a of FIG. 2, and container 11a of FIG. 7, can be blow molded from a multi-layered structure to protect an oxygen barrier layer from the effects of moisture. In a preferred embodiment, this multi-layered structure can be used to produce an economical structure by utilizing relatively inexpensive materials as the bulk of the structure.

US 7,169,419 B2

9

Another exemplary and non-limiting example of a multi-layered structure used to manufacture the container of the present invention would include an inner layer comprising virgin polyolefinic material. The next outward layer would comprise recycled container material, known to those skilled in the art as a 'regrind' layer. The next layers would comprise a thin layer of adhesive, the barrier layer, and another adhesive layer to bind the barrier layer to the container. The final outer layer can comprise another layer of virgin polyolefinic material.

A further exemplary and non-limiting example of a multi-layered structure used to manufacture the container of the present invention would include an inner layer comprising virgin polyolefinic material. The next layers would comprise a thin layer of adhesive, the barrier layer, and another adhesive layer to bind the barrier layer to the container. The next outward layer would comprise recycled container material, known to those skilled in the art as a 'regrind' layer. The final outer layer can comprise another layer of virgin poly-olefinic material. In any regard, it should be known to those skilled in the art that other potential compounds or combinations of compounds, such as polyolefins, adhesives and barriers could be used. Further, an oxygen scavenger can be incorporated into, or on, any layer of a multi-layered structure to remove any complexed or free oxygen existing within a formed container. Such oxygen scavengers can include oxygen scavenging polymers, complexed or non-complexed metal ions, inorganic powders and/or salts, and combinations thereof, and/or any compound capable of entering into polycondensation, transesterification, transamidization, and similar transfer reactions where free oxygen is consumed in the process.

Other such materials and processes for container formation are detailed in *The Wiley Encyclopedia of Packaging Technology*, Wiley & Sons (1986), herein incorporated by reference. Preferably, the inner layer of containers 11, 11*a*, and 11*b* are constructed from high-density polyethylene (HDPE).

A preferred polyolefinic, blow molded container in accordance with the present invention can have an ideal minimum package weight for the round containers of FIGS. 1 and 7, or the parallelpiped container of FIG. 2, and yet still provide the top load characteristics necessary to achieve the goals of the present invention. Exemplary materials (low-density polyethylene (LDPE), high density polyethylene (HDPE) and polyethylene terephthalate (PET)) and starting masses of these compounds that provide sufficient structural rigidity in accordance with the present invention are detailed in Table 1 below.

TABLE 1

Package Shape and Weight For a Given Material and
a Defined Top Load (Empty) for a Nominal 3.0 L Container

| Package Configuration | Package Material & Tensile Modulus (psi/atm) | Package Weight 35 lb. Top Load (grams) | Package Weight 120 lb. Top Load (grams) |
|---|---|---|---|
| Parallelpiped | LDPE (40,000/2,721) | 79 grams | 146 grams |
| Parallelpiped | HDPE (98,000/6,669) | 66 grams | 123 grams |
| Parallelpiped | PET (600,000/40,828) | 40 grams | 74 grams |
| Round | LDPE (40,000/2,721) | 51 grams | 95 grams |

10

TABLE 1-continued

Package Shape and Weight For a Given Material and
a Defined Top Load (Empty) for a Nominal 3.0 L Container

| Package Configuration | Package Material & Tensile Modulus (psi/atm) | Package Weight 35 lb. Top Load (grams) | Package Weight 120 lb. Top Load (grams) |
|---|---|---|---|
| Round | HDPE (98,000/6,669) | 43 grams | 80 grams |
| Round | PET (600,000/40,828) | 26 grams | 48 grams |

It was surprisingly found that a container in accordance with the present invention that is filled with product and sealed to contain the final product has enhanced properties for the same starting compound weight. This provides a benefit in that it is now possible to use less starting material to provide the top load values in accordance with the present invention. Exemplary materials and starting masses of compounds (LDPE, HDPE, and PET) providing the necessary structural rigidity of a filled and sealed container in accordance with the present invention are detailed in Table 2.

TABLE 2

Package Shape and Weight For a Given Material and a
Defined Top Load (Filled) for a Nominal 3.0 L Container

| Package Configuration | Package Material & Tensile Modulus (psi/atm) | Package Weight 35 lb. Top Load (grams) | Package Weight 120 lb. Top Load (grams) |
|---|---|---|---|
| Parallelpiped | LDPE (40,000/2,721) | 72 grams | 134 grams |
| Parallelpiped | HDPE (98,000/6,669) | 61 grams | 112 grams |
| Parallelpiped | PET (600,000/40,828) | 37 grams | 68 grams |
| Round | LDPE (40,000/2,721) | 47 grams | 87 grams |
| Round | HDPE (98,000/6,669) | 39 grams | 73 grams |
| Round | PET (600,000/40,828) | 24 grams | 44 grams |

Again referring to FIG. 1, protuberance 17, in the form of a rim like structure, disposed at the open end of container 11 may have textured surfaces disposed thereon. Textured surfaces disposed on protuberance 17 can comprise raised surfaces in the form of protuberances, annular features, and/or cross-hatching to facilitate better sealing of removable closure 19. Exemplary, but non-limiting, annular features may include a single bead or a series of beads as concentric rings protruding from the seal surface of protuberance 17. While not wishing to be bound by theory, it is believed that a textured surface on protuberance 17 can allow for the application of a more uniform and/or concentrated pressure during a sealing process. Textured surfaces can provide increased sealing capability between protuberance 17 and removable closure 19 due to any irregularities introduced during molding, trimming, shipping processes and the like during manufacture of container 11.

The Removable Closure

Again referring to FIG. 1, fresh packaging system 10 comprises a closure 18 that is a laminated, peelable seal 19 that is removeably attached and sealed to container 11. Peelable seal 19 has a hole beneath which is applied a

US 7,169,419 B2

11

degassing valve, indicated as a whole by reference number 20. One-way valve 20 can be heat welded or glued to peelable seal 19.

In a preferred embodiment according to FIG. 3, the interior of peelable seal 19 to the outer side of peelable seal 19 is a laminate and comprises, in sequence, an inner film 21, such as polyethylene, a barrier layer 22, such as a metallized sheet, preferably metallized PET, metallized PE, or aluminum, and an outer film of plastic 23, such as PET. Inner film 21 is preferably formed from the same material as the outer layer of container 11. Thus, inner film 21 is preferably a polyolefin, and more preferably polyethylene (PE). Plastic outer film 23 is preferably produced from a material such as polyester. However, one skilled in the art would realize that other materials, such as a foil closure, and other stretchable and non-stretchable layer structures can be used and still remain within the scope of the present invention. Additionally, an oxygen scavenger, as described supra, can be incorporated into, or on, any layer of peelable seal 19 to remove free, or complexed, oxygen.

Both inner film 21 and barrier layer 22 are perforated, preferably by means of cuts, pricks, or stampings, to form flow opening 24, as shown in FIG. 3. In the area above the outlet opening, outer film 23 is not laminated to barrier layer 22, thereby forming longitudinal channel 25. Channel 25 extends the entire width of the laminate so that during manufacture, channel 25 extends to the edge of closure 18.

As a result, a very simple and inexpensive one-way valve 20 is formed by means of the non-laminated area of outer film 23 and outlet opening 24. The gases produced by the contents within container 11 may flow through valve 20 to the surrounding environment. Since an overpressure exists in container 11, and since outer film 23 usually adheres or at least tightly abuts barrier layer 22 because of the inner pressure, unwanted gases, such as oxygen, are prevented from flowing into container 11 and oxidizing the contents. Thus, outer film 23 serves as a membrane that must be lifted by the inner gas pressure in the packing in order to release gas. It is preferred that one-way valve 20 respond to pressures developed within container 11. This pressure can exceed 10 millibars, and preferably exceed 15 millibars, and more preferably would exceed 20 millibars, and most preferably, exceed 30 millibars.

Additionally, a small amount of liquid can be filled into channel 25. The liquid can be water, siloxane-based oils, or oil treated with an additive so that the oil is prevented from becoming rancid prior to use of the product. The pressure at which the release of internal off gas from container 11 occurs can be adjusted by varying the viscosity of the liquid within channel 25.

In an alternative, but non-limiting, embodiment, a one-way degassing valve can comprise a valve body, a mechanical valve element, and a selective filter as described in U.S. Pat. No. 5,515,994, herein incorporated by reference.

Returning to FIG. 1, Closure 18 is preferably sealed to container 11 along a rim (protuberance) 17 of container 11. Preferable, but non-limiting, methods of sealing include a heat sealing method incorporating a hot metal plate applying pressure and heat through the closure material and the container rim, causing a fused bond. The peel strength achieved is generally a result of the applied pressure, temperature, and dwell time of the sealing process. However, it should be known to one skilled in the art, that other types of seals and seal methods could be used to achieve a bond with sufficient and effective seal strength, including, but not limited to, a plurality of annular sealing beads disposed on rim 17.

12

Alternatively, if protuberance 17 is provided in at least a substantially outwardly facing orientation from body portion 14 and substantially perpendicular to the longitudinal axis of container 10, protuberance 17 can be supported during the sealing process. Providing support in this manner can allow for a seal to be applied in less overall time through the use of higher temperature and pressure than would be possible if the flange were unsupported. It is also believed that supporting protuberance 17 during the sealing process can result in a higher quality seal, provide less variation in the seal, and provide a more consistent peel force. It is also believed that supporting protuberance 17 during a sealing process can reduce the time necessary to provide such seals resulting in lower production costs.

As shown in FIG. 8, in an alternative embodiment, peelable seal 19c of container 11c can include a pivotable pouring device 50. Pivotable pouring device 50 can be placed at any location on peelable seal 19a or at any position on container 11c. In a preferred embodiment, it is also believed that pivotable pouring device 50 could be disposed on a non-peelable seal located under peelable seal 19c in the interior volume of container 11c. This could enable a user to remove peelable seal 19c, exposing the non-peelable seal having the pivotable pouring device 50 disposed thereon. The user could then pivot the pivotable pouring device 50 to dispense a product contained within container 11c. After dispensing the product from container 11c via pivotable pouring device 50, the user could pivot the pivotable pouring device 50 to effectively close non-peelable seal, thereby effectively sealing container 11c. As would be known to one of skill in the art, exemplary, but non-limiting, examples of pivotable pouring device 50 include pouring spouts. It is believed that pivotable pouring device 50 could have dimensions that facilitate the flow of product from container 11c, as would be known to one of skill in the art. A depression, slot, or other orifice can be disposed on either peelable seal 19c or the non-peelable seal to facilitate insertion of a user's appendage or other device to aid in the application of force necessary to pivot pivotable pouring device 50.

In the alternative embodiment of FIG. 8a, a striker bar 52, formed from either a portion of peelable seal 19d or a non-peelable seal, can be used to strike off excess product from a volumetric measuring device. Without wishing to be bound by theory, it is believed that striker bar 52 could facilitate more consistent measurements of product by increase the packing density and volume present within the volumetric measurement device. Further, it is believed that the presence of the remainder of peelable seal 19d or a non-peelable seal can assist in the retention of the various aromatic and non-aromatic gasses that naturally evolutes from a product held within container 11d.

The Overcap

Referring to FIG. 1, fresh packaging system 10 optionally comprises an overcap 30 comprised of dome portion 31, skirt portion 32, rib 33, and optionally vent 34. As a non-limiting example, overcap 30 is generally manufactured from a plastic with a low flexural modulus, for example, linear low-density polyethylene (LLDPE), low-density polyethylene (LDPE), high-density polyethylene (HDPE), polyethylene (PE), polypropylene (PP), linear low-density polyethylene (LLDPE), polycarbonate, polyethylene terephthalate (PET), polystyrene, polyvinyl chloride (PVC), copolymers thereof, and combinations thereof. This allows for an overcap 30 that has a high degree of flexibility, yet can still provide sufficient rigidity to allow stacking of successive containers. By using a flexible overcap 30, mechanical

US 7,169,419 B2

13

application during packaging as well as re-application of overcap 30 to container 11 after opening by the consumer is facilitated. A surprising feature of a flexible overcap 30 is the ability of the end user to "burp" excess atmospheric gas from container 11 thereby reducing the amount of oxygen present. Further, an oxygen scavenger, as described supra, can be incorporated into, or on, any layer of peelable seal 19 to remove free, or complexed, oxygen. Additionally, the desired balance of flexibility and rigidity exhibited by overcap 30 is to varying the thickness profile of the overcap 30. For example, the dome portion 31 can be manufactured to be thinner than skirt portion 32 and rib 33.

Dome portion 31 is generally designed with a curvature, and hence height, to accommodate for an outward displacement of closure 18 from container 11 as a packaged product, such as roast and ground coffee, off gases. The amount of curvature needed in dome portion 31 can be mathematically determined as a prediction of displacement of closure 18. As a non-limiting example, a nominal height of dome portion 31 can be 0.242 inches (0.61 cm) with an internal pressure on closure 18 of 15 millibars for a nominal 6-inch (15.25 cm) diameter overcap. Further, the dome portion 31 is also generally displaceable beyond its original height as internal pressure rises in container 11, causing closure 18 to rise prior to the release of any off gas by one-way valve 20.

As shown in the exemplary embodiment of FIG. 9A, stand-off 67 can be provided on the underside of overcap 30b to facilitate the release of an off gas that may be present within a container. In this way, stand-off 67 can prevent blockage of a valve disposed on and/or within a flexible film closure by lower portion 65 of overcap 30b by reducing the amount of contact of the valve with lower portion 65. Stand-off 67 can be constructed in various designs including but not limited to a singular, or plurality of, arcuate forms, circles, rectangles, lines, and combinations thereof. Preferably, a circular stand-off 67 is positioned in a region central to lower portion 65 of overcap 30b. It is believed that stand-off 67 can also facilitate the venting of gasses internal to a container. Another such exemplary stand-off 67 is shown in FIG. 13 as a plurality of annular sections 68, wherein each annular section 68 is provided with an opening 69 wherein the plurality of openings 69 provides a path for venting of gasses internal to container 11f.

Referring to FIG. 4, overcap 30 comprises a rib 33. Rib 33 protrudes outwardly from the generally planar dome portion 31 and serves as a physical connection between dome portion 31 and skirt 32. Generally, skirt 32 has a hook shape for lockingly engaging protuberance 17 of container 11. Rib 33 isolates skirt 32 from dome portion 31, acting as a cantilever hinge so that outward deflections (O) of dome portion 31 are translated into inward deflections (I) of skirt 33. This cantilevered motion provides for an easier application of overcap 30 to container 11 and serves to effectively tighten the seal under internal pressures.

Additionally, rib 33 can allow for successive overcaps to be stacked for shipping. Skirt 32 preferably has a flat portion near the terminal end to allow for nesting of successive overcaps. Furthermore, rib 33 can extend sufficiently away from dome portion 31 so that successive systems may be stacked with no disruption of the stack due to a maximum deflection of closure 18 and the dome portion 31 of overcap 30. Without desiring to be bound by theory, it is believed that the downward load force rests entirely on rib 33 rather than across dome portion 31. Resting all downward forces on rib 33 also protects closure 18 from a force opposing the outward expansion of closure 18 from container 11 due to the off gas generated by a contained product.

14

As shown in FIG. 5, an exploded view of the region around rib 33, dome portion 31 correspondingly mates with protuberance 17 of container 11. As a non-limiting example, container 11, after opening, requires replacement of overcap 30. A consumer places overcap 30 on container 11 so that an inside edge 34 of rib 33 contacts protuberance 17. A consumer then applies outward pressure on skirt 32 and downward pressure on dome portion 31, expectorating a majority of ambient air entrapped within the headspace of container 11. As shown in FIG. 6, the inside edge 34 of rib 33 then fully seats on protuberance 17, producing a complete seal. In a non-limiting example, protuberance 17 varies from −5° to +5° from a line perpendicular to body 14. Inside edge 34 is designed to provide contact with protuberance 17 for this variation. As another non-limiting example, overall travel of the inside edge 34 of rib 33 has been nominally measured at three millimeters for a protuberance 17 width of four to six millimeters. It has been found that when protuberance 17 is angularly disposed, protuberance 17 forms a sufficient surface to provide for sealing adhesive attachment of closure 18 to protuberance 17.

Additionally, the inside edge 34 of rib 33 can effectively prevent the pollution of protuberance 17, with or without closure 18 in place, thereby providing a better seal. As pressure within container 11 builds due to off gas from the entrained product, dome portion 31 of overcap 30 deflects outward. This outward deflection causes the inside edge 34 of rib 33 to migrate toward the center of container 11 along protuberance 17. This inward movement results in a transfer of force through rib 33 to an inward force on skirt portion 32 to be applied to container wall 14 and the outer portion of protuberance 17, resulting in a strengthened seal. Additionally, significant deflections of dome 31 due to pressurization of closure 18 causes the inside edge 34 to dislocate from protuberance 17 allowing any vented off gas to escape past protuberance 17 to the outside of overcap 30. This alleviates the need for a vent in overcap 30.

As shown in FIG. 9, in an alternative embodiment of overcap 30b comprises a plurality of nested cylindrical formations. In other words, in this alternative embodiment, the base of overcap 30b, having a diameter, d, forms a base portion 60 upon which the upper portion 62 of overcap 30b, having a diameter, d−Δd, is disposed thereon. The upper portion 62 of overcap 30b can have an annular protuberance 64 disposed thereon. It is believed that the annular protuberance 64 disposed upon the upper portion 62 of overcap 30b can provide a form upon which annular ring 42 disposed upon closed bottom 13, can lockably nest.

In another embodiment, it has been found advantageous to limit Δd. A small Δd can result in the connecting wall 63 of overcap 30b being proximate to protuberance 17. Providing a small Δd in this manner can facilitate the transfer of a force exerted by a load disposed upon overcap 30 to an attached container during storage and shipping.

As shown in FIGS. 9a and 10, in an alternative embodiment, the inner surface of the base portion 60 of overcap 30b can have an annular sealing ring 66 disposed thereon. Annular sealing ring 66 was surprisingly found to facilitate the mating of surfaces corresponding to annular sealing ring 66 and the finish portion of container 11. Mating the surfaces in this manner can provide an audible recognition that both surfaces have made contact and that a secure seal between protuberance 17 and the internal surface of overcap 30b has been made. A surprising feature of overcap 30b is the ability of the end user to "burp" excess atmospheric gas from container 11 thereby reducing the amount of oxygen present. Further, it is believed that an inner surface of base portion 60

US 7,169,419 B2

15

mate with at least a portion of protuberance 17 so that there is provided an overlap of the inner surface of base portion 60 with protuberance 17. One of skill in the art would realize that any configuration of the annular sealing ring 66 may be used to provide the facilitation of the corresponding mating surfaces, including, but not limited to, interrupted annular rings, a plurality of protuberances, and combinations thereof. It is also believed that providing a protuberance 69 in the form of an annular ring, plurality of protuberances, and other protuberances known to one of skill in the art, can provide a method of stacking a plurality of overcaps 30b prior to overcap 30b being applied to a container.

As shown in FIG. 9a, it was surprisingly found that a plurality of protuberances 68 disposed upon the inner surface of overcap 30b could facilitate the replacement of overcap 30b upon container 11. In this manner, it is believed that the plurality of protuberances 68 disposed upon the inner surface of overcap 30b can effectively translate the horizontal component of a force applied to overcap 30b during replacement of overcap 30b upon container 11 through the plurality of protuberances 68 thereby allowing the plurality of protuberances 68 to effectively traverse over the edge of container 11 and ultimately aligning the longitudinal axis of overcap 30b with the longitudinal axis of container 11. Further, a plurality of protuberances 68 disposed upon the inner surface of overcap 30b can also provide additional structural rigidity to overcap 30b and can increase the transfer efficiency of a force exerted by a load disposed upon overcap 30b to container 11. It would be realized by one of skill in the art that the plurality of protuberances 68 could comprise a plurality of spherical, semi-spherical, elliptical, quarter-round, and polygonal projections, indentations, and combinations thereof.

In an alternative embodiment as shown in FIG. 13, container 11f can be provided with at least one secondary protuberance 74 disposed upon body portion 14. In this way, overcap 30c can be provided with an elongate skirt portion 72 with annular sealing ring 66a disposed thereon. Thus, annular sealing ring 66a can be removeably engaged with secondary protuberance 74 to provide a better engagement of overcap 30c to container 11f. Without desiring to be bound by theory, it is believed that a container 11f provided with a protuberance 17a will exhibit a rotational movement about axis 76 due to a vacuum internal to container 11f and/or a load disposed upon protuberance 17a thereby causing protuberance 17a to move away from overcap 30c. Thus, providing secondary protuberance 74 along body portion 14 away from axis 76 can provide a point of interaction between overcap 30c and container 11f that is subject to less movement. Secondary protuberance 74 can be provided as an annular ring, a plurality of individual protuberances or a plurality of collectively elongate protuberances. Elongate skirt portion 72 can be provided as an annular protuberance or a collectively annular plurality of separable segments. Further, elongate skirt portion 72 can be provided in any length to facilitate attachment of overcap 30c to secondary protuberance 74 disposed upon body portion 14.

Coffee Packaging

A preferred method of packaging a whole, roast coffee in accordance with the present invention to provide a more freshly packed coffee product, is detailed herein.

A whole coffee bean is preferably blended and conveyed to a roaster, where hot air is utilized to roast the coffee to the

16

desired degree of flavor development. The hot roasted coffee is then air-cooled and subsequently cleaned of extraneous debris.

In a preferred, but non-limiting step, a whole roast coffee is cracked and normalized (blended) before grinding to break up large pieces of chaff. The coffee is then ground and cut to the desired particle size for the grind size being produced. The ground coffee then preferably enters a normalizer that is connected to the bottom of the grinder heads. In the normalizer, ground coffee is preferably slightly mixed, thus, improving the coffee appearance. As another non-limiting step, the coffee discharges from the normalizer and passes over a vibrating screen to remove large pieces of coffee.

The ground coffee is then preferably sent to a filler surge hopper and subsequently to a filling apparatus (filler). The filler weighs a desired amount of coffee into a bucket that in turn, dumps the pre-measured amount of coffee into a container manufactured as detailed supra. The container is then preferably topped-off with an additional amount of coffee to achieve the desired target weight.

The container is then preferably subjected to an inert gas purge to remove ambient oxygen from the container headspace. Non-limiting, but preferred, inert gases are nitrogen, carbon dioxide, and argon. Optionally, an oxygen scavenger, as described supra, and generally present in the form of a packet can be included within the container to provide removal of free or complexed oxygen. A closure, as disclosed supra, is placed on the container to effectively seal the contents from ambient air. Preferably the closure has a one-way valve disposed thereon. An overcap, disclosed supra, is then applied onto the container, effectively covering the closure and locking into the container sidewall ridge. The finished containers are then packed into trays, shrink wrapped, and unitized for shipping.

Freshness

It is believed that the resulting inventive packaging system provides a consumer with a perceptively fresher packed roast and ground coffee that provides a stronger aroma upon opening of the package and the perception of a longer-lasting aroma that is apparent with repeated and sustained openings of the packaging system. Not wishing to be bound by any theory, it is believed that roast and ground coffee elutes gases and oils that are adsorbed onto the polyolefinic compound comprising the inside of the container and closure. Upon removal of the closure, the polyolefinic compound then evolutes these adsorbed gases and oils back into the headspace of the sealed container. It is also believed that the inventive packaging system can also prevent the infiltration of deleterious aromas and flavors into the packaging system. Thus, the construction of the instant packaging system can be altered to provide the benefit of most use for the product disclosed therein. To this end, it is further believed that the packaging system can be utilized for the containment of various products and yet provide the benefits discussed herein.

Applicants characterize the surprising aroma benefits provided by the present article of manufacture in terms of the article's "overall coffee aroma value", which is an absolute characterization. Applicants also characterize the aroma benefits relative to a control article (a prior art metallic can, as described below). Such a characterization is referred to herein as the article's "differential coffee aroma value". The methods for measuring overall coffee aroma value and differential coffee aroma value are described in detail in the Test Method section infra.

US 7,169,419 B2

17

The article of manufacture will have an overall coffee aroma value of at least about 5.5. Preferably, the article will have an overall coffee aroma value of least about 6, more preferably at least about 6.5, still more preferably at least about 7, and still more preferably at least about 7.5.

Preferably, the article of manufacture of the present invention will have a differential coffee aroma value of at least about 1.0, more preferably at least about 2.0, and most preferably at least about 2.8.

Test Method

A test container and an existing industry standard metallic container (control container) are packed with identical fresh roast and ground coffee product, prepared as stated above, and stored for 120 days prior to testing. Immediately prior to testing, the containers are emptied and wiped with a paper towel to remove excess roast and ground coffee product. Each container is then capped and let stand prior to testing in order to equilibrate. During testing, each container used is exchanged with another similarly prepared, but, unused container at one-hour intervals. A control container is a standard 603, tin-plated, 3-pound (1.36 Kg), vacuum-packed, steel can.

Individual panelists are screened for their ability to discriminate odors utilizing various standard sensory methodologies as part of their sensory screening. Panelists are assessed for aroma discriminatory ability using the gross olfactory acuity-screening test (universal version) as developed by Sensonics, Inc., for aroma. This test method involves a potential panelist successfully identifying aromas in a "scratch and sniff" context.

Forty successful, qualified panelists are then blindfolded and each evaluates a test container and a control container. Each blindfolded panelist smells a first container (either test container or control container) and rates the aroma on a 1 to 9 point scale (integers only) with reference to the following description: no aroma (1) to a lot of aroma (9). After a brief relief period, the blindfolded panelist evaluates the second container. The range for overall aroma is again assessed by panelists using the same rating system.

The panel results for overall coffee aroma value are then tabulated and statistically evaluated. Standard deviations based on a Student T statistical test are calculated with 95% confidence intervals to note where statistically significant differences occur between the mean values of the two products tested. Exemplary and statistically adjusted results of a "blind test" panel using existing packaging methodologies for roast and ground coffee are tabulated in Table 3, as follows:

TABLE 3

Roast and Ground Coffee Sensory Panel Results for Comparing Inventive Articles vs. Existing Articles at 120 days at 70° F. (21° C.)

| | Inventive Package (Plastic) | Standard Steel Package (Control) |
|---|---|---|
| No. Respondents | 40 | 40 |
| Amount of Coffee Aroma | 7.3 | 4.5 |

Based upon this test panel, it was surprisingly found that the present articles of manufacture provide a perceived "fresher" roast and ground coffee end product for a consumer. The improvement in overall coffee aroma was increased from the control sample adjusted panel value of

18

4.5 to an adjusted panel value of 7.3 for the inventive article, resulting in a differential adjusted value of 2.8.

While particular embodiments of the present invention have been illustrated and described, it will be obvious to those skilled in the art that various changes and modifications may be made without departing from the spirit and scope of the invention. One skilled in the art will also be able to recognize that the scope of the invention also encompasses interchanging various features of the embodiments illustrated and described above. Accordingly, the appended claims are intended to cover all such modifications that are within the scope of the invention.

What is claimed is:

1. A packaging system comprising:

a blow-molded container comprising a longitudinal axis, said blow-molded container further comprising a closed bottom, an open top, and a body having an enclosed perimeter between said bottom and said top;

wherein said bottom, top, and body together define an interior volume wherein said body has at least one region of deflection disposed thereon, and wherein said region of deflection allows flexion and thereby has less resistance to flexing than the body of said container proximate to said region of deflection;

an outwardly facing annular protuberance disposed upon said body, said annular protuberance being continuously disposed around said perimeter of said body proximate to said top wherein said protuberance forms a surface external to said body, said surface being substantially perpendicular to said longitudinal axis; and,

a flexible closure removably attached and sealed to said annular protuberance;

wherein coffee is contained within said packaging system.

2. The packaging system of claim 1 wherein said flexible closure comprises a laminate structure, said laminate structure comprising at least one barrier layer.

3. The packaging system of claim 2 wherein said laminate further comprises a foil.

4. The packaging system of claim 1 wherein said flexible closure has a one-way valve disposed thereon.

5. The packaging system of claim 1 wherein said blow-molded container comprises a material selected from the group consisting of polycarbonate, linear low density polyethylene, low density polyethylene, high density polyethylene, polyethylene terephthalate, polypropylene, polystyrene, polyvinyl chloride, co-polymers thereof, and combinations thereof.

6. The packaging system of claim 5 wherein said material is a multi-layered structure.

7. The packaging system of claim 6 wherein said multi-layered structure further comprises at least one oxygen barrier layer.

8. The packaging system of claim 1 wherein said body has a handle disposed thereon.

9. The packaging system of claim 8 wherein said handle is integral with said body.

10. The packaging system of claim 8 wherein said handle is substantially parallel to said longitudinal axis of said container.

11. The packaging system of claim 1 further comprising an overcap.

12. The packaging system of claim 11 wherein said overcap is constructed from a material selected from the group consisting of polycarbonate, linear low density polyethylene, low density polyethylene, high density polyethyl-

US 7,169,419 B2

19

20

ene, polyethylene terephthalate, polypropylene, polystyrene, polyvinyl chloride, co-polymers thereof, and combinations thereof.

13. The packaging system of claim 11 wherein said overcap further comprises a first protuberance disposed upon said overcap, said protuberance being materingly engageable with a second protuberance disposed upon said body of said container, wherein said overcap is releasably attached to said container upon the mating engagement of said first and second protuberances.

14. The packaging system of claim 11, wherein said overcap comprises a dome portion, said dome portion comprising a first surface, said first surface having at least one protuberance disposed thereon.

15. The packaging system of claim 1 wherein said coffee is roast and ground.

16. The packaging system of claim 1, wherein said closed bottom of said container is concave inwardly.

17. A packaging system comprising:

a blow-molded container comprising a longitudinal axis, said blow-molded container further comprising a closed bottom, an open top, and a body having an enclosed perimeter between said bottom and said top; wherein said bottom, top, and body together define an interior volume, wherein said body has at least one

region of deflection disposed thereon, and wherein said region of deflection allows flexion and thereby has less resistance to flexing than the body of said container proximate to said region of deflection;

an outwardly facing annular protuberance disposed upon said body, said annular protuberance being continuously disposed around the perimeter of said body proximate to said top wherein said protuberance forms a surface external to said body, said surface being substantially perpendicular to said longitudinal axis; and

a flexible closure removably attached and sealed to said annular protuberance;

wherein said annular protuberance translates the force of a load of at least about 16 pounds disposed upon said packaging system in a direction substantially parallel to said longitudinal axis and

wherein coffee is contained within said packaging system.

18. The packaging system of claim 17 wherein said blow-molded container is manufactured from a material having a tensile modulus ranging from at least about 35,000 pounds per square inch (2,381 atm) to at least about 650,000 pounds per square inch (4,230 atm).

* * * * *

# Exhibit 3

US007074443B2

## (12) United States Patent
### Thomas et al.

(10) Patent No.: **US 7,074,443 B2**
(45) Date of Patent: **Jul. 11, 2006**

(54) **VENTED CAN OVERCAP**

(75) Inventors: **Jeffrey A. Thomas**, Cortlandt Manor, NY (US); **Jeffrey Alan Zimmermann**, Purdys, NY (US); **Piras DeCleir**, Sleepy Hollow, NY (US); **Mete Bruncaj**, Briarcliff Manor, NY (US)

(73) Assignee: **Kraft Foods Holdings, Inc.**, Northfield, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 348 days.

(21) Appl. No.: **10/298,565**

(22) Filed: **Nov. 19, 2002**

(65) **Prior Publication Data**

US 2004/0096552 A1 May 20, 2004

(51) **Int. Cl.**
*B65D 51/16* (2006.01)

(52) **U.S. Cl.** ..................... **426/118**; 426/131; 426/595; 220/203.01; 220/203.29

(58) **Field of Classification Search** ............... 426/106, 426/118, 131, 395, 594–595; 220/202, 203.01, 220/203.09, 203.29
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 933,103 | A | * 9/1909 | Norton | 220/373 |
| 1,766,173 | A | * 6/1930 | Hills | 53/432 |
| 1,857,015 | A | * 5/1932 | Gere | 215/260 |
| 2,054,094 | A | * 9/1936 | Murch | 220/800 |
| 3,077,409 | A | 2/1963 | Baselt | 426/118 |
| 3,613,938 | A | * 10/1971 | Westcott | 220/785 |
| 3,799,427 | A | * 3/1974 | Goglio | 383/103 |
| 3,850,330 | A | 11/1974 | Koontz et al. | |
| 4,210,255 | A | * 7/1980 | Pan | 220/203.15 |
| 4,213,537 | A | * 7/1980 | Caccavale | 220/215 |
| 4,234,100 | A | 11/1980 | Chabot | |
| 4,315,578 | A | 2/1982 | Ludwig, Jr. | |
| 4,444,219 | A | * 4/1984 | Hollenstein | 137/246 |
| 4,522,298 | A | * 6/1985 | Weinberger | 206/216 |
| 4,705,188 | A | * 11/1987 | Rahn | 220/366.1 |
| 5,242,069 | A | * 9/1993 | Hertrampf | 215/260 |
| 5,445,291 | A | * 8/1995 | Daniel | 220/366.1 |
| 5,558,243 | A | 9/1996 | Chu | |
| 5,688,544 | A | 11/1997 | Bolton et al. | |
| 5,692,632 | A | 12/1997 | Hsieh et al. | |
| 5,782,266 | A | * 7/1998 | Domke | 137/551 |
| 5,992,442 | A | * 11/1999 | Urquhart et al. | 137/246 |
| 6,068,154 | A | 5/2000 | Grabher | |
| 6,089,271 | A | * 7/2000 | Tani | 137/854 |
| 6,662,827 | B1 | * 12/2003 | Clougherty et al. | 137/859 |

FOREIGN PATENT DOCUMENTS

EP 0 638 274 A1 5/1994

* cited by examiner

*Primary Examiner*—Drew Becker
(74) *Attorney, Agent, or Firm*—Stites & Harbison PLLC, Marvin Petry

(57) **ABSTRACT**

Packaging for a can containing ground roasted coffee packed under atmospheric pressure and having a flexible peel-off lid which is vented to allow the escape of a buildup of carbon dioxide gases. A spacing structure prevents the vent valve in the lid from being closed by contact with the plastic overcap. The spacing structure may include bosses on the overcap which engage the vent valve or a pocket in the overcap which allows the flexible lid to reach a maximum height without engaging the overcap. A permanently opened passageway may be provided between the plastic overcap and the rim of the can to further facilitate the escape of carbon dioxide.

**25 Claims, 6 Drawing Sheets**





*FIG. 1*

PRIOR ART



FIG. 2
PRIOR ART

FIG. 3
PRIOR ART



*FIG. 4*



FIG. 5



FIG. 6

FIG. 7

FIG.11

FIG. 12



*FIG. 8*



*FIG. 10*



FIG. 9

US 7,074,443 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

**VENTED CAN OVERCAP**

FIELD OF THE INVENTION

This invention relates to a canned product which generates a gaseous pressure buildup, and to an improved arrangement for venting such gases.

BACKGROUND OF THE INVENTION

Historically, ground roast coffee packaged in a can has been vacuum packed. Recently, it has been found desirable to freshly package roast ground coffee in cans or other rigid or semi-rigid gas impervious packages under atmospheric pressure as contrasted to the prior vacuum packaged cans. Additionally, it has also been found desirable to close off the top of the can with a flexible peel-off easy opening seal or lid, whether the coffee was packed under a vacuum or atmospheric pressure. Examples of such peel-off easy opening lids are shown in the Bolton et al U.S. Pat. No. 5,688,544.

Packaged ground roast coffee gives off carbon dioxide which, in a sealed confined space will generate a pressure buildup within the container. In the case of vacuum packed ground roast coffee, this generation of carbon dioxide causes no problem because the pressure buildup simply tended to reduce the negative pressure within the sealed container. However, if the product is freshly packaged initially at atmospheric pressure without extensive degassing, then generated carbon dioxide will cause a pressure buildup in the can above atmospheric pressure. In atmospheric pressure packed ground roasted coffee cans now on the market, this pressure buildup caused by the generated carbon dioxide is dealt with by simply placing a vent valve in the top of the can. If the can is of a type having a flexible peel-off seal, the vent valve will be built directly into the flexible peel-off lid.

It is also highly desirable, if not a commercial necessity, to include with any coffee can a plastic overcap which is intended primarily to protect the coffee product within the package after the main airtight seal has been opened.

A problem has developed, however, in the case of a ground roast coffee can having a vented peel-off lid and a plastic overcap. It has been found that as the gas pressure builds up within the can it tends to dome the flexible lid upwardly and eventually against the overcap. This creates several problems. First, the constant extension of the flexible lid in its domed condition deforms the flexible lid, causing a wrinkled appearance which is unacceptable to the consumer. Additionally, the materials used to seal the vent valve to the lid, including silicon-based oils, would tend to be expelled from the valve opening and onto the surface of the overcap. This causes a visual blemish which is also unacceptable to the consumer. Additionally, if the valve is sufficiently blocked, the gas within the can can cause the can itself to bulge outwardly, which again is unacceptable to the consumer.

While a primary problem has been blockage of the vent valve in the flexible easy-off lid, an additional problem arises in that gases which do escape through the lid may not be able to escape from the space between the lid and the overcap. It is true that the overcap is simply snapped over the chime of the can in a non-airtight manner. However, the surfaces of the overcap which engage the chime of the can, generally along the top and outer periphery of the chime, while not forming a hermetic seal, clearly form a closure which resists escape of any generated gases which might exit from the vent valve into the space between the lid of the can and the overcap.

Thus, a need exists for an improved arrangement for venting gases created within a can wherein the product is packed under atmospheric pressure and is of the type which generates gases sufficiently to cause a pressure buildup, especially when such a can is used in combination with an overcap.

BRIEF SUMMARY OF THE INVENTION

It is a purpose of the present invention to provide a new and improved arrangement for venting gases which build up in a package of the type wherein the product is packaged under atmospheric pressure in a can having a flexible lid with a vent valve and an overcap. More specifically, it is the purpose of the present invention to provide such an improvement for the fresh packaging of ground roast coffee in a can under atmospheric pressure. The term "can" is intended to encompass various types of containers and packages, including the usual cylindrical metallic can as well as rectangular cans, thin metallic cans of any shape and non-metallic cans.

In accordance with the present invention, an arrangement is provided for preventing the vent valve to be closed off by contact with the overcap. This arrangement comprises a spacing structure preferably formed in or on the bottom of the overcap, which prevents the vent valve in the lid from being closed by contact with the plastic overcap. In one preferred embodiment, this is achieved by providing bosses on the lower, internal surface of the overcap which will engage the flexible lid as it moves upwardly so as to limit such upward movement to such a height that the vent valve remains unblocked and the vented gases are permitted to flow therethrough. Preferably the bosses engage the vent valve in such a way as to block its upward movement while not occluding the vent valve opening. The bosses can take many different shapes such as thin ribs, rectangular cross sections and the like.

In another preferred embodiment, the spacing structure may take the form of a pocket formed in the bottom of the overcap and of such a depth that it allows the flexible lid to reach its maximum height caused by the gas buildup without the flexible lid or the vent valve engaging the overcap.

Additionally, the present invention may include a permanently open passageway at the interface between the overcap and the chime of the coffee can which will allow the escape of any built-up gases which have passed through the vent valve into the space between the flexible lid and the overcap.

In a preferred embodiment, this permanently open passageway between the overcap and the chime of the can can be provided by providing some raised bosses on the inside surface of the plastic overcap precisely where it engages the chime of the can. A series of such bosses, arranged side-by-side, would thereby provide a permanently open passageway between the bosses.

Thus, it is an object of the present invention to provide a new and improved arrangement for venting built-up gases in a can containing a product which generates gases and which can includes a flexible lid and an overcap.

It is another object of the present invention to provide a new and improved arrangement for venting gases from a can of the type described which includes a structure for preventing blockage of a vent valve in the flexible lid.

It is still another object of the present invention to provide an improved venting arrangement in a package of the type described which includes a structure for forming a perma-

US 7,074,443 B2

3

nently open passageway between the interface of the over-cap and the chime of the coffee can.

These and other objects of the present invention will become apparent from the detailed description of the preferred embodiments.

BRIEF DESCRIPTION OF THE DRAWINGS

Preferred embodiments of the present invention are illustrated in the accompanying drawings, wherein:

FIG. 1 is a cross sectional view through a prior art package illustrating the problem solved by the present invention;

FIG. 2 is a plan view of the vent valve on the flexible lid of FIG. 1;

FIG. 3 is a greatly enlarged cross sectional view of a vent valve of FIGS. 1 and 2, taken along line 3—3 of FIG. 2;

FIG. 4 is a cross sectional view through a package, similar to FIG. 1, but showing the features of the present invention;

FIG. 5 is a top plan view of the overcap of FIG. 4;

FIG. 6 is a partial cross sectional view taken along line 6—6 of FIG. 5;

FIG. 7 is a partial cross sectional view taken along line 7—7 of FIG. 5;

FIG. 8 is a partial plan view of an overcap similar to FIG. 5 but showing a modification of the present invention;

FIG. 9 is a cross sectional view through a package, similar to FIG. 4, but showing a modification of the present invention;

FIG. 10 is a partial plan view of the overcap of FIG. 9;

FIG. 11 is a partial cross sectional view taken along line 11—11 of FIG. 5; and

FIG. 12 is an enlarged view of the upper right-hand portion of FIG. 4, more clearly illustrating certain features of the present invention.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring now to the drawings, like elements are represented by like numerals throughout the several views.

FIG. 1 illustrates a conventional can 10 which packages a product 11, for example ground roast coffee, under atmospheric pressure. The normal condition of the can is shown in solid lines. The top of the can is sealed by a flexible peel-off lid 12 formed of a flexible foil material, which lid is hermetically sealed around its periphery to a flexible rim 14 which is integral with the can 10. In a manner known per se, the easy peel-off lid 12 has a pull tab 15. When a product such as ground roasted coffee is packaged at atmospheric conditions, the carbon dioxide which is naturally given off by the product will cause a gaseous buildup within the interior of the can 10. It is therefore necessary to provide a vent in the form of a vent valve 16 which will permit the built-up carbon dioxide to escape to the space above the flexible lid 12.

A conventional can includes a chime 13 with inner edge 13a and a plastic overcap 20. The overcap engages the chime at contact lines 21 and 22. While these contact lines are not intended to provide a hermetic seal, they do to some extent restrict the flow of gas. The primary purpose of the overcap is to provide some protection for the product after the lid 12 has been removed. The overcap 20 also includes a lower part 23 which hangs below the chime and is not in contact with it.

The can 10 may be of any suitable material such as metal, plastic, composite materials, cardboard or other suitable

4

materials. Between the time that a can such as that shown in FIG. 1 is initially sealed, until the time that the consumer removes the lid 12, carbon dioxide is being generated within the hermetically sealed interior of the can. Initially, as the carbon dioxide tries to escape through the vent valve 16, the resistance offered by the vent valve 16 would be greater than the resistance offered to upward bending of the flexible lid 12. Eventually, the condition is reached as shown in dotted lines in FIG. 1 whereat the flexible lid 12 has been moved up to a domed position 12' and the vent valve 16 has been moved up against the bottom of the overcap 20 as shown at 16'. At this point, the downward force of the overcap would tend to close off the vent valve 16. This presents two problems. First, the lid 12 will remain in the domed position 12' and thus become deformed, causing a wrinkled appearance which is not acceptable to the consumer. Second, if the vent valve 16 includes a silicone-based oil, such oil will be expelled from the valve and onto the overcap 20. This causes a stain which tends to spread, causing a visual blemish. Additionally, in the case of rectangular cans, thin metallic cans of any shape, and non-metallic cans, a further buildup could cause the sides of the can 10 to bulge outwardly, as represented by dotted lines 10'. Such a bulged out can is also unacceptable to the consumer.

The vent valve is a commercial product made by Plitek, LLC. Referring to FIG. 2, the vent valve is divided into two outer portions 50 which are completely adhered to the top of lid 12 and a central portion 51 which includes a channel therein for the flow of the built-up gases out both ends of the channel, as shown by the arrows in FIG. 2.

The valve 16 is shown in greater detail in FIG. 3. The flexible lid 12 would preferably have openings formed therein in the form of slits 52 of a type as shown in FIG. 14 of the Bolton U.S. Pat. No. 5,688,544. The width of the slits is highly exaggerated in greatly enlarged FIG. 3. In practice, there could be approximately seven small slits, all located in the central portion of the vent valve 16. FIG. 2 illustrates a plurality of slit openings in the lid 12 within a central area designated at 60. Referring to FIG. 3, the vent valve 16 includes an upper membrane 53 of metallic polyethylene terephthalate (PET). Below the membrane 53 is a polyethylene terephthalate valve flap 57 which is adhered by synthetic rubber adhesive 54 to a natural PET base 56 which is in turn adhered to the flexible lid 12 by a pressure sensitive adhesive 56. The inner space between the valve flap 57 and the flexible lid 12 just above the slits 52 is filled with a silicone-based oil with graphite suspension. In practice, gas escaping through the flexible lid 12 will flow through an opening in the valve flap 57 and then outwardly through the ends of central portion 51 between the valve flap 57 and the membrane 53. The portions 50 and 51 are indicated by vertical dotted lines in FIG. 3.

Solutions to the problem described above are illustrated in FIGS. 4–12.

Referring to FIGS. 4–7, there is provided an overcap 30. A vent valve 16 of the type described in FIGS. 2 and 3 is superimposed in dotted lines on FIG. 5. Formed on the underside of the overcap 30 (and referring also to FIGS. 6 and 7, there are provided a plurality of thin rib bosses 31, 32 and 33. Referring to FIGS. 4 and 5, a highly domed position of the lid 12, the vent valve 16 will engage the thin rib bosses 31, 32 and 33, thus keeping the vent valve 16 spaced beneath the actual undersurface of the overcap 30. By providing three bosses 31, 32 and 33, and by placing them at 120° from each other around the center of the overcap, it is assured that at any given rotational position, while one of the thin ribs might well engage and prevent gas from flowing through

US 7,074,443 B2

5

one end of the central channel portion **51**, the other end thereof will always be unobstructed for the flow of the escaping built-up gases.

The rib bosses **31–33** are all identical, and one of them is shown in detail in FIGS. **6** and **7**. In a preferred embodiment, each rib boss would have a thickness of approximately 0.01 inches, a height of 0.04 inches and a width at its bottom of approximately 0.01 inches.

FIG. **8** illustrates a modification of the present invention. In this case, there is provided an overcap **40** which differs from the overcap **30** in that the thin rib bosses **31**, **32** and **33** have been replaced by square cross section bosses as shown at **41**, **42** and **43** in FIG. **8**. These could for example have a side dimension of 0.06 inches and a depth, the same as in FIGS. **4–7**, of approximately 0.04 inches. The bosses may also have other polygonal or round shapes. Referring to FIG. **8**, it is noted that the three bosses **41**, **42** and **43** are arranged in a triangular pattern, equiangularly about the axis of the overcap **40**. Here, the vent valve **16** is turned relative to its orientation in FIGS. **4** and **5**. However, owing to the arrangement of the bosses **41**, **42** and **43**, even though one of them, in this case **43**, engages the central portion **51**, the other two bosses **41** and **42** are so situated as to permit gas to flow out through the other end of central portion **51**.

In the package of FIG. **4**, the flexible lid **12**, upon original sealing of the can, would be in the downwardly curved position as shown in solid lines in FIG. **1**. However, FIG. **4** is intended to illustrate in solid lines only the position when the carbon dioxide has caused sufficient upward movement of the flexible lid **12** to the height whereat the vent valve **16** has engaged the bosses **31**, **32** and **33**.

FIGS. **9** and **10** illustrate another embodiment of the present invention. In this embodiment, an overcap **45** includes a pocket **46** which is sufficiently deep that the vent valve **16**, even in its uppermost domed position, will never engage the bottom of pocket **46** and hence will not engage the bottom of overcap **45**. The location and depth of pocket **46** must be selected so that in the uppermost position of the lid **12** and vent valve **16**, there is an open passageway through the vent valve **16**, below the edges of the pocket **46** and out toward the periphery of the can. The pocket would preferably have a height of between ⅛ and ¼ inch.

As noted above, the contact lines **21** and **22** between the chime of the can and the interior of the overcap **30**, **40**, **45**, while not forming a hermetic seal, do offer some resistance to the flow of gases. Referring to FIGS. **11** and **12**, with the vent valve **16** unblocked (by the use of bosses **31–33** or **41–43**, or pocket **46**), permitting free flow of the carbon dioxide out of the can and into the space between the flexible lid **12** and the overcap **30**, **40**, **45**, it is possible that the gases can build up to a pressure sufficient to pass beyond contact lines **21** and **22**. However, in order to facilitate the flow of gases out of the space between the overcap **30**, **40**, **45** and the lid **12**, the present invention further includes providing a permanently opened passageway from this inner space to the surrounding exterior. For this purpose, raised elongated bosses **35** and **36** are provided on the top and side of the interior of the overcap **30**, **40**, **45** where the overcap engages the chime **13** at contact lines **21** and **22**. Gases entering this inner space between lid **12** and overcap **30**, **40**, **45** now have a permanently opened passageway for flowing out of this space. This flow from the vent valve **16** up and around the chime **13** is shown by arrows at the upper right hand portion of FIG. **2** and by arrows A in FIG. **7**.

Although the invention has been described in considerable detail, it will be apparent that the invention is capable

6

of numerous modifications and variations, apparent to those skilled in the art, without departing from the spirit and scope of the invention.

What is claimed is:

**1**. A can containing a food product which creates a gas buildup, the top of the can comprising a flexible lid having a vent valve to vent built-up gases, an overcap covering the lid and engaging the sides of the can around the periphery thereof, the overcap including a spacing structure inward from an inner edge of the periphery which prevents the vent valve from being blocked by the overcap when the lid is pushed toward the overcap by gases built-up within the can.

**2**. A can according to claim **1**, said spacing structure comprising a plurality of bosses on the overcap positioned to be engaged by the flexible lid to block further upward movement thereof, and to allow gases passing through the vent valve to flow toward the periphery of the can.

**3**. A can according to claim **2**, wherein the bosses are positioned to engage the vent valve without occluding gas flow therethrough.

**4**. A can according to claim **3**, wherein there are three bosses which are arranged equiangularly about the center of the overcap.

**5**. A can according to claim **4**, wherein the bosses, viewed in plan view, are thin ribs extending along radii of the overcap.

**6**. A can according to claim **4**, wherein the bosses are, in plan view, rectangular.

**7**. A can according to claim **1**, wherein the spacing structure comprises a pocket formed in the bottom of the overcap which is of sufficient depth to allow the flexible lid to reach a maximum height of the lid caused by the gas buildup without the flexible lid or the vent valve engaging the overcap.

**8**. A can according to claim **1**, wherein the product is ground roast coffee.

**9**. A can according to claim **1**, including a permanently opened passageway from the space between the lid and overcap around the top rim of the can to the exterior.

**10**. A can according to claim **9**, said passageway being formed between raised bosses formed in the overcap where the overcap engages the top rim of the can.

**11**. A can according to claim **1**, wherein the lid does not contact the overcap to block the valve from opening when gases build up within the can.

**12**. The can of claim **1**, wherein the flexible lid is a peelable lid.

**13**. The can of claim **1**, wherein the flexible lid comprises flexible foil.

**14**. A can containing a food product which creates a gas buildup, the top of the can comprising a flexible lid having a vent valve to vent built-up gases and a chime around the periphery of the top, an overcap covering the lid, and a lower portion extending down along the sides of the can and engaging the sides of the can around the periphery thereof, and including a permanently opened passageway from the space between the lid and the overcap to the exterior, said passageway extending over the chime and down inside the lower portion of the overcap to empty out along the side of the can, said passageway being formed between raised bosses formed in the overcap which engage the top rim of the can.

**15**. A can containing roast ground coffee packed at atmospheric pressure and generating a carbon dioxide gas buildup,

US 7,074,443 B2

7

a flexible lid hermetically sealing the top of the can and
    including a vent valve allowing the escape of built-up
    carbon dioxide, and

an overcap covering the top of the can and engaging the
    can around the upper rim thereof, the overcap including
    a spacing structure inward from an inner edge of the
    rim which prevents the vent valve from being blocked
    by the overcap when the lid is pushed up toward the
    overcap by the pressure of the built-up carbon dioxide.

16. A can according to claim 15, said spacing structure
comprising a plurality of bosses on the overcap positioned to
be engaged by the flexible lid to block further upward
movement thereof, and to allow gases passing through the
vent valve to flow toward the periphery of the can.

17. A can according to claim 16, wherein the bosses are
positioned to engage the vent valve without occluding the
flow of carbon dioxide therethrough.

18. A can according to claim 17, wherein there are three
bosses which are arranged equiangularly about the center of
the overcap.

19. A can according to claim 18, wherein the bosses,
viewed in plan view, are thin ribs extending along the radii
of the overcap.

20. A can according to claim 18, wherein the bosses are,
in plan view, rectangular.

21. A can according to claim 15, wherein the spacing
structure comprises a pocket formed in the bottom of the

8

overcap which is of sufficient depth to allow the flexible lid
to reach a maximum height of the lid as caused by the carbon
dioxide buildup without the flexible lid or the vent valve
engaging the overcap.

22. A can according to claim 15, including a permanently
opened passageway from the space between the lid and
overcap around the top rim of the can to the exterior.

23. A can containing a food product which creates a gas
buildup, the top of the can comprising a flexible lid having
a vent valve to vent built-up gases, an overcap covering the
lid and engaging the sides of the can around the periphery
thereof, the overcap including a spacing structure which
prevents the vent valve from being blocked by the overcap
when the lid is pushed toward the overcap by gases built-up
within the can, said spacing structure being positioned such
that said spacing structure is not engaged by the valve when
the lid is pushed toward the overcap by the gases built-up
within the can.

24. A can according to claim 23, wherein the spacing
structure is circular.

25. A can according to claim 23, wherein the product is
ground roast coffee.

*   *   *   *   *

# Exhibit 4

PLI-VALV package degassing system I one-way degassing valves (coffee valves) & valve applicators - Plitek, L.L.C.

# PLITEK®

| ABOUT US | INDUSTRIES SERVED | CONVERTING CAPABILITIES | SERVICES | MATERIALS | FEATURED PRODUCTS | NEWS & EVENTS |

CONTACT US

United States & Europe  **+1.847.827.6680**
Asia-Pacific  **+852.2258.7618**

SEARCH

Submit Query

Industries served

Converting Capabilities

Value added services

featured products

>Home  >Industries Served  >**Coffee Packaging**

# PLI-VALV®
## PACKAGE DEGASSING SYSTEM

## Coffee Packaging

The PLI-VALV™ Package Degassing System offers coffee roasters the best solution for fresh coffee.

🖨 Print page    ✉ E-mail this page

**PLI-VALV® Package Degassing System**
In order to provide the freshest coffee possible, coffee roasters must package and seal their coffee beans immediately after roasting. However, as freshly roasted coffee beans cool, they naturally release $CO_2$ gas which can deform or even rupture the package. The solution is the PLI-VALV® Package Degassing System. Composed of our patented one-way degassing valves and valve applicators, The PLI-VALV® Package Degassing System is the complete solution for venting natural $CO_2$ build-up from coffee packaging while sealing-out environmental oxygen, moisture & contaminants.

• **PLI-VALV® Package Degassing System**

©2008 PLITEK LLC
Contact Us | PLITEK, LLC, 69 RAWLS ROAD, DES PLAINES, IL 60018 | TEL +1.847.827.6680 | FAX +1.847.827.6680 |
Site Map|INFO@PLITEK.COM

# Exhibit 5

Design Support - Plitek, L.L.C.



# PLITEK®

United States & Europe **+1.847.827.6680**
Asia-Pacific **+852.2258.7618**

ABOUT US | INDUSTRIES SERVED | CONVERTING CAPABILITIES | SERVICES | MATERIALS | FEATURED PRODUCTS | NEWS & EVENTS

CONTACT US

SEARCH

Submit Query

>**Home**  >**Services**  >**Design Support**

**Design Support**

Part design assistance, process design assistance, packaging design assistance, and more.

🖨 Print page    ✉ E-mail this page

**Design Support**

For over 35 years PLITEK has provided innovative part and process design solutions for some of the most challenging requirements. We will work with you at any phase of your product's life-cycle to understand your requirements and design parts and processes which overcome technical issues, reduce costs, and secure your supply.

**Design Support Capabilities**

- Overcome technical challenges
- Improve manufacturing efficiency
- Reduce material waste
- Optimize integration/assembly with your finished product

Industries served

Converting Capabilities

Value added services

featured products

Contact ©2008 PLITEK LLC
Site Map|PLITEK, LLC, 69 RAWLS ROAD, DES PLAINES, IL 60018 | TEL +1.847.827.6680 | FAX +1.847.827.6680 |
INFO@PLITEK.COM

# Exhibit 6

US007178555B2

(12) **United States Patent**
Engel et al.

(10) **Patent No.:** **US 7,178,555 B2**
(45) **Date of Patent:** **Feb. 20, 2007**

(54) **PRESSURE RELIEF VALVE**

(75) Inventors: **Roger K. Engel**, Schaumburg, IL (US); **Dave Carroll**, Bensenville, IL (US)

(73) Assignee: **Plitek, LLC**, Des Plaines, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/607,857**

(22) Filed: **Jun. 27, 2003**

(65) **Prior Publication Data**

US 2004/0050437 A1      Mar. 18, 2004

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/705,524, filed on Nov. 3, 2000, now abandoned.

(51) **Int. Cl.**
*F16K 15/14*      (2006.01)
*B65D 77/22*      (2006.01)
*B65D 33/01*      (2006.01)

(52) **U.S. Cl.** ..................... **137/852**; 137/843; 220/89.1; 383/103; 426/118

(58) **Field of Classification Search** ................ 137/843, 137/859, 852; 220/89.1; 383/103; 426/118
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,000,846 | A | * | 1/1977 | Gilbert ........................ 383/103 |
| 4,206,870 | A | * | 6/1980 | DeVries ...................... 383/103 |
| 5,263,777 | A | * | 11/1993 | Domke ....................... 383/103 |
| 5,584,409 | A | * | 12/1996 | Chemberlen ............... 220/89.1 |
| 5,727,881 | A | * | 3/1998 | Domke ....................... 383/103 |
| 5,782,266 | A | * | 7/1998 | Domke ....................... 137/551 |
| 5,881,881 | A | * | 3/1999 | Carrington ............... 206/524.8 |
| 5,989,608 | A | * | 11/1999 | Mizuno ...................... 426/113 |

* cited by examiner

*Primary Examiner*—Ramesh Krishnamurthy
(74) *Attorney, Agent, or Firm*—Niro, Scavone, Haller & Niro

(57) **ABSTRACT**

A pressure relief valve that is mountable to protect packaging so as to vent pressurized gases contained within the packaging. The present invention also pertains to a pressure relief valve which includes at least one passageway defined by at least one inner rail and which is in communication with an aperture.

**8 Claims, 1 Drawing Sheet**







US 7,178,555 B2

1

# PRESSURE RELIEF VALVE

This application is a continuation-in-part of application Ser. No.: 09/705,524, filed Nov. 3, 2000, now abandoned.

## BACKGROUND OF THE INVENTION

The present invention relates to a pressure relief valve that is mountable to product packaging so as to vent pressurized gasses contained within the packaging. More specifically, the present invention is a pressure relief valve which includes at least one passageway defined by at least one inner rail and which is in communication with an aperture.

## SUMMARY OF THE INVENTION

Pressure relief valves are often used to vent product packaging which contains materials which may produce gasses. In flexible wall packaging or containers, a build-up of gasses within the container often distorts the appearance of the product or damages the packaging, among other things. To prevent excessive pressure from building within the container, a pressure relief valve is used to vent the gasses while also sealing the contents from the environment through the use of a flexible film or membrane.

However, in use, and especially when numerous cartons are packaged together in bulk, the operation of the film is often obstructed or impeded by an adjoining carton which is placed in contact with the membrane or film. To solve this problem, outer rails are often used which prevent an object from physically contacting the flexible film. This, of course, leads to use of additional materials, manufacturing steps, and ultimately, increased costs.

The present invention eliminates the use of outer rails through the use of at least one inner rail that defines a passageway which is recessed from an aperture located on the valve. In a closed position, the film covers the aperture, and in an open position, the film is raised above the aperture to permit the aperture to be in communication with the passageway in order to vent the container.

## DESCRIPTION OF THE DRAWINGS

These and other features, objects and advantages of the present invention will become apparent from the following description and drawings wherein like reference numerals represent like elements in several views, and in which:

FIG. 1 is a perspective view of a first exemplary embodiment of the invention.

FIG. 2 shows how pressure relief valves may be formed on rolls.

FIG. 3 is a cross sectional view taken along line 3—3.

FIG. 4 is a cross sectional view taken along line 4—4.

FIG. 5 is another cross sectional view taken along line 4—4.

FIG. 6 is a perspective view of an alternative embodiment of the present invention.

FIG. 7 illustrates an alternate embodiment of the present invention.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

Set forth below is a description of what are currently believed to be the preferred embodiments or best examples of the invention claimed. Future and present alternatives and modifications to the preferred embodiments are contem-

2

plated. Any alternates or modifications having insubstantial changes in function, in purpose, in structure or in result are intended to be covered by the claims of this patent.

As shown in FIG. 1, one embodiment of the present invention includes a pressure relief valve 10 having a base 11 which may include an adhesive layer 12 and a release liner 14. The adhesive layer 12 allows the base to be mounted to a package or support surface 16.

An aperture 20 is included on base 11 which is often located over an opening on package 16. Base 11 may be made of a number of materials known to those of skill in the art including Polyethylene Terephthalate by DuPont Teijin Films.

As is also shown in FIGS. 1–5, inner rails 22 and 24 are provided on base 11. Inner rails 22 and 24 may be an adhesive layer that has been applied to the base or of some other suitable material known to those of skill in the art. The thickness of the inner rails should be about 1 to 10 millimeters, with a thickness of 4–6 millimeters being preferred.

The inner rails are located a spaced distance from aperture 20 to form a passageway 30 which is recessed from aperture 20. As show in FIG. 6, in another embodiment of the present invention, a single inner rail 135 may also be provided which forms a passageway 130 that is recessed from aperture 20. Of course, the shape of base 111 may be generally circular or oval as shown in FIG. 6 or 4-sided as shown in FIG. 1. In addition, other shapes would work as well.

A film or membrane 50 or 150 is also provided which is supported by inner rail 135 or inner rails 22 and 24. The film may be made of Polyethylene Terephthalate by DuPont. In addition, a plurality of pressure relief valves 10 may be formed on a roll 60 as shown in FIG. 2 in a manner known to those of ordinary skill in the art.

In operation, as shown in FIG. 3, film 50 is in a closed position and extends inwardly to cover aperture 20. In this position, film 50 acts as a seal which prevents exposure to the outside environment.

To vent the contents, film 50 moves into an open position through the force created by the pressurized gas located in container 16. The pressure moves film 50 up off of aperture 20. This, in turn, permits aperture 20 to be in communication with the passageway so as to allow venting to occur. Once the pressure in the package equalizes, film 50, again, moves inwardly to cover and seal off the aperture.

As is also shown in FIG. 3, in an open position, the passageway and aperture form an opening that is stepped in configuration which permits venting to occur. By permitting film 50 to move downwardly and upwardly within space defined by the passageway, contact by extraneous surfaces or objects with film 50 will not interfere with the operation of valve 50. This, in turn, eliminates the need to use outer rails with the device.

As shown in FIG. 7, an alternate embodiment of the present invention concerns a valve 399 which includes a release liner 400, adhesive 402, base 404, and an elastomeric film 408 which is attached to base 404 by adhesive 406. As described above, this embodiment forms a channel or passageway 412 as well. However, by using an elastomeric film 408, the size of channel 412 may be increased by the ability of the film to balloon outwardly 410 past base 404 when subject to pressure created by outflowing gas. In other words, when in an open position, said film is arcuate or curved in shape. This ability to create a larger than normal passageway 412 allows the valve to handle sudden high flow volumes of air or other gasses that may be encountered. This prevents the container from rupturing when subjected to this condition. A suitable elastomeric film 408 is Exxon 318.92

US 7,178,555 B2

3

EVA LD. Of course, other expandable films known to those of ordinary skill in the art maybe used as well. The operation of this embodiment is otherwise as was described above.

While the invention has been described with reference to the preferred embodiments thereof, it will be appreciated that numerous variations, modifications, and alternate embodiments are possible, and accordingly, all such variations, modifications, and alternate embodiments are to be regarded as being within the spirit and scope of the invention.

It should be understood that various changes and modifications to the preferred embodiments described would be apparent to those skilled in the art. Changes and modifications can be made without departing from the spirit and scope of the present invention and without diminishing its intended advantages. It is, therefore, intended that such changes and modifications be covered by the following claims.

What is claimed is:

1. A pressure relief valve comprising: a self-supporting base mountable to a support surface and having a first layer defining an inner aperture; an inner rail member having a different configuration than said self-supporting base, wherein said inner rail member is positioned on the self-supporting base and connected by an adhesive layer to said self-supporting base: a flexible film connected with adhesive to the inner rail member, the flexible film being disposed on the periphery of the valve; said inner rail member defining a passageway between the flexible film and the base recessed from said inner aperture and in communication

4

with said inner aperture; said flexible film moveable between an open and closed position; in said open position said flexible film is located above said aperture and extends outwardly beyond said base; and in said closed position, said film covers said aperture, the inner rail member has a sufficient thickness to permit said flexible film to move from said open position wherein said flexible film does not contact said self-supporting base and to said closed position wherein said flexible film does contact said self-supporting base.

2. The device of claim 1 wherein said flexible film is curved in shape when in said open position.

3. The device of claim 1 wherein said flexible film comprises an elastomeric material.

4. The device of claim 1 wherein said film balloons outwardly when in a said open position.

5. The pressure relief valve of claim 1, wherein said inner rail member comprises a pair of strips located along an outer edge of the base.

6. The pressure relief valve of claim 5, wherein said inner rail member forms a rectangular passage that connects to the inner aperture.

7. The pressure relief valve of claim 1, wherein the base comprises Polyethylene Terephthalate.

8. The pressure relief valve of claim 7, wherein the inner rail member has a uniform thickness between 1–10 millimeters.

* * * * *

# Exhibit 7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

KRAFT FOODS HOLDINGS, INC.,

Plaintiff,

v.

THE PROCTER & GAMBLE COMPANY,

Defendant

THE PROCTER & GAMBLE COMPANY,

Counterclaim Plaintiff,

v.

KRAFT FOODS HOLDINGS, INC.

Counterclaim Defendant

and

KRAFT FOODS GLOBAL, INC.

Third-Party Defendant

Case No. 07C0613S

---

**PLAINTIFF AND COUNTERCLAIM DEFENDANT
KRAFT FOODS HOLDING, INC.'S AND THIRD-PARTY DEFENDANT KRAFT FOODS
GLOBAL, INC.'S INITIAL DISCLOSURES**

---

Pursuant to Federal Rule of Civil Procedure 26(a)(1), Plaintiff and Counterclaim

Defendant Kraft Foods Holdings, Inc. and Third-Party Defendant Kraft Foods Global, Inc.

(collectively, "Kraft") hereby make their Initial Disclosures to Defendant and Counterclaim

Plaintiff The Procter & Gamble Company ("P&G"):

I.   **Witnesses**

Kraft identifies the following individuals likely to have discoverable information that

Kraft may use to support their claims and/or defenses:

| Name | Possible Subjects |
|---|---|
| Jeffrey A. Thomas<br>c/o Quinn Emanuel Urquhart Oliver &<br>Hedges LLP<br>555 Twin Dolphin Drive, Ste. 560<br>Redwood Shores, CA 94065<br>Telephone:  (650) 801-5000<br>Facsimile:  (650) 801-5100 | The design, development, conception and reduction to practice of the invention disclosed in U.S. Patent No. 7,074,443; the construction of the asserted claims in U.S. Patent No. 7,074,443; damages; Procter & Gamble's infringement of U.S. Patent No. 7,074,443. |
| Jeffrey Alan Zimmermann<br>Associate Principle Engineer<br>c/o Quinn Emanuel Urquhart Oliver &<br>Hedges LLP<br>555 Twin Dolphin Drive, Ste. 560<br>Redwood Shores, CA 94065<br>Telephone:  (650) 801-5000<br>Facsimile:  (650) 801-5100 | The design, development, conception and reduction to practice of the invention disclosed in U.S. Patent No. 7,074,443; the construction of the asserted claims in U.S. Patent No. 7,074,443; damages; Procter & Gamble's infringement of U.S. Patent No. 7,074,443. |
| Piaras DeCleir<br>Program Manager<br>c/o Quinn Emanuel Urquhart Oliver &<br>Hedges LLP<br>555 Twin Dolphin Drive, Ste. 560<br>Redwood Shores, CA 94065<br>Telephone:  (650) 801-5000<br>Facsimile:  (650) 801-5100 | The design, development, conception and reduction to practice of the invention disclosed in U.S. Patent No. 7,074,443; the construction of the asserted claims in U.S. Patent No. 7,074,443; prior art, invalidity and non-infringement of U.S. Patent No. 7,169,419; damages; Procter & Gamble's infringement of U.S. Patent No. 7,074,443. |
| Mete Bruncaj<br>Associate Principle Engineer<br>c/o Quinn Emanuel Urquhart Oliver &<br>Hedges LLP<br>555 Twin Dolphin Drive, Ste. 560<br>Redwood Shores, CA 94065<br>Telephone:  (650) 801-5000<br>Facsimile:  (650) 801-5100 | The design, development, conception and reduction to practice of the invention disclosed in U.S. Patent No. 7,074,443; the construction of the asserted claims in U.S. Patent No. 7,074,443; damages; Procter & Gamble's infringement of U.S. Patent No. 7,074,443. |
| Eve Snyder<br>Senior CAT Insight Manager<br>c/o Quinn Emanuel Urquhart Oliver &<br>Hedges LLP<br>555 Twin Dolphin Drive, Ste. 560<br>Redwood Shores, CA 94065<br>Telephone:  (650) 801-5000<br>Facsimile:  (650) 801-5100 | Marketing of Maxwell House coffee products; damages. |

| Name | Possible Subjects |
|------|-------------------|
| Gerald Denske<br>Director Mainstream Coffee<br>c/o Quinn Emanuel Urquhart Oliver &<br>Hedges LLP<br>555 Twin Dolphin Drive, Ste. 560<br>Redwood Shores, CA 94065<br>Telephone:  (650) 801-5000<br>Facsimile:  (650) 801-5100 | Marketing of Maxwell House coffee products;<br>damages. |
| George Albright<br>Packaging Consultant<br>c/o Quinn Emanuel Urquhart Oliver &<br>Hedges LLP<br>555 Twin Dolphin Drive, Ste. 560<br>Redwood Shores, CA 94065<br>Telephone:  (650) 801-5000<br>Facsimile:  (650) 801-5100 | Design and development of accused Maxwell<br>House coffee product; prior art, invalidity and<br>non-infringement of U.S. Patent No. 7,169,419;<br>damages. |
| Scott Schleiger<br>Dir. N. A. Packaging Beverage Sector<br>c/o Quinn Emanuel Urquhart Oliver &<br>Hedges LLP<br>555 Twin Dolphin Drive, Ste. 560<br>Redwood Shores, CA 94065<br>Telephone:  (650) 801-5000<br>Facsimile:  (650) 801-5100 | Conception, design, and development of accused<br>Maxwell House product; prior art, invalidity and<br>non-infringement of U.S. Patent No. 7,169,419;<br>damages. |
| Leonard Scarola<br>Packaging Consultant<br>c/o Quinn Emanuel Urquhart Oliver &<br>Hedges LLP<br>555 Twin Dolphin Drive, Ste. 560<br>Redwood Shores, CA 94065<br>Telephone:  (650) 801-5000<br>Facsimile:  (650) 801-5100 | Conception, design, and development of accused<br>Maxwell House coffee product; prior art,<br>invalidity and non-infringement of U.S. Patent<br>No. 7,169,419; infringement of U.S. Patent No.<br>7,074,443; damages. |
| Glen Gruskin<br>Senior Program Leader<br>c/o Quinn Emanuel Urquhart Oliver &<br>Hedges LLP<br>555 Twin Dolphin Drive, Ste. 560<br>Redwood Shores, CA 94065<br>Telephone:  (650) 801-5000<br>Facsimile:  (650) 801-5100 | Design and development of accused Maxwell<br>House product; prior art, invalidity and non-<br>infringement of U.S. Patent No. 7,169,419;<br>damages. |

| Name | Possible Subjects |
|------|-------------------|
| Nevin Dubin<br>Senior CAT Insight Manager<br>c/o Quinn Emanuel Urquhart Oliver & Hedges LLP<br>555 Twin Dolphin Drive, Ste. 560<br>Redwood Shores, CA 94065<br>Telephone:  (650) 801-5000<br>Facsimile:  (650) 801-5100 | Infringement of U.S. Patent No. 7,074,443; marketing of Maxwell House coffee products; damages. |
| Nick Winters<br>Packaging Consultant<br>c/o Quinn Emanuel Urquhart Oliver & Hedges LLP<br>555 Twin Dolphin Drive, Ste. 560<br>Redwood Shores, CA 94065<br>Telephone:  (650) 801-5000<br>Facsimile:  (650) 801-5100 | Infringement of U.S. Patent No. 7,074,443. |
| James Cebry<br>c/o Quinn Emanuel Urquhart Oliver & Hedges LLP<br>555 Twin Dolphin Drive, Ste. 560<br>Redwood Shores, CA 94065<br>Telephone:  (650) 801-5000<br>Facsimile:  (650) 801-5100 | The design, development, conception and reduction to practice of the invention disclosed in U.S. Patent No. 7,074,443. |
| Joseph Bruscino<br>c/o Quinn Emanuel Urquhart Oliver & Hedges LLP<br>555 Twin Dolphin Drive, Ste. 560<br>Redwood Shores, CA 94065<br>Telephone:  (650) 801-5000<br>Facsimile:  (650) 801-5100 | The design, development, conception and reduction to practice of the invention disclosed in U.S. Patent No. 7,074,443. |
| Omega Plastics, Inc.<br>401 S.E. Thompson Drive<br>P.O. Box 1297<br>Lee's Summit, MO 64063 | The design and development of Maxwell House coffee containers. |
| Olgivy & Mather<br>World Wide Plaza<br>309 W. 49th St.<br>New York, NY 10019 | Marketing of Maxwell House coffee products. |

| Name | Possible Subjects |
|---|---|
| Lorraine Hansen<br>Sr. V.P. & General Manager, Coffee<br>c/o Quinn Emanuel Urquhart Oliver &<br>Hedges LLP<br>555 Twin Dolphin Drive, Ste. 560<br>Redwood Shores, CA 94065<br>Telephone: (650) 801-5000<br>Facsimile: (650) 801-5100 | Maxwell House coffee sales and marketing;<br>Maxwell House coffee division; damages. |
| Irma Villarreal<br>Chief Counsel and Asst. Corp. Sec.<br>c/o Quinn Emanuel Urquhart Oliver &<br>Hedges LLP<br>555 Twin Dolphin Drive, Ste. 560<br>Redwood Shores, CA 94065<br>Telephone: (650) 801-5000<br>Facsimile: (650) 801-5100 | The corporate relationship between Kraft Foods<br>Holdings, Inc. and Kraft Foods Global, Inc. |
| Marvin Petry<br>Stites & Harbison<br>Tel (703) 837-3902<br>Fax (703) 518-2932<br>mpetry@stites.com | Prosecution of the application that matured into<br>U.S. Patent No. 7,074,443. |
| David Andrew Dalton<br>Principle Engineer<br>The Procter & Gamble Company<br>Loveland, OH | The design, development, conception and<br>reduction to practice of the alleged inventions<br>disclosed in U.S. Patent Nos. 7,169,418 and<br>7,169,419; construction of the asserted claims in<br>U.S. Patent Nos. 7,169,418 and 7,169,419;<br>prosecution of the applications that lead to U.S.<br>Patent Nos. 7,169,418 and 7,169,419; divisionals,<br>foreign counterparts, continuations and<br>continuations in part to U.S. Patent No.<br>7,169,419; prior art, invalidity and non-<br>infringement of U.S. Patent No. 7,169,419;<br>damages; infringement of U.S. Patent No.<br>7,074,443; P&G's Northern District of California<br>lawsuit against Kraft Foods Global, Inc. |

| Name | Possible Subjects |
|------|-------------------|
| Kerry Lloyd Weaver<br>Florence, KY | The design, development, conception and reduction to practice of the alleged inventions disclosed in U.S. Patent Nos. 7,169,418 and 7,169,419; construction of the asserted claims in U.S. Patent Nos. 7,169,418 and 7,169,419; prosecution of the applications that lead to U.S. Patent Nos. 7,169,418 and 7,169,419; divisionals, foreign counterparts, continuations and continuations in part to U.S. Patent No. 7,169,419; prior art, invalidity and non-infringement of U.S. Patent No. 7,169,419; damages; infringement of U.S. Patent No. 7,074,443; P&G's Northern District of California lawsuit against Kraft Foods Global, Inc. |
| Thomas James Manske, Jr.<br>Mason, OH | The design, development, conception and reduction to practice of the alleged inventions disclosed in U.S. Patent Nos. 7,169,418 and 7,169,419; construction of the asserted claims in U.S. Patent Nos. 7,169,418 and 7,169,419; prosecution of the applications that lead to U.S. Patent Nos. 7,169,418 and 7,169,419; divisionals, foreign counterparts, continuations and continuations in part to U.S. Patent No. 7,169,419; prior art, invalidity and non-infringement of U.S. Patent No. 7,169,419; damages; infringement of U.S. Patent No. 7,074,443; P&G's Northern District of California lawsuit against Kraft Foods Global, Inc. |
| James David Smith<br>Loveland, OH | The design, development, conception and reduction to practice of the alleged inventions disclosed in U.S. Patent Nos. 7,169,418 and 7,169,419; construction of the asserted claims in U.S. Patent Nos. 7,169,418 and 7,169,419; prosecution of the applications that lead to U.S. Patent Nos. 7,169,418 and 7,169,419; divisionals, foreign counterparts, continuations and continuations in part to U.S. Patent No. 7,169,419; prior art, invalidity and non-infringement of U.S. Patent No. 7,169,419; damages; infringement of U.S. Patent No. 7,074,443; P&G's Northern District of California lawsuit against Kraft Foods Global, Inc. |

| Name | Possible Subjects |
|------|-------------------|
| James Lee Bono<br>Cincinnati, OH | The design, development, conception and reduction to practice of the alleged inventions disclosed in U.S. Patent Nos. 7,169,418 and 7,169,419; construction of the asserted claims in U.S. Patent Nos. 7,169,418 and 7,169,419; prosecution of the applications that lead to U.S. Patent Nos. 7,169,418 and 7,169,419; divisionals, foreign counterparts, continuations and continuations in part to U.S. Patent No. 7,169,419; prior art, invalidity and non-infringement of U.S. Patent No. 7,169,419; damages; infringement of U.S. Patent No. 7,074,443; P&G's Northern District of California lawsuit against Kraft Foods Global, Inc. |
| Sameer Mungur<br>Cincinnati, OH | The design, development, conception and reduction to practice of the alleged inventions disclosed in U.S. Patent Nos. 7,169,418 and 7,169,419; construction of the asserted claims in U.S. Patent Nos. 7,169,418 and 7,169,419; prosecution of the applications that lead to U.S. Patent Nos. 7,169,418 and 7,169,419; divisionals, foreign counterparts, continuations and continuations in part to U.S. Patent No. 7,169,419; prior art, invalidity and non-infringement of U.S. Patent No. 7,169,419; damages; infringement of U.S. Patent No. 7,074,443; P&G's Northern District of California lawsuit against Kraft Foods Global, Inc. |
| Douglas Bruce Zeik<br>Middletown, OH | The design, development, conception and reduction to practice of the alleged inventions disclosed in U.S. Patent Nos. 7,169,418 and 7,169,419; construction of the asserted claims in U.S. Patent Nos. 7,169,418 and 7,169,419; prosecution of the applications that lead to U.S. Patent Nos. 7,169,418 and 7,169,419; divisionals, foreign counterparts, continuations and continuations in part to U.S. Patent No. 7,169,419; prior art, invalidity and non-infringement of U.S. Patent No. 7,169,419; damages; infringement of U.S. Patent No. 7,074,443; P&G's Northern District of California lawsuit against Kraft Foods Global, Inc. |

| Name | Possible Subjects |
|------|-------------------|
| Aisha Barry<br>Mason, OH | The design, development, conception and reduction to practice of the alleged inventions disclosed in U.S. Patent Nos. 7,169,418 and 7,169,419; construction of the asserted claims in U.S. Patent Nos. 7,169,418 and 7,169,419; prosecution of the applications that lead to U.S. Patent Nos. 7,169,418 and 7,169,419; divisionals, foreign counterparts, continuations and continuations in part to U.S. Patent No. 7,169,419; prior art, invalidity and non-infringement of U.S. Patent No. 7,169,419; damages; infringement of U.S. Patent No. 7,074,443; P&G's Northern District of California lawsuit against Kraft Foods Global, Inc. |
| Jennifer Ruth Ralston Floyd<br>Sr. Engineer, Coffee R & D<br>The Procter & Gamble Company<br>West Chester, OH | The design, development, conception and reduction to practice of the alleged inventions disclosed in U.S. Patent Nos. 7,169,418 and 7,169,419; construction of the asserted claims in U.S. Patent Nos. 7,169,418 and 7,169,419; prosecution of the applications that lead to U.S. Patent Nos. 7,169,418 and 7,169,419; divisionals, foreign counterparts, continuations and continuations in part to U.S. Patent No. 7,169,419; prior art, invalidity and non-infringement of U.S. Patent No. 7,169,419; damages; infringement of U.S. Patent No. 7,074,443; P&G's Northern District of California lawsuit against Kraft Foods Global, Inc. |
| Greg Huntington<br>Director of Research & Development, Coffee Category<br>The Procter & Gamble Company | Sales and marketing of the accused P&G products; damages; invalidity and non-infringement of U.S. Patent No. 7,169,419; infringement of U.S. Patent No. 7,074,443; P&G's Northern District of California lawsuit against Kraft Foods Global, Inc. |
| Jason Gemeiner<br>Lead Business Analyst, Coffee Division<br>The Procter & Gamble Company | Sales and marketing of the accused P&G products; damages; invalidity and non-infringement of U.S. Patent No. 7,169,419; infringement of U.S. Patent No. 7,074,443; P&G's Northern District of California lawsuit against Kraft Foods Global, Inc. |
| Todd Roe<br>Consumer Market Knowledge Division<br>The Procter & Gamble Company | Sales and marketing of the accused P&G products; damages; invalidity and non-infringement of U.S. Patent No. 7,169,419; infringement of U.S. Patent No. 7,074,443; P&G's Northern District of California lawsuit against Kraft Foods Global, Inc. |

| Name | Possible Subjects |
|------|-------------------|
| Edward Bello<br>Brand Manager for North American Folgers Coffee<br>The Procter & Gamble Company | Sales and marketing of the accused P&G products; damages; invalidity and non-infringement of U.S. Patent No. 7,169,419; infringement of U.S. Patent No. 7,074,443; P&G's Northern District of California lawsuit against Kraft Foods Global, Inc. |
| Rudy Schmeller<br>Account Executive, Folgers Coffee<br>The Procter & Gamble Company | Sales and marketing of the accused P&G products; damages; invalidity and non-infringement of U.S. Patent No. 7,169,419; infringement of U.S. Patent No. 7,074,443; P&G's Northern District of California lawsuit against Kraft Foods Global, Inc. |
| Sue Mills<br>Principle Scientist<br>The Procter & Gamble Company | Sales and marketing of the accused P&G products; damages; invalidity and non-infringement of U.S. Patent No. 7,169,419; infringement of U.S. Patent No. 7,074,443; P&G's Northern District of California lawsuit against Kraft Foods Global, Inc. |
| Coffee Bean International<br>2181 N.W. Nicolai Street<br>Portland, Oregon 97210 | Prior art to U.S. Patent No. 7,169,419. |
| Arbor Strategy Group<br>680 State Circle<br>Ann Arbor, MI 48108 | Prior art to U.S. Patent No. 7,169,419. |
| Plitek L.L.C.<br>69 Rawls Road<br>Des Plaines, IL 60018 | Prior art to U.S. Patent No. 7,169,419. |
| Graham Packaging Company, L.P.<br>2401 Pleasant Valley Road<br>York, PA 17402 | Prior art to U.S. Patent No. 7,169,419. |
| Consolidated Container Company<br>Corporate Headquarters<br>3101 Towercreek Parkway<br>Suite 300<br>Atlanta, GA 30339 | Prior art to U.S. Patent No. 7,169,419. |
| James M. Myers (Formerly employed by Coffee Bean International)<br>c/o Quinn Emanuel Urquhart Oliver & Hedges LLP<br>555 Twin Dolphin Drive, Ste. 560<br>Redwood Shores, CA 94065<br>Telephone: (650) 801-5000<br>Facsimile: (650) 801-5100 | Prior art to U.S. Patent No. 7,169,419. |
| Dunkin' Donuts Incorporated<br>130 Royall Street<br>Canton, MA 02021 | Prior art to U.S. Patent No. 7,169,419. |
| Continental Group Company<br>Riverpark 800 Connecticut Ave.<br>Norwalk, Connecticut 06856 | Prior art to U.S. Patent No. 7,169,419. |

| Name | Possible Subjects |
|---|---|
| Ball Corporation<br>10 Longs Peak Drive<br>Broomfield, CO, 80021 | Prior art to U.S. Patent No. 7,169,419. |
| Monsanto Company<br>800 N. Lindbergh Blvd.<br>St. Louis, MO 63167 | Prior art to U.S. Patent No. 7,169,419. |
| Owens-Illinois, Inc.<br>One Michael Owens Way<br>Perrysburg, OH 43551-2999 | Prior art to U.S. Patent No. 7,169,419. |
| Constar International Inc.<br>1 Crown Way<br>Philadelphia, Pennsylvania 19154-4599 | Prior art to U.S. Patent No. 7,169,419. |
| Flavorcoffee Co. Inc.<br>Unit 10 70 Connie Crescent<br>Concord, Ontartio Canada L4K 1L6 | Prior art to U.S. Patent No. 7,169,419. |
| Hoover Universal, Inc.<br>49200 Halyard Dr<br>Plymouth, MI , 48170-2481 | Prior art to U.S. Patent No. 7,169,419. |
| Fres-co System USA, Inc.<br>3005 State Road<br>Telford, PA 18969-1033 | Prior art to U.S. Patent No. 7,169,419. |
| Plastipak Holdings, Inc.<br>Global Business and<br>Technology Center<br>41605 Ann Arbor Road<br>Plymouth, Michigan 48170 | Prior art to U.S. Patent No. 7,169,419. |
| Crown Cork & Seal Technologies<br>Crown Holdings, Inc.<br>One Crown Way<br>Philadelphia, PA 19154-4599 USA | Prior art to U.S. Patent No. 7,169,419. |
| Yoshino Kogyosho Co., Ltd.<br>Japan | Prior art to U.S. Patent No. 7,169,419. |
| Sewell Plastics, Inc.<br>Atlanta, Georgia | Prior art to U.S. Patent No. 7,169,419. |
| CMB Foodcan plc<br>United Kingdom | Prior art to U.S. Patent No. 7,169,419. |
| Van Dorn Company<br>Cleveland, Ohio | Prior art to U.S. Patent No. 7,169,419. |
| Robert Bosch GmbH<br>Stuttgart, Germany | Prior art to U.S. Patent No. 7,169,419. |
| Goglio<br>Via Dell'industria 7 - 21020<br>Daverio - (VA) - Italy | Prior art to U.S. Patent No. 7,169,419. |
| Amcor Limited<br>South Melbourne, Australia | Prior art to U.S. Patent No. 7,169,419. |
| Continental PET Technologies, Inc. | Prior art to U.S. Patent No. 7,169,419. |
| Goglio Luigi Milano SpA | Prior art to U.S. Patent No. 7,169,419. |

| Name | Possible Subjects |
|---|---|
| Peter D. Meyer<br>Attorney for P&G<br>Registration No. 47,972<br>(513) 634-9359 | Prosecution of the applications that matured into U.S. Patent Nos. 7,169,418 and 7,169,419; construction of the claims in U.S. Patent Nos. 7,169,418 and 7,169,419; non-infringement and invalidity of U.S. Patent Nos. 7,169,418 and 7,169,419. |
| Carl J. Roof, Attorney for Applicants<br>Attorney for P&G<br>Registration No. 37,708<br>(513) 634-5209 | Prosecution of the applications that matured into U.S. Patent Nos. 7,169,418 and 7,169,419; construction of the claims in U.S. Patent Nos. 7,169,418 and 7,169,419; non-infringement and invalidity of U.S. Patent Nos. 7,169,418 and 7,169,419. |
| Brynt T. Lorentz<br>Attorney for P&G<br>Registration No. 55,668<br>(513) 634-2084 | Prosecution of the applications that matured into U.S. Patent Nos. 7,169,418 and 7,169,419; construction of the claims in U.S. Patent Nos. 7,169,418 and 7,169,419; non-infringement and invalidity of U.S. Patent Nos. 7,169,418 and 7,169,419. |
| Jerry J. Yetter<br>Attorney for P&G<br>Registration No. 26,598<br>(513) 627-2996 | Prosecution of the applications that matured into U.S. Patent Nos. 7,169,418 and 7,169,419; construction of the claims in U.S. Patent Nos. 7,169,418 and 7,169,419; non-infringement and invalidity of U.S. Patent Nos. 7,169,418 and 7,169,419. |
| Ingrid N. Hackett<br>Registration No. 46,770 | Prosecution of the applications that matured into U.S. Patent Nos. 7,169,418 and 7,169,419; construction of the claims in U.S. Patent Nos. 7,169,418 and 7,169,419; non-infringement and invalidity of U.S. Patent Nos. 7,169,418 and 7,169,419. |

Kraft expressly reserves the right to supplement its response pursuant to Fed. R. Civ. Proc. 26(e) as its investigation continues.

## II.    **Documents**

Kraft has within its possession, custody and control the following categories of documents that Kraft may use to support its claims and/or defenses:

| Category | Location |
|---|---|
| Prior art relating to U.S. Patent No. 7,169,419. | Quinn Emanuel Urquhart Oliver & Hedges LLP<br>555 Twin Dolphin Drive, Ste. 560<br>Redwood Shores, CA 94065<br>Telephone: (650) 801-5000<br>Facsimile: (650) 801-5100 |

| Category | Location |
|---|---|
| U.S. Patent No. 7,169,419, file history and available cited references. | Quinn Emanuel Urquhart Oliver & Hedges LLP 555 Twin Dolphin Drive, Ste. 560 Redwood Shores, CA 94065 Telephone:  (650) 801-5000 Facsimile:  (650) 801-5100 |
| Foreign counterparts, continuations, divisionals, and any provisional applications relating to U.S. Patent No. 7,169,419. | Quinn Emanuel Urquhart Oliver & Hedges LLP 555 Twin Dolphin Drive, Ste. 560 Redwood Shores, CA 94065 Telephone:  (650) 801-5000 Facsimile:  (650) 801-5100 |
| Documents and correspondence related to the accused Maxwell House product in this action. | Kraft c/o Quinn Emanuel Urquhart Oliver & Hedges LLP 555 Twin Dolphin Drive, Ste. 560 Redwood Shores, CA 94065 Telephone:  (650) 801-5000 Facsimile:  (650) 801-5100 |
| U.S. Patent No. 7,074,443, file history and available cited references. | Quinn Emanuel Urquhart Oliver & Hedges LLP 555 Twin Dolphin Drive, Ste. 560 Redwood Shores, CA 94065 Telephone:  (650) 801-5000 Facsimile:  (650) 801-5100 |
| Prior art relating to U.S. Patent No. 7,169,418. | Quinn Emanuel Urquhart Oliver & Hedges LLP 555 Twin Dolphin Drive, Ste. 560 Redwood Shores, CA 94065 Telephone:  (650) 801-5000 Facsimile:  (650) 801-5100 |
| U.S. Patent No. 7,169,418, file history and available cited references. | Quinn Emanuel Urquhart Oliver & Hedges LLP 555 Twin Dolphin Drive, Ste. 560 Redwood Shores, CA 94065 Telephone:  (650) 801-5000 Facsimile:  (650) 801-5100 |
| Foreign counterparts, continuations, divisionals, and any provisional applications relating to U.S. Patent No. 7,169,418. | Quinn Emanuel Urquhart Oliver & Hedges LLP 555 Twin Dolphin Drive, Ste. 560 Redwood Shores, CA 94065 Telephone:  (650) 801-5000 Facsimile:  (650) 801-5100 |
| Documents and correspondence related to the accused P&G products in this action. | The Procter & Gamble Company |

Kraft expressly reserves the right to supplement its response pursuant to Fed. R. Civ.

Proc. 26(e) as its investigation continues.

III.     **Computation of Damages**

Kraft seeks damages in an amount yet to be determined stemming from P&G's infringement of U.S. Patent No. 7,074,443. Kraft also seeks its attorneys' fees and costs incurred in defending this lawsuit in an amount yet to be determined. Kraft expressly reserves the right to supplement its response pursuant to Fed. R. Civ. Proc. 26(e) as its investigation continues.

IV.     **Insurance Agreements**

Kraft is not aware of any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.

V.     **Preliminary Infringement Analysis for U.S. Patent No. 7,074,443**

Attached as Exhibit A is Kraft's preliminary infringement analysis for U.S. Patent No. 7,074,443. Discovery has not yet commenced, and the asserted claims of U.S. Patent No. 7,074,443 have not yet been construed by the Court. Kraft therefore reserves its right to amend, supplement, or otherwise modify the infringement analysis set forth in attached Exhibit A, in the event discovery and/or rulings from this Court so require.

## CERTIFICATION OF DISCLOSURE

The undersigned certifies that, to the best of his knowledge, information and belief, formed after an inquiry that is reasonable under the circumstances, the above disclosure is complete and correct as of the time it is made.

December 10, 2007

By:  */s/Evette D. Pennypacker*
     Evette D. Pennypacker (*pro hac vice*)
     evettepennypacker@quinnemanuel.com
**QUINN EMANUEL URQUHART OLIVER &**
  **HEDGES, LLP**
555 Twin Dolphin Drive, Suite 560
Redwood Shores, California 94065-2129
650.801.5000
Facsimile:  (650) 801-5100

ANTHONY A. TOMASELLI
**QUARLES & BRADY LLP**
33 East Main Street
Suite 900
Madison, WI 53703
608.251.5000

*Attorneys for Plaintiff and Counterclaim Defendant*
*Kraft Foods Holding, Inc. and Third-Party*
*Defendant Kraft Foods Global, Inc.*

# EXHIBIT A

*Kraft Foods Holdings, Inc. v. The Proctor & Gamble Co.*
Case No. 07-C-0613-S (W.D. Wis.)

**EXHIBIT A to Kraft's Rule 26(a)(1) Initial Disclosures**
**Preliminary Infringement Analysis**

| U.S. Pat. No. 7,074,443 Claim Element | Infringing Product: Folgers 39-ounce Can | Infringing Product: Folgers 52-ounce Can | Exemplary Citations to Specification Further Describing Claim Element |
|---|---|---|---|
| **1.** A can containing a food product which creates a gas buildup | The Folgers 39-ounce can is a can that contains a food product, namely ground coffee, which creates a gas buildup. | The Folgers 52-ounce can is a can that contains a food product, namely ground coffee, which creates a gas buildup. | This claim element is described, for example, in the specification at 1:23-37, 2:20-23, 3:49-53, 3:66-4:4. |

**"can"**

1

*Kraft Foods Holdings, Inc. v. The Proctor & Gamble Co.*
Case No. 07-C-0613-S (W.D. Wis.)

**EXHIBIT A to Kraft's Rule 26(a)(1) Initial Disclosures**
**Preliminary Infringement Analysis**

| U.S. Pat. No. 7,074,443 Claim Element | Infringing Product: Folgers 39-ounce Can | Infringing Product: Folgers 52-ounce Can | Exemplary Citations to Specification Further Describing Claim Element |
|---|---|---|---|
| [a] the top of the can comprising a flexible lid having a vent val[v]e to vent built up gases | <br>The top of the Folgers 39-ounce can has a flexible lid with a vent valve to vent built up gases. | <br>The top of the Folgers 52-ounce can has a flexible lid with a vent valve to vent built up gases. | This claim element is described, for example, in the specification at 1:17-22, 1:36-37 and 3:45-56. |

"food product which creates a gas buildup" (ground coffee)

2

*Kraft Foods Holdings, Inc. v. The Proctor & Gamble Co.*
Case No. 07-C-0613-S (W.D. Wis.)

**EXHIBIT A to Kraft's Rule 26(a)(1) Initial Disclosures**
**Preliminary Infringement Analysis**

| U.S. Pat. No. 7,074,443 Claim Element | Infringing Product: Folgers 39-ounce Can | Infringing Product: Folgers 52-ounce Can | Exemplary Citations to Specification Further Describing Claim Element |
|---|---|---|---|
| |  **"flexible lid"**  **"vent valve"** |   | |
| [b] an overcap covering the lid and engaging the sides of the can around the periphery thereof | The Folgers 39-ounce can includes an overcap that covers the lid and engages the sides of the can around the periphery thereof. | The Folgers 52-ounce can includes an overcap that covers the lid and engages the sides of the can around the periphery thereof. | This claim element is described, for example, in the specification at 1:38-42, 3:57-66 and FIGS. 4-7. |

3

*Kraft Foods Holdings, Inc. v. The Proctor & Gamble Co.*
Case No. 07-C-0613-S (W.D. Wis.)

**EXHIBIT A to Kraft's Rule 26(a)(1) Initial Disclosures**
**Preliminary Infringement Analysis**

| U.S. Pat. No. 7,074,443 Claim Element | Infringing Product: Folgers 39-ounce Can | Infringing Product: Folgers 52-ounce Can | Exemplary Citations to Specification to Specification Further Describing Claim Element |
|---|---|---|---|
| [c] the overcap including a spacing structure inward from an inner edge of the periphery which prevents the vent value from |  The overcap on the Folgers 39-ounce can includes a spacing structure inward from an inner edge of the periphery which prevents the vent valve from being blocked by the overcap by gases built-up within the can. |  "overcap" The overcap on the Folgers 39-ounce can includes a spacing structure inward from an inner edge of the periphery which prevents the vent valve from being blocked by the overcap by gases built-up within the can. | This claim element is described, for example, in the specification at 2:24-39, 2:57-60, 4:55-5:24, 5:32-43. |

4

51284/2298834.2

*Kraft Foods Holdings, Inc. v. The Proctor & Gamble Co.*
Case No. 07-C-0613-S (W.D. Wis.)

**EXHIBIT A to Kraft's Rule 26(a)(1) Initial Disclosures**
**Preliminary Infringement Analysis**

| U.S. Pat. No. 7,074,443 Claim Element | Infringing Product: **Folgers 39-ounce Can** | Infringing Product: **Folgers 52-ounce Can** | Exemplary Citations to Specification Further Describing Claim Element |
|---|---|---|---|
| being blocked by the overcap by gases built-up within the can. | | | |
| **2.** A can according to claim **1**, said spacing structure comprising a plurality of bosses on | The Folgers 39-ounce can satisfies the elements of claim 1, and its spacing structure is equivalent to a plurality of bosses on the overcap positioned to be engaged by the flexible lid to block further upward | The Folgers 52-ounce can satisfies the elements of claim 1, and its spacing structure is equivalent to a plurality of bosses on the overcap positioned to be engaged by the flexible lid to block further upward | This claim element is described, for example, in the specification at 2:29-39, 4:55-5:3, 5:9-24, FIGS. |

**"spacing structure"**



5

51284/2298834.2

*Kraft Foods Holdings, Inc. v. The Proctor & Gamble Co.*
Case No. 07-C-0613-S (W.D. Wis.)

**EXHIBIT A to Kraft's Rule 26(a)(1) Initial Disclosures**
**Preliminary Infringement Analysis**

| U.S. Pat. No. 7,074,443 Claim Element | Infringing Product: Folgers 39-ounce Can | Infringing Product: Folgers 52-ounce Can | Exemplary Citations to Specification Further Describing Claim Element |
|---|---|---|---|
| the overcap positioned to be engaged by the flexible lid to block further upward movement thereof, and to allow gases passing through the vent valve to flow toward the periphery of the can. | movement thereof, and to allow gases passing through the vent valve to flow toward the periphery of the can. | movement thereof, and to allow gases passing through the vent valve to flow toward the periphery of the can. | 4-8. |
| **3.** A can according to claim **2**, wherein the bosses are positioned to engage the vent valve without occluding gas flow therethrough. | The Folgers 39-ounce can satisfies the elements of claim 2, wherein the equivalent of the bosses is positioned to engage the vent valve without occluding gas flow therethrough. | The Folgers 52-ounce can satisfies the elements of claim 2, wherein the equivalent of the bosses is positioned to engage the vent valve without occluding gas flow therethrough. | This claim element is described, for example, in the specification at 2:29-39, 4:55-5:3, 5:9-24, FIGS. 4-8. |
| **7.** A can according to claim **1**, wherein the spacing structure comprises a pocket formed in the bottom of the overcap which is of sufficient depth to allow the flexible lid to reach a maximum height of the lid caused by the gas buildup without the flexible lid or the vent valve engaging the overcap. | The Folgers 39-ounce can satisfies the elements of claim 1, wherein the spacing structure comprises a circular pocket formed in the bottom of the overcap which is of sufficient depth to allow the flexible lid to reach a maximum height of the lid caused by the gas buildup without the flexible lid or vent valve engaging the overcap. | The Folgers 52-ounce can satisfies the elements of claim 1, wherein the spacing structure comprises a circular pocket formed in the bottom of the overcap which is of sufficient depth to allow the flexible lid to reach a maximum height of the lid caused by the gas buildup without the flexible lid or the vent valve engaging the overcap. | This claim element is described, for example, in the specification at 2:40-44, 5:33-43, FIGS. 9-10. |

6

*Kraft Foods Holdings, Inc. v. The Procter & Gamble Co.*
Case No. 07-C-0613-S (W.D. Wis.)

**EXHIBIT A to Kraft's Rule 26(a)(1) Initial Disclosures**
**Preliminary Infringement Analysis**

| U.S. Pat. No. 7,074,443 Claim Element | Infringing Product: Folgers 39-ounce Can | Infringing Product: Folgers 52-ounce Can | Exemplary Citations to Specification Further Describing Claim Element |
|---|---|---|---|
| |  |  | |
| **8.** A can according to claim **1**, wherein the product is ground roast coffee. | The Folgers 39-ounce can satisfies the elements of claim **1**, wherein the product is ground roast coffee. | The Folgers 52-ounce can satisfies the elements of claim **1**, wherein the product is ground roast coffee. | This claim element is described, for example, in the specification at 1:23-36, 2:17-20, 3:42-44, 3:49-56, FIGS. 4, 9. |

"pocket"

7

51284/2298834.2

*Kraft Foods Holdings, Inc. v. The Proctor & Gamble Co.*
Case No. 07-C-0613-S (W.D. Wis.)

**EXHIBIT A to Kraft's Rule 26(a)(1) Initial Disclosures**
**Preliminary Infringement Analysis**

| U.S. Pat. No. 7,074,443 Claim Element | Infringing Product: Folgers 39-ounce Can | Infringing Product: Folgers 52-ounce Can | Exemplary Citations to Specification Further Describing Claim Element |
|---|---|---|---|
| **11.** A can according to claim **1** wherein the lid does not contact the overcap to block the valve from opening when gases build up within the can. |  The Folgers 39-ounce can satisfies the elements of claim 1, wherein the lid does not contact the overcap to block the valve from opening when gases build up within the can. |  The Folgers 52-ounce can satisfies the elements of claim 1, wherein the lid does not contact the overcap to block the valve from opening when gases build up within the can. | This claim element is described, for example, in the specification at 2:24-37, 4:55-63, 5:9-24, FIGS. 4-8. |

"ground roast coffee"

8

*Kraft Foods Holdings, Inc. v. The Proctor & Gamble Co.*
Case No. 07-C-0613-S (W.D. Wis.)

**EXHIBIT A to Kraft's Rule 26(a)(1) Initial Disclosures**
**Preliminary Infringement Analysis**

| U.S. Pat. No. 7,074,443 Claim Element | Infringing Product: Folgers 39-ounce Can | Infringing Product: Folgers 52-ounce Can | Exemplary Citations to Specification to Specification Further Describing Claim Element |
|---|---|---|---|
| **12.** The can of claim **1**, wherein the flexible lid is a peelable lid. | The Folgers 39-ounce can satisfies the elements of claim 1, wherein the flexible lid ("Peel Away Seal") is a peelable lid that has a pull tab.  | The Folgers 52-ounce can satisfies the elements of claim 1, wherein the flexible lid ("Peel Away Seal") is a peelable lid that has a pull tab.  | This claim element is described, for example, in the specification at 1:17-22, 3:45-49. FIGS. 4, 9. |
| **13.** The can of claim **1**, wherein the flexible lid comprises flexible foil. | The Folgers 39-ounce can satisfies the elements of claim 1, wherein the flexible lid comprises flexible foil. | The Folgers 52-ounce can satisfies the elements of claim 1, wherein the flexible lid comprises flexible foil. | This claim element is described, for example, in the specification at 3:45-48, FIGS. 4, 9. |

9

51284/2298834.2

*Kraft Foods Holdings, Inc. v. The Procter & Gamble Co.*
Case No. 07-C-0613-S (W.D. Wis.)

**EXHIBIT A to Kraft's Rule 26(a)(1) Initial Disclosures**
**Preliminary Infringement Analysis**

| U.S. Pat. No. 7,074,443 Claim Element | Infringing Product: Folgers 39-ounce Can | Infringing Product: Folgers 52-ounce Can | Exemplary Citations to Specification Further Describing Claim Element |
|---|---|---|---|
| |  |  | |
| **15.** A can containing roast ground coffee packed at atmospheric pressure and generating a carbon dioxide gas buildup. | The Folgers 39-ounce can contains roast ground coffee packed at atmospheric pressure and generating a carbon dioxide gas buildup. *See also supra* at claim 1 preamble. | The Folgers 52-ounce can contains roast ground coffee packed at atmospheric pressure and generating a carbon dioxide gas buildup. *See also supra* at claim 1 preamble. | This claim element is described, for example, in the specification at 1:23-37, 2:20-23, 3:49-53, 3:66-4:4. |
| **[a]** a flexible lid hermetically sealing the top of the can and including a vent valve allowing the escape of built-up carbon dioxide, and | The Folgers 39-ounce can has a flexible lid hermetically sealing the top of the can, which lid includes a vent valve allowing the escape of built-up carbon dioxide. *See also supra* at claim 1[a]. | The Folgers 52-ounce can has a flexible lid hermetically sealing the top of the can, which lid includes a vent valve allowing the escape of built-up carbon dioxide. *See also supra* at claim 1[a]. | This claim element is described, for example, in the specification at 1:17-22, 1:36-37, 3:45-56, 4:2-4, FIGS. 4, 9. |
| **[b]** an overcap covering the top of the can and engaging the can | The Folgers 39-ounce can has an overcap covering the top of the can and engaging the can around its upper rim. *See also supra* at claim 1[b]. | The Folgers 52-ounce can has an overcap covering the top of the can and engaging the can around its upper rim. *See also supra* at claim 1[b]. | This claim element is described, for example, in the specification at 1:38-42, 3:57-66 and FIGS. 4-7. |

10

51284/2298834.2

*Kraft Foods Holdings, Inc. v. The Proctor & Gamble Co.*
Case No. 07-C-0613-S (W.D. Wis.)

**EXHIBIT A to Kraft's Rule 26(a)(1) Initial Disclosures**
**Preliminary Infringement Analysis**

| U.S. Pat. No. 7,074,443 Claim Element | Infringing Product: Folgers 39-ounce Can | Infringing Product: Folgers 52-ounce Can | Exemplary Citations to Specification Further Describing Claim Element |
|---|---|---|---|
| around the upper rim thereof, | | | |
| **[c]** the overcap including a spacing structure inward from an inner edge of the rim which prevents the vent valve form being blocked by the overcap when the lid is pushed up toward the overcap by the pressure of the built-up carbon dioxide. | The Folgers 39-ounce can has a spacing structure inward form an inner edge of the rim which prevents the vent valve form being blocked by the overcap when the lid is pushed up toward the overcap by the pressure of the built-up carbon dioxide. *See also supra* at claim 1[c]. | The Folgers 52-ounce can has a spacing structure inward form an inner edge of the rim which prevents the vent valve form being blocked by the overcap when the lid is pushed up toward the overcap by the pressure of the built-up carbon dioxide. *See also supra* at claim 1[c]. | This claim element is described, for example, in the specification at 2:24-39, 2:57-60, 4:55-5:24, 5:32-43. |
| **16.** A can according to claim **15**, said spacing structure comprising a plurality of bosses on the overcap positioned to be engaged by the flexible lid to block further upward movement thereof, and to allow gases passing through the vent valve to flow toward the periphery of the can. | The Folgers 39-ounce can satisfies the elements of claim **15**, and its spacing structure is equivalent to a plurality of bosses on the overcap positioned to be engaged by the flexible lid to block further upward movement thereof, and to allow gases passing through the vent valve to flow toward the periphery of the can. *See also supra* at claim 2. | The Folgers 52-ounce can satisfies the elements of claim **15**, and its spacing structure is equivalent to a plurality of bosses on the overcap positioned to be engaged by the flexible lid to block further upward movement thereof, and to allow gases passing through the vent valve to flow toward the periphery of the can. *See also supra* at claim 2. | This claim element is described, for example, in the specification at 2:29-39, 4:55-5:3, 5:9-24, FIGS. 4-8. |

11

Kraft Holdings, Inc. v. The Proctor & Gamble Co.
Case No. 07-C-0613-S (W.D. Wis.)

**EXHIBIT A to Kraft's Rule 26(a)(1) Initial Disclosures
Preliminary Infringement Analysis**

| U.S. Pat. No. 7,074,443 Claim Element | Infringing Product: Folgers 39-ounce Can | Infringing Product: Folgers 52-ounce Can | Exemplary Citations to Specification Further Describing Claim Element |
|---|---|---|---|
| **17.** A can according to claim 16, wherein the bosses are positioned to engage the vent valve without occluding the flow of carbon dioxide therethrough. | The Folgers 39-ounce can satisfies the elements of claim 16, wherein the equivalent to the bosses is positioned to engage the vent valve without occluding the flow of carbon dioxide therethrough. *See also supra* at claim 3. | The Folgers 52-ounce can satisfies the elements of claim 16, wherein the equivalent to the bosses is positioned to engage the vent valve without occluding the flow of carbon dioxide therethrough. *See also supra* at claim 3. | This claim element is described, for example, in the specification at 2:29-39, 4:55-5:3, 5:9-24, FIGS. 4-8. |
| **21.** A can according to claim 15, wherein the spacing structure comprises a pocket formed in the bottom of the overcap which is of sufficient depth to allow the flexible lid to reach a maximum height of the lid as caused by the carbon dioxide buildup without the flexible lid or the vent valve engaging the overcap. | The Folgers 39-ounce can satisfies the elements of claim 15, wherein the spacing structure comprises a circular pocket formed in the bottom of the overcap which is of sufficient depth to allow the flexible lid to reach a maximum height of the lid as caused by the carbon dioxide buildup without the flexible lid or the vent valve engaging the overcap. *See also supra* at claim 7. | The Folgers 52-ounce can satisfies the elements of claim 15, wherein the spacing structure comprises a circular pocket formed in the bottom of the overcap which is of sufficient depth to allow the flexible lid to reach a maximum height of the lid as caused by the carbon dioxide buildup without the flexible lid or the vent valve engaging the overcap. *See also supra* at claim 7. | This claim element is described, for example, in the specification at 2:40-44, 5:33-43, FIGS. 9-10. |
| **23.** A can containing a food product which creates a gas buildup, | The Folgers 39-ounce can is a can that contains a food product, namely ground coffee, which creates a gas buildup. *See also supra* at claim 1 preamble. | The Folgers 52-ounce can is a can that contains a food product, namely ground coffee, which creates a gas buildup. *See also supra* at claim 1 preamble. | This claim element is described, for example, in the specification at 1:23-37, 2:20-23, 3:49-53, 3:66-4:4. |
| [a] the top of the can comprising a flexible lid having | The top of the Folgers 39-ounce can has a flexible lid with a vent valve to vent built up gases. *See also supra* at claim 1[a]. | The top of the Folgers 52-ounce can has a flexible lid with a vent valve to vent built up gases. *See also supra* at claim 1[a]. | This claim element is described, for example, in the specification at 1:17- |

12

*Kraft Foods Holdings, Inc. v. The Proctor & Gamble Co.*
Case No. 07-C-0613-S (W.D. Wis.)

**EXHIBIT A to Kraft's Rule 26(a)(1) Initial Disclosures**
**Preliminary Infringement Analysis**

| U.S. Pat. No. 7,074,443 Claim Element | Infringing Product: Folgers 39-ounce Can | Infringing Product: Folgers 52-ounce Can | Exemplary Citations to Specification Further Describing Claim Element |
|---|---|---|---|
| a vent valve to vent built-up gases | | | 22, 1:36-37, and 3:45-48. |
| [b] an overcap covering the lid and engaging the sides of the can around the periphery thereof | The Folgers 39-ounce can includes an overcap that covers the lid and engages the sides of the can around the periphery thereof. *See also supra* at claim 1[b]. | The Folgers 52-ounce can includes an overcap that covers the lid and engages the sides of the can around the periphery thereof. *See also supra* at claim 1[b]. | This claim element is described, for example, in the specification at 1:38-42, 3:57-66 and FIGS. 4-7. |
| [c] the overcap including a spacing structure which prevents the vent valve from being blocked by the overcap when the lid is pushed toward the overcap by gases built-up within the can | The Folgers 39-ounce can has an overcap that includes a spacing structure which prevents the vent valve from being blocked by the overcap when the lid is pushed toward the overcap by gases built-up within the can.  "spacing structure" | The Folgers 52-ounce can has an overcap that includes a spacing structure which prevents the vent valve from being blocked by the overcap when the lid is pushed toward the overcap by gases built-up within the can.  | This claim element is described, for example, in the specification at 2:24-39, 2:57-60, 4:55-5:24, 5:32-43. |
| [d] said spacing structure being positioned such that the said spacing structure is not engaged by the valve when the lid | The spacing structure on the underside of the overcap of the Folgers 39-ounce can is positioned such that the spacing structure is not engaged by the valve when the lid is pushed toward the overcap by the gases built-up within the can. | The spacing structure on the underside of the overcap of the Folgers 52-ounce can is positioned such that the spacing structure is not engaged by the valve when the lid is pushed toward the overcap by the gases built-up within the can. | This claim element is described, for example, in the specification at 2:24-39, 2:57-60, 4:55-5:24, 5:32-43. |

13

5284/2298834.2

*Kraft Foods Holdings, Inc. v. The Proctor & Gamble Co.*
Case No. 07-C-0613-S (W.D. Wis.)

**EXHIBIT A to Kraft's Rule 26(a)(1) Initial Disclosures**
**Preliminary Infringement Analysis**

| U.S. Pat. No. 7,074,443 Claim Element | Infringing Product: Folgers 39-ounce Can | Infringing Product: Folgers 52-ounce Can | Exemplary Citations to Specification Further Describing Claim Element |
|---|---|---|---|
| is pushed toward the overcap by the gases built-up within the can. | | | |
| **24.** A can according to claim **23**, wherein the spacing structure is circular. | The Folgers 39-ounce can satisfies the elements of claim 23, wherein the spacing structure is circular.  | The Folgers 52-ounce can satisfies the elements of claim 23, wherein the spacing structure is circular.  | This claim element is described, for example, in the specification at 2:24-39, 2:57-60, 4:55-5:24, 5:32-43. |
| **25.** A can according to claim **23**, wherein the product is ground roast coffee. | The Folgers 39-ounce can satisfies the elements of claim 1, wherein the product is ground roast coffee. *See also supra* at claim 8. | The Folgers 52-ounce can satisfies the elements of claim 1, wherein the product is ground roast coffee. *See also supra* at claim 8. | This claim element is described, for example, in the specification at 1:23-36, 2:17-20, 3:42-44, 3:49-56, FIGS. 4, 9. |

14

# Exhibit 8

AO88 (Rev. 12/06) Subpoena in a Civil Case

**Issued by the**

# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KRAFT FOODS HOLDINGS, INC.,<br>Plaintiff<br>V.<br><br>THE PROCTER & GAMBLE COMPANY,<br>Defendant | **SUBPOENA IN A CIVIL CASE**<br><br>Case Number:[1] 07-C-0613-S<br>(W.D. WISCONSIN) |

TO:     PLITEK, LLC
        69 Rawls Road
        Des Plaines, IL 60018

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Exhibit A

| PLACE | DATE AND TIME |
|---|---|
| Howrey LLP, 321 N. Clark Street, Suite 3400, Chicago, IL 60610 | February 22, 2008, 9:30 a.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Attorney for Defendant     *Ben Davidson* | February 8, 2008 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Ben M. Davidson
HOWREY LLP, 550 S. Hope Street, Suite 1100, Los Angeles, CA 91101   TEL: 213-892-1866

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

American LegalNet, Inc.
www.FormsWorkflow.com

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED |  |  |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
|  |  |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
|  |  |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(C) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(D) DUTIES IN RESPONDING TO SUBPOENA

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

American LegalNet, Inc.
www.FormsWorkflow.com

## EXHIBIT A

## DEFINITIONS

A.     "Plitek" "You" or "your" shall mean and refer to Plitek LLC, and shall include, where appropriate, any divisions, departments, parents, predecessors, successors, subsidiaries, affiliates, and other organizational or operating units, and present officers, directors, employees, or agents.

B.     The phrase "Kraft" shall mean and refer to Kraft Foods Holdings, Inc., Kraft Foods Global, Inc., any divisions, departments, parents, predecessors, successors, subsidiaries, affiliates, and other organizational or operating units, and officers, directors, employees, or agents.

C.     The phrase "Kraft Patent" shall mean and refer to United States Patent No. 7,074,443, entitled "Vented Can Overcap."

D.     The phrase "vent valve" shall mean any device or structure designed to act or that does act to control the release of gases from a container.  For example, such a structure includes, but is not limited to, the valve discussed in the Kraft Patent.

E.     The phrase "overcap" shall mean any device or structure designed to act or that does act as a lid or cover for any container or package.  For example, such a structure includes, but is not limited to, the overcap discussed in the Kraft Patent.

F.     The term "Document" or "Documents" shall mean the same broad meaning as in Fed. R. Civ. P. 34.  This shall include, without limitation, the following items, namely, electronically stored information, notes, letters, correspondence, communications, facsimiles, e-mails, memoranda, diaries, reports, laboratory and research reports and notebooks, recorded experiments, charts, plans, drawings, diagrams, schematic diagrams, illustrations, product descriptions, product analyses, documents related to proposed or actual product improvements or changes, users manuals or guides, installation guides or manuals, technical descriptions or specifications, product functional

descriptions or specifications, brochures, pamphlets, advertisements, circulars, trade letters, press releases, drafts of documents and other material known to you or in your possession or control.

G.     A request for all documents "relating to," "referring or relating to," "concerning," "related to," or that "refer or relate to" a subject matter extends to each document that constitutes, represents, embodies, illustrates, evidences, contains, utilizes, supports, modifies, contradicts, criticizes, negates, distinguishes, rebuts, discusses, mentions, makes reference to, describes, records, reports, reflects, pertains to, concerns, or was prepared in connection with, the subject matter specified.

H.     The use of the singular shall be deemed to include the plural.

I.     The terms "and," "or," and "and/or" shall be construed in the conjunctive or the disjunctive, whichever makes the request more inclusive.

J.     The terms "each" and "any" shall mean each and every.

## INSTRUCTIONS

1.     You are required to produce for inspection and copying all of the requested documents and things that are in your possession, custody or control.

2.     All documents that respond, in whole or in part, to any portion of this subpoena are to be produced in their entirety, without abbreviation or redaction, including all attachments or other matters affixed thereto.

3.     If any otherwise responsive document was, but no longer is, in existence or in your possession, custody or control, identify its current or last known custodian, the location/address of such document, the date of the document, the names of the authors of the document, the persons from whom the document was received or to whom the document was sent, the subject matter of the document and describe in full the circumstances surrounding its disposition from your possession or control.

4.      If you find the meaning of any term in this subpoena to be unclear, you should assume a reasonable meaning, state what the assumed meaning is, and produce documents on the basis of that assumed meaning.

5.      With respect to any documents otherwise responsive to this subpoena that you withhold or refuse to divulge on a claim of privilege, provide a statement setting forth as to each document:

    (a)    the name(s) of the sender, author, primary and secondary recipient(s) of the document and any persons to whom the document was shown;

    (b)    the date of the document, or if no date appears, the date on which it was prepared;

    (c)    a general description of the nature and subject matter of the document;

    (d)    the name of the person who has custody of the document; and

    (e)    the basis for withholding the document, including the statute, rule or decision which is claimed to give rise to the privilege.

6.      If, after the date you produce documents responsive to this subpoena, you discover or receive additional documents that are responsive to this subpoena, promptly produce all such additional documents to the full extent required by the Federal Rules of Civil Procedure and the Local Rules of the District Court.

## DOCUMENTS AND THINGS REQUESTED

**REQUEST NO. 1:**

All documents relating to the Kraft Patent.

**REQUEST NO. 2:**

All documents relating to the problem of vent valves not allowing gases to escape a container, including, but not limited to, documents relating to preventing vent valves from being blocked by the overcap of a container.

**REQUEST NO. 3:**

All documents relating to vent valves, including degassing valves, not functioning properly because of blockage, including documents describing methods of preventing valve blockage.

**REQUEST NO. 4:**

All documents relating to providing space between a vent valve and the upper lid or cap of a container to prevent blockage.

**REQUEST NO. 5:**

All documents relating to solutions developed by Plitek for customers to prevent vent valve blockage, including, but not limited to, work performed under non-disclosure agreements that Dick Boiteau referenced in a conversation with counsel for P&G on January 29, 2008.

**REQUEST NO. 6:**

All documents relating to work done by anyone for Kraft regarding preventing vent valve blockage in containers.

**REQUEST NO. 7:**

All documents relating to communications with Jeffrey Thomas, Jeffrey Zimmerman, Piras DeCleir, Mete Bruncaj, or any attorneys for Kraft relating to the subject matter of the Kraft Patent, including, but not limited to, communications relating to developing technology described in the Kraft Patent, obtaining a patent for that technology, or litigation regarding that technology.

**REQUEST NO. 8:**

All documents created before November 19, 2002 describing or showing any structure that prevents vent valve blockage in a container, including, but not limited to, the use of pockets or protrusions on the overcap to prevent valve blockage.

**REQUEST NO. 9:**

All documents relating to communications with Sonoco or Kraft regarding the problem of vent valves becoming blocked or any solution or structure for preventing vent valve blockage.

**REQUEST NO. 10:**

An exemplar of any product having a peelable seal with a vent valve and an overcap.

**REQUEST NO. 11:**

All documents describing or constituting communications, including complaints or inquiries from third parties regarding providing clearance between vent valves and other parts of a product so that the vent valve functions properly.

**REQUEST NO. 12:**

Any studies, reports, or memoranda from Plitek relating to how Plitek valves should be incorporated into the designs of products to provide sufficient clearance for venting.

**REQUEST NO. 13:**

All documents referring to (1) Kraft or any Kraft container for storing coffee and (2) P&G or any P&G container for storing coffee; and (3) any vent valve.

**REQUEST NO. 14:**

All documents relating to any existing or potential litigation or dispute between P&G and Kraft concerning container technology, including the litigation initiated by P&G in the Northern District of California and the litigation initiated by Kraft in the Western District of Wisconsin, including, but not limited to, any communications with counsel for Kraft, counsel for P&G and Kraft, any communication relating to a conversation with counsel for P&G or for Kraft, and any notes or memoranda regarding the litigations.

**REQUEST NO. 15:**

All documents relating to any agreement entered into between Plitek and Kraft relating to vent valve technology, including, but not limited to, licensing agreements, agreements to perform work, and agreements to cooperate in litigation.

**REQUEST NO. 16:**

All documents relating to licensing agreements between Plitek and any other company requiring the payment of royalties or a licensing fee for the use of technology relating to packaging technology.

**REQUEST NO. 17:**

Documents sufficient to describe payments received by Plitek from Kraft in the last five years.

# Exhibit 9

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| KRAFT FOODS HOLDINGS, INC. | Case No. 07-C-0613-S |
| Plaintiff, | (W.D. WISCONSIN) |
| vs. | |
| THE PROCTER & GAMBLE COMPANY, | |
| Defendant. | |

**PLITEK, LLC'S OBJECTIONS AND RESPONSES TO SUBPOENA FROM THE**
**PROCTER & GAMBLE COMPANY**

General Objections

1.      Plitek objects to P&G's requests and instructions to the extent those requests and instructions seek to impose a duty upon Plitek beyond those set forth in the Federal Rules of Civil Procedure.

2.      Plitek objects to P&G's requests to the extent they seek information that is neither relevant to any claim or defense raised in the lawsuit styled *Kraft Foods Holdings, Inc. v. The Procter & Gamble Company*, Western District of Wisconsin Case No. 07C0613S, nor reasonably calculated to lead to the discovery of admissible evidence in that case.

3.      Plitek objects to P&G's requests as harassing, oppressive and unduly burdensome.

4.      Plitek objects to P&G's requests to the extent they seek information that is subject to confidentiality agreements with Kraft and other third parties, without the prior consent of such parties.

5.    Plitek objects to P&G's requests to the extent they seek information protected from production by the attorney-client privilege, attorney work product immunity and/or any other privileges or exemptions.  Plitek does not intend for any of its responses to P&G's requests to be a waiver of any privilege or immunity.

6.    Plitek objects to each of P&G's requests to the extent they seek documents or other information not in Plitek's possession, custody, or control.

7.    Plitek objects to the definition of "Plitek" as overly broad and unduly burdensome to the extent it includes entities over which Plitek has no control.

8.    Plitek objects to the definitions of the terms "vent valve" and "overcap" as vague and ambiguous and overly broad.

9.    Plitek objects to the time and place designated for production of documents and things.  Plitek will produce the materials referenced in its Specific Objections and Responses (set forth below) at a mutually convenient time and location.

Specific Responses and Objections

**Request No. 1:**
In addition to the foregoing general objections, which are expressly incorporated herein, Plitek objects to this request on the grounds that it is burdensome, oppressive, and harassing.  Plitek further objects to this request to the extent it seeks information that is subject to confidentiality agreements with Kraft and other third parties, without the prior consent of such parties.  Plitek further objects to this request to the extent it seeks information protected from production by the attorney-client privilege, attorney work product immunity and/or any other privileges or exemptions.  Subject to and without waiving the foregoing general and specific objections, Plitek responds that after a reasonable investigation, it has no knowledge of documents in its possession, custody or control related to the "Kraft Patent," as that term appears to be defined in P&G's Definitions and Instructions.

**Request No. 2:**
In addition to the foregoing general objections, which are expressly incorporated herein, Plitek objects to this request on the grounds that it is burdensome, oppressive, and harassing.  Plitek further objects to this request to the extent it seeks information that is subject to confidentiality agreements with Kraft and other third parties, without the prior consent of such parties.  Plitek

further objects to this request on the grounds that it is vague and ambiguous and overly broad as to time. Plitek further objects to this request on the grounds that the term "vent valve" is vague and ambiguous. Plitek further objects to this request to the extent it seeks information protected from production by the attorney-client privilege, attorney work product immunity and/or any other privileges or exemptions. Subject to and without waiving the foregoing general and specific objections, Plitek responds that after a reasonable investigation, it is not aware of documents in its possession, custody or control "relating to preventing vent valves from being blocked by the overcap of a container."

### Request No. 3:
In addition to the foregoing general objections, which are expressly incorporated herein, Plitek objects to this request on the grounds that it is burdensome, oppressive, and harassing. Plitek further objects to this request to the extent it seeks information that is subject to confidentiality agreements with Kraft and other third parties, without the prior consent of such parties. Plitek further objects to this request on the grounds that it is vague and ambiguous and overly broad as to time. Plitek further objects to this request on the grounds that the terms "vent valve," "not functioning properly," and "blockage" are vague and ambiguous. Plitek further objects to this request to the extent it seeks information protected from production by the attorney-client privilege, attorney work product immunity and/or any other privileges or exemptions. Subject to and without waiving the foregoing general and specific objections, Plitek responds that after a reasonable investigation, it is not aware of documents in its possession, custody or control "describing methods of preventing valve blockage."

### Request No. 4:
In addition to the foregoing general objections, which are expressly incorporated herein, Plitek objects to this request on the grounds that it is burdensome, oppressive, and harassing. Plitek further objects to this request to the extent it seeks information that is subject to confidentiality agreements with Kraft and other third parties, without the prior consent of such parties. Plitek further objects to this request on the grounds that it is vague and ambiguous and overly broad as to time. Plitek further objects to this request on the grounds that the terms "vent valve," "upper lid or cap," and "blockage" are vague and ambiguous. Plitek further objects to this request to the extent it seeks information protected from production by the attorney-client privilege, attorney work product immunity and/or any other privileges or exemptions. Subject to and without waiving the foregoing general and specific objections, Plitek responds that after a reasonable investigation, it is not aware of documents in its possession, custody or control "relating to providing space between a vent valve and the upper lid or cap of a container to prevent blockage."

### Request No. 5:
In addition to the foregoing general objections, which are expressly incorporated herein, Plitek objects to this request on the grounds that it is burdensome, oppressive, and harassing. Plitek further objects to this request to the extent it seeks information that is subject to confidentiality agreements with Kraft and other third parties, without the prior consent of such parties. Plitek further objects to this request on the grounds that it is vague and ambiguous and overly broad as to time. Plitek further objects to this request on the grounds that the terms "vent valve" and

blockage are vague and ambiguous.  Plitek further objects to this request to the extent it seeks information protected from production by the attorney-client privilege, attorney work product immunity and/or any other privileges or exemptions.  Subject to and without waiving the foregoing general and specific objections, Plitek responds that after a reasonable investigation, it is not aware of documents in its possession, custody or control "relating to solutions developed by Plitek for customers to prevent vent valve blockage."

**Request No. 6:**
In addition to the foregoing general objections, which are expressly incorporated herein, Plitek objects to this request on the grounds that it is burdensome, oppressive, and harassing.  Plitek further objects to this request to the extent it seeks information that is subject to confidentiality agreements with Kraft and other third parties, without the prior consent of such parties.  Plitek further objects to this request on the grounds that it is vague and ambiguous and overly broad as to time.  Plitek further objects to this request on the grounds that the terms "vent valve" and "blockage" are vague and ambiguous.  Plitek further objects to this request to the extent it seeks information protected from production by the attorney-client privilege, attorney work product immunity and/or any other privileges or exemptions.  Subject to and without waiving the foregoing general and specific objections, Plitek responds that after a reasonable investigation, it is not aware of documents in its possession, custody or control "relating to work done by anyone for Kraft regarding preventing vent valve blockage in containers."

**Request No. 7:**
In addition to the foregoing general objections, which are expressly incorporated herein, Plitek objects to this request on the grounds that it is burdensome, oppressive, and harassing.  Plitek further objects to this request to the extent it seeks information that is subject to confidentiality agreements with Kraft and other third parties, without the prior consent of such parties.  Plitek further objects to this request on the grounds that it is vague and ambiguous and overly broad as to time.  Plitek further objects to this request to the extent it seeks information protected from production by the attorney-client privilege, attorney work product immunity and/or any other privileges or exemptions.  Subject to and without waiving the foregoing general and specific objections, Plitek responds that after a reasonable investigation, it is not aware of documents in its possession, custody or control constituting "communications relating to developing technology described in the Kraft Patent, obtaining a patent for that technology, or litigation regarding that technology."

**Request No. 8:**
In addition to the foregoing general objections, which are expressly incorporated herein, Plitek objects to this request on the grounds that it is burdensome, oppressive, and harassing.  Plitek further objects to this request to the extent it seeks information that is subject to confidentiality agreements with Kraft and other third parties, without the prior consent of such parties.  Plitek further objects to this request on the grounds that the terms "vent valve," "blockage," "pockets," "structure," and "protrusions" are vague and ambiguous.  Plitek further objects to this request to the extent it seeks information protected from production by the attorney-client privilege, attorney work product immunity and/or any other privileges or exemptions.  Subject to and without waiving the foregoing general and specific objections, Plitek responds that after a reasonable investigation, it is not aware of documents in its possession, custody or control

"describing or showing any structure that prevents vent valve blockage in a container, including but not limited to, the use of pockets or protrusions on the overcap to prevent valve blockage."

**Request No. 9:**
In addition to the foregoing general objections, which are expressly incorporated herein, Plitek objects to this request on the grounds that it is burdensome, oppressive, and harassing. Plitek further objects to this request to the extent it seeks information that is subject to confidentiality agreements with Kraft, Sonoco and other third parties, without the prior consent of such parties. Plitek further objects to this request on the grounds that it is vague and ambiguous and overly broad as to time. Plitek further objects to this request on the grounds that the terms "vent valve," "blocked," and structure are vague and ambiguous. Plitek further objects to this request to the extent it seeks information protected from production by the attorney-client privilege, attorney work product immunity and/or any other privileges or exemptions. Subject to and without waiving the foregoing general and specific objections, Plitek responds that even if documents in response to this request did exist, Plitek could not agree to produce such documents, since they would be subject to non-disclosure agreements.

**Request No. 10:**
In addition to the foregoing general objections, which are expressly incorporated herein, Plitek objects to this request on the grounds that it is burdensome, oppressive, and harassing. Plitek further objects to this request to the extent it seeks information that is subject to confidentiality agreements with Kraft and other third parties, without the prior consent of such parties. Plitek further objects to this request on the grounds that it is vague and ambiguous and overly broad as to time. Plitek further objects to this request on the grounds that the terms "peelable seal," and "vent valve" are vague and ambiguous. Plitek further objects to this request to the extent it seeks information protected from production by the attorney-client privilege, attorney work product immunity and/or any other privileges or exemptions. Subject to and without waiving the foregoing general and specific objections, Plitek responds that its products are generally available in local food stores and are therefore readily available to P&G.

**Request No. 11:**
In addition to the foregoing general objections, which are expressly incorporated herein, Plitek objects to this request on the grounds that it is burdensome, oppressive, and harassing. Plitek further objects to this request to the extent it seeks information that is subject to confidentiality agreements with Kraft and other third parties, without the prior consent of such parties. Plitek further objects to this request on the grounds that it is vague and ambiguous and overly broad as to time. Plitek further objects to this request on the grounds that the terms "clearance," "vent valve," "between vent valves and other parts of the product," and "functions properly" are vague and ambiguous. Plitek further objects to this request to the extent it seeks information protected from production by the attorney-client privilege, attorney work product immunity and/or any other privileges or exemptions. Subject to and without waiving the foregoing general and specific objections, Plitek responds that after a reasonable investigation, it is not aware of documents in its possession, custody or control "regarding providing clearance between vent valves and other parts of a product so that the vent valve functions properly" in rigid containers.

**Request No. 12:**

In addition to the foregoing general objections, which are expressly incorporated herein, Plitek objects to this request on the grounds that it is burdensome, oppressive, and harassing. Plitek further objects to this request to the extent it seeks information that is subject to confidentiality agreements with Kraft and other third parties, without the prior consent of such parties. Plitek further objects to this request on the grounds that it is vague and ambiguous and overly broad as to time. Plitek further objects to this request on the grounds that the terms "studies," "reports" or "memoranda" and the phrases "should be incorporated into the designs of products" and "to provide sufficient clearance for venting" are vague and ambiguous. Plitek further objects to this request to the extent it seeks information protected from production by the attorney-client privilege, attorney work product immunity and/or any other privileges or exemptions. Subject to and without waiving the foregoing general and specific objections, Plitek responds that it is not currently aware of documents in its possession, custody or control constituting "studies, reports, or memoranda from Plitek relating to how Plitek valves should be incorporated into the designs of products to provide sufficient clearance for venting," but that its investigation continues. If Plitek locates any documents responsive to this request, it will produce such documents at a mutually agreeable time and location, after addressing any applicable confidentiality obligations.

**Request No. 13:**

In addition to the foregoing general objections, which are expressly incorporated herein, Plitek objects to this request on the grounds that it is burdensome, oppressive, and harassing. Plitek further objects to this request to the extent it seeks information that is subject to confidentiality agreements with Kraft and other third parties, without the prior consent of such parties. Plitek further objects to this request on the grounds that it is vague and ambiguous and overly broad as to time. Plitek further objects to this request on the grounds that the term "vent valve" is vague and ambiguous. Plitek further objects to this request to the extent it seeks information protected from production by the attorney-client privilege, attorney work product immunity and/or any other privileges or exemptions. Subject to and without waiving the foregoing general and specific objections, Plitek responds that it is unable to respond to this request in its current form.

**Request No. 14:**

In addition to the foregoing general objections, which are expressly incorporated herein, Plitek objects to this request on the grounds that it is burdensome, oppressive, and harassing. Plitek further objects to this request to the extent it seeks information that is subject to confidentiality agreements with Kraft and other third parties, without the prior consent of such parties. Plitek further objects to this request on the grounds that it is vague and ambiguous and overly broad as to time. Plitek further objects to this request to the extent it seeks information protected from production by the attorney-client privilege, attorney work product immunity and/or any other privileges or exemptions. Subject to and without waiving the foregoing general and specific objections, Plitek responds that after a reasonable investigation, it is not aware of any documents in its possession, custody or control concerning litigation between Kraft and P&G that are not publicly available and therefore equally available to P&G.

**Request No. 15:**

In addition to the foregoing general objections, which are expressly incorporated herein, Plitek objects to this request on the grounds that it is burdensome, oppressive, and harassing. Plitek

further objects to this request to the extent it seeks information that is subject to confidentiality agreements with Kraft and other third parties, without the prior consent of such parties. Plitek further objects to this request on the grounds that it is vague and ambiguous and overly broad as to time. Plitek further objects to this request on the grounds that the term "vent valve" is vague and ambiguous. Plitek further objects to this request to the extent it seeks information protected from production by the attorney-client privilege, attorney work product immunity and/or any other privileges or exemptions.

**Request No. 16:**
In addition to the foregoing general objections, which are expressly incorporated herein, Plitek objects to this request on the grounds that it is burdensome, oppressive, and harassing. Plitek further objects to this request to the extent it seeks information that is subject to confidentiality agreements with Kraft and other third parties, without the prior consent of such parties. Plitek further objects to this request on the grounds that it is vague and ambiguous and overly broad as to time. Plitek further objects to this request on the grounds that the phrase "technology relating to packaging technology" is vague and ambiguous. Plitek further objects to this request to the extent it seeks information protected from production by the attorney-client privilege, attorney work product immunity and/or any other privileges or exemptions.

**Request No. 17:**
In addition to the foregoing general objections, which are expressly incorporated herein, Plitek objects to this request on the grounds that it is burdensome, oppressive, and harassing. Plitek further objects to this request to the extent it seeks information that is subject to confidentiality agreements with Kraft and other third parties, without the prior consent of such parties. Plitek further objects to this request to the extent it seeks information protected from production by the attorney-client privilege, attorney work product immunity and/or any other privileges or exemptions.

Dated: February 22, 2008

Respectfully submitted,

**PLITEK, LLC**

By One of its Attorneys

**Martin S. Korey**
**Dean J. Lurie**
**STONE, POGRUND & KOREY LLC**
**221 N. LaSalle St.**
**Suite 3200**
**Chicago, IL 60601**
**(312) 782-3636**

# Exhibit 10



4 Park Plaza
Suite 1700
Irvine, CA 92614-8557
T 949.721.6900
F 949.721.6910
www.howrey.com

March 10, 2008

File 05837.0246

**BY FAX & FIRST CLASS MAIL**

Dean J. Lurie, Esq.
STONE, POGRUND & KOREY, LLC
221 N. LaSalle Street, Suite 3200
Chicago, Illinois 60601
312.782.1482

Re:    *Kraft Foods Holdings v. The Procter & Gamble Company*
       Case No. 7-C-0613-S, USDC, Wisconsin

Dear Mr. Lurie:

I work with Ben Davidson on the litigation pending in the Northern District of Wisconsin between Kraft and our client, The Procter & Gamble Company. I write regarding Plitek, LLC's responses to the P&G's, which was served on Plitek on February 8, 2008. As explained below, we believe Plitek's responses are deficient and would like to schedule a telephone conference to attempt to reach an accord on the same in accordance with the United States District Court for the Northern District of Illinois Local Rule 37.2.

As an initial matter, your February 22, 2008 email to Mr. Davidson stated that "Plitek does not possess any documents relating to 'vent valve blockage.'" We are concerned that Plitek may be asserting that there are no such documents based on its objection that "vent valve" is "vague and ambiguous." For several reasons, that objection, like the many other boilerplate objections made by Plitek, lacks merit. Indeed, Plitek makes vent valves and it knows quite well what is meant by this term. Based on a conversation between Mr. Boiteau and my colleagues, we believe that Plitek does, in fact, possess documents relating to its vent valves becoming blocked.

Plitek's representation that it has no documents is especially unsupportable in light of its patent that is specifically directed to an invention for preventing the flexible membrane or film of vent valves from becoming blocked. United States Patent No. 7,178,555 ("the '555 Patent") explains that such an invention is needed because:

> [I]n use, and especially when numerous cartons are packaged
> together in bulk, *the operation of the film is often obstructed or*
> *impeded by an adjoining carton which is placed in contact with*

AMSTERDAM  BRUSSELS  CHICAGO  EAST PALO ALTO  HOUSTON  IRVINE  LONDON  LOS ANGELES
MADRID  MUNICH  NEW YORK  NORTHERN VIRGINIA  PARIS  SALT LAKE CITY  SAN FRANCISCO  TAIPEI  WASHINGTON, DC

*the membrane or film*. To solve this problem, outer rails are often used which prevent an object from physically contacting the flexible film. This, of course, leads to the use of additional materials, manufacturing steps, and ultimately, increased costs.

The present invention eliminates the use of outer rails through the use of at least one inner rail that defines a passageway which is recessed from an aperture located on the valve. In a closed position the film covers the aperture, and in an open position, the film is raised above the aperture to permit the aperture to be in communication with the passageway in order to vent the container.

The '555 Patent 1:26-40 (emphasis added). Later in discussing the operation of a preferred embodiment, the patent explains:

In operation … film 50 is in a closed position and extends inwardly to cover aperture 20. In this position, film 50 acts as a seal which prevents exposure to the outside environment.

To vent the contents, film 50 moves into an open position through the force created by the pressurized gas located in the container 16.

. . .

By permitting film 50 to move downwardly and upwardly within the space defined by the passageway, *contact with extraneous surfaces or objects with film 50 will not interfere with the operation of valve 50 [sic]. This, in turn, eliminates the need to use outer rails with the device.*

*Id.* at 2:28-40, 47-52 (emphasis added). Plitek's patent is clearly directed to the problem of vent valves not allowing gases to escape a container. Nonetheless, in response to Request No. 2, Plitek represented that "it is not aware of documents in its possession, custody, or control 'relating to preventing vent valves from being blocked by the overcap of a container." Again, we believe Plitek does have such documents, not only based on Mr. Boiteau's comments and the '555 Patent, but also based on Plitek's collaboration with Kraft on Kraft's Maxwell House container.

Putting aside whether Plitek's representation is accurate, Request No. 2 is broader than Plitek's response. It required production of "[a]ll documents relating to the problem of vent valves not allowing gases to escape a container, including, *but not limited to*, documents relating to preventing vent valves from being blocked by the overcap of a container." (Emphasis added.) Clearly documents related to the '555 Patent fall within the scope of the request. . We look forward to speaking with you regarding Plitek's representation that no such documents exist.

**HOWREY** LLP

In addition to its deficient response to Request No. 2, Plitek has stated in response to Requests Nos. 1-8, 11, 12, and 14 that it will not produce any documents. It is not clear whether you are, in fact, representing that there are no responsive documents, or that, in light of your objections, Plitek will not produce documents. Plitek's responses to these requests, as well at its response that it is unable to respond to Request No. 13 in its current form, require additional explanation. A party responding to discovery must exercise reason and common sense and attribute ordinary meanings to terms and phrases used by the requesting party. *McCoo v. Denny's, Inc.*, 192 F.R.D. 675, 694 (D. Kan. 2000). Plitek must provide explanations as to why it believes the terms at issue are vague and or ambiguous. We would like to discuss these matters as well during our meet and confer.

Plitek also objects to every document request on confidentiality grounds. It is inappropriate to withhold discovery on such a basis. The scope of discovery obtainable by subpoena to a third party is as broad as permitted under normal discovery rules. *Williams v. Blagojevich*, No. 05 C 4673, 2008 W.L. 68680, *3 (N. D. Ill. Jan. 2, 2008). Rule 26 allows for discovery of relevant non-privileged materials. Confidentiality is not a recognized basis for withholding production of such materials. *Hanas v. Inner City Christian Outreach Center*, 06-CV-10290-DT, 2007 W.L. 551609, *2 (E.D. Mich. Feb. 20, 2007); *Martin v. Lamb*, 122 F.R.D. 143, 146 (W.D.N.Y. 1988); *Luey v. Sterling Drug, Inc.*, 240 F. Supp. 632, 636 (W.D. Mich. 1965). Instead confidentiality is a basis for moving for a protective order. *Carney v. City of Shawnee, Kansas*, No. Civ. A. 98-2019-EEO, 1998 W.L. 231133, *1 (D. Kan. 1998). Moreover, there is already a protective order in place in this case. I am enclosing a copy of the order with this letter. There is simply no basis for Plitek to withhold documents based on confidentiality.

Plitek's objections to P&G's requests based on the assertion that they are "burdensome, oppressive, and harassing" are equally unfounded. Plitek bears the burden of showing that responding to P&G's requests is unduly burdensome. *Beach v. City of Olathe*, 203 F.R.D. 489, 493 (D. Kan. 2001). Plitek's repeated use of this objection in all of its responses fails to provide the specificity required to support the withholding of documents. *Manufacturer Direct, LLC v. Directbuy, Inc.*, No. 2:05 CV 451, 2007 W.L. 4224072, *2 (N.D. Ind. Nov. 27, 2007). Plitek must provide, in response to each request, the specific reasons for withholding documents based on this objection. If Plitek does not withdraw these objections, we would like to discuss the specific reasons for each assertion of the objection during our upcoming meet and confer.

Plitek also has objected to every document request based on claims of attorney-client privilege, work-product immunity and "other privileges or exemptions." While certain privileges may provide grounds for withholding discovery, Plitek has once again failed to meet its burden to invoke such protection. Rule 45 explicitly required Plitek to "describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess [its] claims." Fed. R. Civ. P. 45(d)(2)(A)(ii). Thus, Plitek was required to produce a privilege log to enable P&G to assess the merits of these objections. Moreover, Plitek was required to produce this log at the time it responded to the subpoena regardless of its other non-privileged based objections. *FTC v.*

Dean J. Lurie, Esq.
March 10, 2008
Page 4

*Nationwide Connections, Inc.*, No. 06-08180-CIV, 2007 W.L. 2462015, *1 (S.D. Fla. Aug. 27, 2007); *Capital Corp. Mergers & Acquisitions, Inc. v. Arias Co. Ltd.*, 2006 W.L. 1208012, *3 (M.D. Fla. 2006); *Green v. Baca*, 219 F.R.D. 485, 488 (C.D. Cal. 2003). Accordingly, Plitek's responses are deficient in this regard as well.

As the attorneys for Kraft may have informed you, the litigation between P&G and Kraft is proceeding under the accelerated docket of the Western District of Wisconsin. Accordingly, time is of the essence and we must move quickly to either resolve our disputes with respect to the deficiencies in Plitek's responses or otherwise P&G intends to raise these issues with the Court. Please let me know what your availability is for a telephone conference either Tuesday or Wednesday. Also, please call me if you have any questions.

Very truly yours,

Scott R. Maynard

Encl.

cc:   Ben Davidson, Esq.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| KRAFT FOODS HOLDINGS, INC., | |
| Plaintiff | |
| v. | |
| THE PROCTER & GAMBLE COMPANY, | |
| Defendant | Case No. 07-C-0613-S |
| | |
| THE PROCTER & GAMBLE COMPANY, | |
| Counterclaim Plaintiff | |
| v. | |
| KRAFT FOODS HOLDINGS, INC. | |
| Counterclaim Defendant | |
| and | |
| KRAFT FOODS GLOBAL, INC. | |
| Third-Party Defendant | |

---

### STIPULATED PROTECTIVE ORDER

---

Upon stipulation of counsel for Plaintiff and Counterclaim Defendant Kraft Foods

Holdings, Inc. ("KFH"), Defendant and Counterclaim Plaintiff Procter & Gamble Company

("P&G") and Third-Party Defendant Kraft Foods Global, Inc. ("KFG"), it appearing to the

Court that a Protective Order under Rule 26(c) of the Federal Rules of Civil Procedure is

necessary and appropriate and will facilitate discovery,

IT IS HEREBY ORDERED THAT:

1.     Any Party or non-party producing material or information in this litigation ("Producing Party") may designate such material or information as "Confidential" or "Attorney's Eyes Only" in which case such material or information shall be treated in accordance with the terms of this Protective Order.

2.     The term "Confidential" may be applied only to material or information not known to the general public that is produced in this litigation by a Producing Party to any other Party ("Receiving Party"), that the Producing Party in good faith considers to constitute or contain trade secrets or other confidential research and development, know-how, proprietary data, financial results, other non-publicly available information, or commercial information within the meaning of Federal Rule of Civil Procedure 26(c)(7) or that the Producing Party is under an obligation to a third party to maintain as confidential.

3.     The term "Attorney's Eyes Only" may be applied only to such highly confidential materials or information that consist of or contain particularly sensitive information relating to, e.g., product or packaging research and development, marketing, pricing, manufacturing, customer data, financial information, and any pending or abandoned patent applications, foreign or domestic; as well as such other documents, information or materials that relate to other proprietary information within the meaning of Federal Rule of Civil Procedure 26(c)(7) that the Producing Party reasonably believes is of such nature and character that disclosure of such information would be harmful to the Producing Party or may cause the Producing Party to violate  federal laws and/or regulations.

4.     Any document or portion thereof that a Producing Party believes to contain Confidential or Attorney's Eyes Only information shall be so designated by stamping or otherwise applying on each page containing Confidential or Attorney's Eyes Only information the designation

2

"Confidential" or "Attorney's Eyes Only," in which case such designated document and the information contained therein shall be treated in accordance with the terms of this Protective Order. Nothing in this Protective Order constitutes an admission of a Party that any information designated as "Confidential" or "Attorney's Eyes Only" by a Producing Party does in fact constitute a trade secret or proprietary information or constitutes an agreement or admission with respect to the competency, relevance, or materiality of any such information.

5.    All Confidential or Attorney's Eyes Only information not reduced to documentary, tangible, or physical form or which cannot be conveniently designated pursuant to Paragraph 4 shall be designated by the Producing Party by informing all Receiving Parties in writing.

6.    "Qualified Person," as used herein, is limited to the following categories of persons provided that such persons are not currently, during the course of this litigation, and will not be for a period of one (1) year following the entry of a final non-appealable judgment or order or the complete settlement of all claims against all parties in this action, (i) drafting, or providing substantive input into the drafting of, any patent application and/or engaging in correspondence with the PTO or any other patent-issuing body, domestic or foreign of any patent application (or portion thereof), whether design or utility, and either in the United States or abroad, relating to coffee product packaging; or (ii) having knowledge of and providing advice, counsel or suggestions regarding specific claim scope and/or language, embodiment(s) for specific claim coverage, specific claim(s) for prosecution, or products or processes for coverage by specific claim(s) relating to coffee product packaging. Notwithstanding the above, the prohibitions of this paragraph shall not apply to: (1) a person employed by Kraft or P&G to review Attorney's Eyes Only information if that person's role in the patent review process within Kraft or P&G is limited to general knowledge of his or her employer's pending patent application(s) covering the subject of coffee packaging, without specific knowledge of the content of any claims of such application, and having

3

input as to whether such application should be filed with any patent-issuing body, domestic or foreign; or (2) Mr. Clinton Hallman, representing Kraft, and Mr. Roddy Bullock, representing P&G. The parties agree that, in the event the duties of Mr. Hallman are reassigned to another attorney for Kraft, or in the event that the duties of Mr. Bullock are reassigned to another attorney for P&G, the parties will not unreasonably withhold their consent to the new attorney having access to Attorneys' Eyes Only information.

a.  any attorney appearing of record or of counsel in this case, other than in-house counsel, together with other attorneys at the firm(s) of counsel of record, and their employees including paralegal, secretarial, photocopying, document imaging, data entry, data processing, drafting, graphics, stenographic reporting, or clerical personnel;

b.  subject to the conditions set forth in paragraphs 10 and 11, any independent technical or financial expert, independent consultant, or independent testing personnel and their employees serving any attorneys identified in Paragraph 6(a) for the purposes of this case, who shall first have executed the UNDERTAKING annexed hereto as Exhibit A;

c.  any independent paralegal, secretarial, photocopying, document imaging, data entry, data processing, drafting, graphics, stenographic reporting or clerical personnel serving such attorneys identified in Paragraph 6(a) for the purposes of this case;

d.  any court reporter or videographer employed or retained by a party for the purposes of transcribing and/or recording a deposition or inspection of premises;

e.  the Court and its personnel;

f.  any person indicated on the face of a document as having written or received such document during the course of his or her employment or consultancy; and, at trial or deposition, any current or former employee of the Producing Party ("Witness"), provided that the Producing Party's document was written or received prior to or during the Witness's period of employment;

g.  non-technical jury or trial consulting services retained by outside counsel, who shall first have executed the UNDERTAKING annexed hereto as Exhibit A ; and

h.  Up to) two (2) in-house party counsel for P&G and one (1) in-house party counsel each for KFH and KFG, in addition to Mr. Hallman and Mr. Bullock, (and such in-house counsel's clerical staff), to be designated by each party by

written notice and provided that such party in-house counsel has executed the UNDERTAKING annexed hereto as Exhibit A.

i.        Employees of KFG, KFH, and P&G.

7.        No other person shall become a Qualified Person without prior leave of Court or prior written consent of the Producing Party. Documents, testimony or information designated by a Producing Party as "Confidential information" may be disclosed and copies may be provided by the Receiving Party only to Qualified Persons as specified in paragraph 6(a) through (i), shall be retained by them in strictest confidence, shall only be used for this action (including appeals) or any other proceeding involving P&G and KFG or KFH, and P&G's United States Patent Nos. 7,169,418 or 7,169,419, provided that a protective order is provided in that proceeding to protect the confidentiality of that information. Confidential information shall not be disclosed to any person not specified in paragraph 6 without the prior written consent of the Producing Party or of the Court. All Confidential information obtained by a Qualified Person shall be carefully maintained so as to preclude access by anyone who is not a Qualified Person.

8.        Documents, testimony or information designated by a Producing Party as "Attorney's Eyes Only" may be disclosed and copies may be provided by the Receiving Party only to Qualified Persons as specified in paragraph 6(a) through (h), shall be retained by them in strictest confidence, shall only be used for the purpose of this action (including appeals) or any other proceeding involving P&G and KFG or KFH, and P&G's United States Patent Nos. 7,169,418 or 7,169,419, provided that a protective order is provided in that proceeding to protect the confidentiality of that information. Attorneys' Eyes Only information shall not be disclosed to any person not specified in paragraph 6(a) through (h) without the prior written consent of the Producing Party or of the Court. All Attorney's Eyes Only information obtained by a Qualified Person under paragraph 6(a) through (h) shall be carefully maintained so as to preclude access by anyone who is not a Qualified Person under paragraph 6(a) through (h).

9.    Except as otherwise agreed to by the parties, Confidential or Attorney's Eyes Only information may not be used in, or to form the basis for, any other proceeding or litigation. However, such information may be used for any reason in any future proceeding or litigation or any other proceeding involving P&G and KFG or KFH, and P&G's United States Patent Nos. 7,169,418 or 7,169,419, provided that a protective order is provided in that proceeding to protect the confidentiality of that information. Confidential or Attorney's Eyes Only information may be disclosed in response to a lawful subpoena issued in connection with grand jury proceedings, other criminal proceedings, or in civil proceedings, but only if notice and a copy of the subpoena are provided to the Producing Party by facsimile transmission or overnight mail at least five (5) business days in advance of such anticipated disclosure or, if the subpoena requires production of such documents in less than five days, as soon as reasonably possible. Should the person seeking access to Confidential or Attorney's Eyes Only information take action against the Receiving Party or anyone else covered by this Protective Order to enforce such a subpoena, demand or other legal process, the Receiving Party shall respond, at a minimum, by setting forth the existence of this Protective Order. Nothing herein shall be construed as requiring the Receiving Party or anyone else covered by this Protective Order to challenge or appeal any order requiring production of Confidential or Attorney's Eyes Only information covered by this Protective Order, or to subject itself to any penalties for noncompliance with any legal process or order, or to seek any relief from this Court.

10.    All Qualified Persons, other than those designated in paragraphs 6(a), (c), (d), (e), and (f), shall be given a copy of this Protective Order prior to being shown any Confidential or Attorney's Eyes Only information. Each such person, prior to having access to said Confidential or Attorney's Eyes Only information, shall execute the UNDERTAKING annexed hereto as EXHIBIT A and thereby agree not to disclose any Confidential or Attorney's Eyes Only information to

anyone who is not a Qualified Person, shall agree not to make use of any such Confidential or

Attorney's Eyes Only information other than for the purposes of this litigation, and shall agree to be

subject to the jurisdiction of the United States District Court for the Western District of Wisconsin

with respect to any issue arising out of this Protective Order.

11.    Before Confidential or Attorney's Eyes Only information is disclosed to any proposed

Qualified Person identified in Paragraphs 6(b) , the Party seeking to disclose that information shall

notify all Producing Parties in writing of the identity of the proposed Qualified Person and provide

the proposed Qualified Person's executed UNDERTAKING and curriculum vitae by facsimile.  No

Confidential or Attorney's Eyes Only information may be shown to any proposed Qualified Person

under 6(b) so identified for four (4) business days following receipt by all Producing Parties of such

notice.  If a Producing Party objects to disclosure of Confidential or Attorney's Eyes Only

information to that proposed Qualified Person within that four (4) business day period, for

reasonable cause set forth in writing, the parties shall thereafter attempt in good faith to resolve the

objection.  Should the parties be unable to resolve the objection, the objecting party shall file a

motion for an Order that access to Confidential or Attorney's Eyes Only information be denied to

such proposed Qualified Person.  Failure to file a motion within five (5) business days after such

Producing Party's receipt of the notification of the objection shall be deemed approval, and such

proposed Qualified Person shall thereafter be qualified to have access to the Confidential or

Attorney's Eyes Only information pursuant to the terms and conditions of this Protective Order.

The proposing party shall not disclose any Confidential or Attorney's Eyes Only information to

proposed Qualified Persons during the period for objection nor during the pendency of any motion

filed in accordance with this paragraph.  No Party shall use its right to object to a proposed

Qualified Person to interfere with the ability of the other Party to reasonably prepare for trial, and

consent to the disclosure of information to proposed Qualified Persons shall not unreasonably be withheld.

12.   In the event that counsel for a Party deems it necessary to disclose any Confidential or Attorney's Eyes Only information of a Producing Party to any person not specified as a Qualified Person, said counsel shall notify counsel for the Producing Party in writing of (a) the information or documents to be disclosed, (b) the person(s) to whom such disclosure is to be made, and (c) the reason(s) for such disclosure, and shall attempt to reach agreement regarding such disclosure. If agreement cannot be reached, the Party wishing to make such disclosure shall file an appropriate motion with the Court. In the event of such motion, the Court shall rule as to whether such disclosure may be made at all and, if so, whether any restriction or limitation shall be placed on such disclosure.

13.   Should any Confidential or Attorney's Eyes Only information be disclosed, through inadvertence or otherwise, to any person not authorized pursuant to the terms of this Protective Order, the disclosing party shall (a) use its best efforts to obtain the return of any such Confidential or Attorney's Eyes Only information; (b) promptly inform such person of all provisions of this Protective Order; (c) identify such person immediately in writing to the Party or third party that designated the Confidential or Attorney's Eyes Only information; and (d) request such person to sign an UNDERTAKING in the form attached hereto as EXHIBIT A. The executed UNDERTAKING shall promptly be served upon counsel of record for the Party or upon the third party that designated the Confidential or Attorney's Eyes Only information. Execution of an UNDERTAKING under such circumstances shall in no way serve to convert the person signing such UNDERTAKING into a Qualified Person.

14.   Counsel for a Producing Party may redact specific material which the Producing Party believes, in good faith, is subject to the attorney-client privilege, work product immunity, or other

legally cognizable privilege or immunity. Counsel for a Producing Party may also redact

information which would qualify for protection as Attorneys Eyes Only confidential, but which is

irrelevant to any issue in this case and not reasonably calculated to lead to the discovery of relevant

evidence. The deletion of all material redacted shall be clearly indicated by visibly marking the

document with the word "REDACTED" or with a solid black line where material has been deleted.

Both parties reserve the right to challenge any redactions made by the Producing Party. All

documents of any nature that are filed with the Court for any purpose and that contain Confidential

or Attorney's Eyes Only information shall be filed in sealed envelopes or other sealed containers

that are marked with the caption of the litigation, that identify each document and thing contained

therein and that bear a statement substantially in the following form:

**FILED UNDER SEAL**
**CONTAINS CONFIDENTIAL INFORMATION**
**SUBJECT TO A PROTECTIVE ORDER**
This envelope contains Confidential information
and is not to be opened, nor the contents thereof
displayed or revealed, except by order of the Court.

or

**FILED UNDER SEAL**
**CONTAINS CONFIDENTIAL INFORMATION – ATTORNEY'S EYES ONLY**
**SUBJECT TO A PROTECTIVE ORDER**
This envelope contains Confidential information
and is not to be opened, nor the contents thereof
displayed or revealed, except by order of the Court.

15.   All deposition testimony automatically shall be treated as Attorney's Eyes Only for a

period of five (5) calendar days from the receipt of the final official transcript thereof. After five

(5) calendar days, the information revealed during the deposition shall cease to be treated as

Attorney's Eyes Only unless orally, on the record at the deposition, or in writing before the five (5)

days have expired, the witness or the witness' employer or counsel informs the deposing party that

Confidential or Attorney's Eyes Only information of the witness or the witness' employer is set

forth in the transcript and identifies the portions of the transcript that disclose such information. In the case of non-party witnesses, any Party or non-party witness may designate information revealed as Confidential or Attorney's Eyes Only information within five (5) calendar days of receipt of the final official deposition transcript by counsel. Upon receipt of such notice that all or a portion of the deposition testimony is Confidential or Attorney's Eyes Only information, each party shall mark all copies of the transcript of the deposition within its possession, custody or control by placing the appropriate designation upon the cover of the transcript; however, failure to so mark transcript copies shall not be an actionable violation of this Protective Order. Thereafter, deposition testimony designated as Confidential or Attorney's Eyes Only information on the record or in writing shall continue to be treated as Confidential or Attorney's Eyes Only information in accordance with the terms of this Protective Order.

16.    Nothing in this Protective Order shall preclude any party representative(s), including but not limited to persons identified under Paragraph 6 of this Protective Order, from either side from attending a deposition. If and when any Confidential and/or Attorneys Eyes Only information is disclosed in deposition, and provided that such party representative(s) do not have authority to view such information under this protective order, the party representative shall leave the deposition for as long as the Confidential and/or Attorneys Eyes Only information is being discussed.

17.    If Confidential or Attorney's Eyes Only information is to be the subject of examination in deposition of a non-party witness who is not a Qualified Person, the following procedures shall apply. Confidential or Attorney's Eyes Only information shall not be provided to any such person without the Producing Party's prior written consent or oral consent during a deposition on the record, or without permission by the Court upon motion and notice. Confidential

or Attorneys Eyes Only information shall not be disclosed unless and until the non-party witness has signed the UNDERTAKING attached as Exhibit A.

18.   Nothing herein shall be construed (a) as preventing any Party from using or continuing to use any information that, at the time of the disclosure, is publicly known through no unauthorized act of such Party, or (b) as preventing a Party from using or continuing to use any information known or used by it if such information was lawfully obtained by the Party other than through discovery of the Producing Party.  Should a dispute arise as to any specific information or material, the burden shall be upon the Party claiming that such information or material is or was publicly known or was lawfully obtained other than through discovery of the Producing Party.

19.   Nothing herein shall prevent any Party from contending, during the progress of this litigation, that any or all material or information designated "Confidential" or "Attorney's Eyes Only" is not, in fact, confidential.  Grounds for such a contention may include that such designated Confidential or Attorney's Eyes Only information is or was publicly known at or prior to disclosure thereof in this litigation, that such designated Confidential or Attorney's Eyes Only information, after disclosure thereof, has become public knowledge as a result of lawful publication by an independent source who obtained the information lawfully, that such designated Confidential or Attorney's Eyes Only information was previously known by the Receiving Party, or that such designated Confidential or Attorney's Eyes Only information was later obtained in good faith by the Receiving Party from an independent source who obtained the information lawfully.  Any Party may request any Producing Party that designated information as Confidential or Attorney's Eyes Only information to remove that designation.  Such a request shall be in writing, stating the grounds therefor, and shall be served on counsel for the Producing Party who designated the information as Confidential or Attorney's Eyes Only information.  The requested change shall occur unless, within ten (10) calendar days after service of such notice, an objection for good cause is served on the

Party requesting removal of the Confidential or Attorney's Eyes Only information designation. That objection may thereafter be resolved by agreement or by the Court. The Producing Party shall have the burden of establishing the need for maintaining the "Confidential" or "Attorney's Eyes Only" designation.

20.　Nothing in this Protective Order shall require a Party to challenge the propriety of any "Confidential" or "Attorney's Eyes Only" designation at the time such designation is made, and failure to do so shall not preclude a subsequent challenge thereto.

21.　Notwithstanding the parties' designation of "Confidential" or "Attorney's Eyes Only" documents, testimony or information, any Court hearing that refers to or describes "Confidential" or "Attorney's Eyes Only" documents, testimony or information may be held in open court with records unsealed, provided the Producing Party is afforded reasonable notice of the Receiving Party's intent to disclose such documents, testimony or information in open court, so that the confidentiality of such documents, testimony or information can be protected. However, any party may request or the Court may order that the portion of such proceeding where use thereof is to be made be held *in camera* with access thereto limited to Qualified Persons under this Protective Order. To the extent that the Court grants any such request, such Confidential or Attorney's Eyes Only information shall continue to be treated in accordance with the terms of this Protective Order.

22.　(a)　The inadvertent or unintentional failure by a Producing Party to designate specific documents or information as containing Confidential or Attorney's Eyes Only information shall not be deemed a waiver in whole or in part of the Producing Party's claim of confidentiality as to such documents or information. Upon notice of such failure to designate, all Receiving Parties shall cooperate to restore the confidentiality of the inadvertently disclosed documents or information, without prejudice.

(b)    Per Fed. R. Civ. P. 26(b)(5), if a Producing Party produces any document or information that it believes is immune from discovery pursuant to any attorney-client privilege, attorney work product immunity or any other privilege or immunity from production, such production shall not be deemed a waiver, and the Producing Party may give written notice to all Receiving Parties that the document or information so produced is deemed privileged and that return of the document or information is requested. Upon receipt of such written notice, all Receiving Parties shall immediately undertake to gather the original and all copies of the document or information and shall immediately return the original and all such copies to the Producing Party or certify in writing the destruction thereof. Return of such documents or information to the Producing Party shall not preclude any Receiving Party from later moving to compel production of the returned documents or information.

23.    When a Party produces files and records for inspection, no marking need be made in advance of the inspection. For purposes of the initial inspection, all documents in any produced files shall be considered marked as Attorney's Eyes Only. Thereafter, upon selection of specified documents for copying and by the inspecting party, the Producing Party shall mark the copies of such documents with the appropriate confidentiality marking at the time that the copies are produced to the Receiving Party.

24.    Making documents or other information available for inspection shall not, by itself, constitute a waiver by the Producing Party of any claim of confidentiality, but delivery of documents and things to a Receiving Party without designating such as Confidential or Attorney's Eyes Only information shall not constitute waiver of any claim of confidentiality if such inadvertence or mistake is thereafter brought to the attention of the Receiving Party promptly after discovery by the Producing Party. Upon such notice, the Receiving Party shall, at the election of the Producing Party, re-mark the documents and things with the appropriate level of confidentiality

or return said documents and things and not retain copies thereof for replacement by appropriately marked documents and things. Any summaries or notes of the inadvertently produced documents or things shall be treated as Confidential or Attorney's Eyes Only information, as designated by the Producing Party.

25.   The terms of this Protective Order shall be applicable to any third party that produces information that is designated by such third party or by a party hereto as Confidential or Attorney's Eyes Only information.

26.   On final determination of this litigation, each Party and other person subject to the terms hereof shall, within sixty (60) calendar days, assemble and, at its option, destroy or return to the Producing Party all materials, documents and things constituting Confidential or Attorney's Eyes Only information, all copies, summaries and abstracts thereof and all other materials, memoranda or documents constituting or containing Confidential or Attorney's Eyes Only information. If destroyed, such party or person shall certify to the Producing Party, within sixty (60) calendar days, the destruction of all such materials. Outside counsel for each Party may retain archive copies of pleadings, motion papers, written discovery responses, in addition to one set of documents produced by any Party or non-party and correspondence that include Confidential or Attorney's Eyes Only information.

27.   This Protective Order shall survive the termination of this litigation.

28.   Nothing in this Protective Order shall prevent any Party from applying to the Court for additional protection, for example, for particularly highly sensitive materials or information, such as technical, planning, manufacturing, marketing, and research and development materials and information relating to product development, that the Producing Party believes require such protection.

29.   Nothing in this Protective Order shall be construed as a waiver by any Party of its right to object to the subject matter of any request for production of documents in this action, nor as a waiver by any other Party of the first Party's obligation to make proper response to discovery requests.

30.   Nothing in this Protective Order shall be construed as a waiver by any Party of any objections that might be raised as to admissibility at trial of any evidentiary materials.

31.   Except as may be set forth in paragraph 6, above, it is not the intent of the Parties, nor of the Court, that an attorney or law firm that acquires knowledge of, or is given access to, Confidential or Attorney's Eyes Only information pursuant to this Protective Order should thereby be disqualified from other representations adverse to the Producing Party solely because of such knowledge or access.

32.   Any Party may, on motion for good cause shown, seek a modification of this Protective Order.  No modification of this Protective Order that adversely affects the protection of any document produced or given by a non-party in this case shall be made without giving to that non-party appropriate notice and opportunity to be heard by the Court.


SIGNED and ENTERED this _____ day of _____, 2007


_____
Hon. John C. Shabaz
UNITED STATES DISTRICT JUDGE

APPROVED AS TO CONTENT AND FORM:

February 20, 2008                          February 20, 2008


By: s:/ Evette D. Pennypacker             By: s:/ Charles J. Crueger
Anthony A. Tomaselli                       Paul F. Linn
Quarles & Brady LLP                        Charles J. Crueger
33 East Main Street, Suite 900             Michael Best & Friedrich LLP
Madison, WI 53703                          100 East Wisconsin Avenue
                                           Suite 3300
Of Counsel:                                Milwaukee, WI 53202-4108
Claude M. Stern
Evette D. Pennypacker                      Of Counsel:
QUINN EMANUEL URQUHART
  OLIVER & HEDGES, LLP                     Mark D. Wegener
555 Twin Dolphin Drive, Suite 560          HOWREY LLP
Redwood Shores, California 94065-2129      1299 Pennsylvania Ave., N.W.
Telephone: (650) 801-5000                  Washington, DC 20004
Facsimile: (650) 801-5100                  Telephone: (202) 383-0800
                                           Facsimile: (202) 383-6610
Attorneys for Plaintiff
Kraft Foods Holdings, Inc. and  Third-Party   William C. Rooklidge
Defendant Kraft Foods Global, Inc.         Gregory S. Cordrey
                                           Ben M. Davidson

                                           HOWREY LLP
                                           2020 Main Street, Suite 1000
                                           Irvine, CA 92614
                                           Telephone: (949) 721-6900
                                           Facsimile: (949) 721-6910

                                           Attorneys for Defendant The Procter &
                                           Gamble Company

**EXHIBIT A**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| KRAFT FOODS HOLDINGS, INC., | |
| Plaintiff | |
| v. | |
| THE PROCTER & GAMBLE COMPANY, | |
| Defendant | Case No. 07-C-0613-S |
| | |
| THE PROCTER & GAMBLE COMPANY, | |
| Counterclaim Plaintiff | |
| v. | |
| KRAFT FOODS HOLDINGS, INC. | |
| Counterclaim Defendant | |
| and | |
| KRAFT FOODS GLOBAL, INC. | |
| Third-Party Defendant | |

**UNDERTAKING**

I, _____ declare that

my address is _____.

My current employer is _____.

My current occupation is _____.

17

1.    I have received a copy of the Stipulated Protective Order in this action. I have carefully read and understand the provisions of the Stipulated Protective Order.

2.    I will comply with all of the provisions of the Stipulated Protective Order. I will hold in confidence, will not disclose to anyone not qualified under the Stipulated Protective Order, and will use only for purposes of this action any Confidential or Attorney's Eyes Only information that is disclosed to me.

3.    Promptly upon termination of this action, I will return all Confidential and Attorney's Eyes Only materials that came into my possession, and all documents and things that I have prepared relating thereto, to the outside attorney for the party by whom I am employed or retained, or who noticed my deposition.

4.    I hereby submit to the jurisdiction of this Court for the purpose of enforcement of the Stipulated Protective Order in this action.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _____    Signed: _____

## Maynard, Scott

| | |
|---|---|
| **From:** | Davidson, Ben |
| **Sent:** | Monday, March 10, 2008 2:16 PM |
| **To:** | Maynard, Scott |
| **Subject:** | FW: Activity in Case 3:07-cv-00613-jcs Kraft Foods Holdings Inc v. Procter & Gamble Company The Text Only Order |

**From:** wiwd_ecf@wiwd.uscourts.gov [mailto:wiwd_ecf@wiwd.uscourts.gov]
**Sent:** Tuesday, March 04, 2008 3:15 PM
**To:** courtmail@wiwd.uscourts.gov
**Subject:** Activity in Case 3:07-cv-00613-jcs Kraft Foods Holdings Inc v. Procter & Gamble Company The Text Only Order

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. District Court

### Western District of Wisconsin

## Notice of Electronic Filing

The following transaction was entered on 3/4/2008 at 3:15 PM CST and filed on 3/4/2008
**Case Name:**      Kraft Foods Holdings Inc v. Procter & Gamble Company The
**Case Number:**      3:07-cv-613
**Filer:**
**Document Number:** 41(No document attached)

**Docket Text:**
\*\* TEXT ONLY ORDER \*\*
Order ACCEPTING and ENTERING [35] Stipulated MOTION for Protective Order, EXCEPT that the definitions of "Confidential" and "Attorney's Eyes Only" are modified to make them objective rather than subjective. In paragraph (2) the phrase "that the Producing Party in good faith considers to" is deleted and "constitute and contain" is changed to "constitutes and contains." In Paragraph (3) the phrase "the Producing Party reasonably believes" is deleted. Signed by Magistrate Judge Stephen L Crocker on 3/4/08. (krj)

**3:07-cv-613 Notice has been electronically mailed to:**
Paul F. Linn pflinn@michaelbest.com, amgelhaus@michaelbest.com, tlbudish@michaelbest.com
Anthony A. Tomaselli aat@quarles.com
Charles J. Crueger cjcrueger@michaelbest.com
Claude Michael Stern Claudestern@quinnemanuel.com
Evette Dionna Pennypacker Evettepennypacker@quinnemanuel.com, Claudestern@quinnemanuel.com, Sandranichols@quinnemanuel.com, Tomwallerstein@quinnemanuel.com

3/10/2008

Michael Daniel Powell Michaelpowell@quinnemanuel.com

**3:07-cv-613 Notice will be delivered by other means to::**


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Unless otherwise expressly indicated, if this email, or any attachment
hereto, contains advice concerning any federal tax issue or
submission, please be advised that the advice was not intended or
written to be used, and that it cannot be used, for the purpose of
avoiding federal tax penalties.

The information contained in this communication may be confidential,
is intended only for the use of the recipient(s) named above, and may
be legally privileged.  If the reader of this message is not the
intended recipient, you are hereby notified that any dissemination,
distribution, or copying of this communication, or any of its
contents, is strictly prohibited.  If you have received this
communication in error, please return it to the sender immediately and
delete the original message and any copy of it from your computer
system.  If you have any questions concerning this message, please
contact the sender.

# MESSAGE CONFIRMATION

03/10/08      15:35
ID=HOWREY SIMON

| NO. | MODE | BOX | GROUP |
|-----|------|-----|-------|
| 505 | TX   |     |       |

| DATE/TIME | TIME | DISTANT STATION ID | PAGES | RESULT | ERROR PAGES | S.CODE |
|-----------|------|--------------------|-------|--------|-------------|--------|
| 03/10  15:28 | 07'02" | 3127821482 | 025 | OK | | 0000 |

# HOWREY LLP

4 PARK PLAZA
SUITE 1700
IRVINE, CA 92614
PHONE: 949.721.6900 • FAX: 949.721.6910

## FACSIMILE COVER SHEET

*DATE:* March 10, 2008

*TO:*      *NAME:*      Dean J. Lurie, Esq.

         *COMPANY:*      Stone, Pogrund & Korey, LLC

         *FAX NUMBER*      (312) 782-1482      *PHONE NUMBER:*      (312) 782-3636

         *CITY:*      Chicago, IL

*FROM:*      *NAME:*      Scott R. Maynard

         *DIRECT DIAL NUMBER:*      (949) 759-3910      *USER ID:*      2602

*NUMBER OF PAGES, INCLUDING COVER:*      25      *CHARGE NUMBER:*      05837.0246

☒ *ORIGINAL WILL FOLLOW VIA:*

     ☒ *REGULAR MAIL*      ☐ *OVERNIGHT DELIVERY*      ☐ *HAND DELIVERY*      ☐ *OTHER:*

☐ *ORIGINAL WILL NOT FOLLOW*

*SUPPLEMENTAL MESSAGE:*

Please reference attached letter of today's date, together with attachment.

*THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.*

*IF THERE ARE ANY QUESTIONS OR PROBLEMS WITH THE TRANSMISSION OF THIS FACSIMILE, PLEASE CALL 949.721.6900.*

# Exhibit 11

LAW OFFICES

# STONE, POGRUND & KOREY

32ND FLOOR
221 NORTH LASALLE STREET
CHICAGO, ILLINOIS 60601
TELEPHONE: (312) 782-3636
FACSIMILE: (312) 893-2092
WEB SITE: www.spklaw.com

BEHTRAM A. STONE (1915-1994)
SHERWIN I. POGRUND, P.C.
MARTIN S. KOREY
JAMES P. ZIEGLER
DAVID B. POGRUND
CHRISTOPHER T. NOWOTARSKI, P.C.
LAWRENCE J. STARK
CARTER A. KOREY
DEAN J. LURIE
STUART M. SHELDON
PATRICK T. JOY

*1957 - 2007*

*50*
*YEARS OF*
*PROVIDING*
*QUALITY*
*LEGAL*
*REPRESENTATION*

WRITER'S E-MAIL:
dlurie@spklaw.com

March 11, 2008

VIA U.S. MAIL AND EMAIL: DavidsonB@Howrey.com

Ben M. Davidson
Howrey LLP
550 S. Hope Street Suite 1100
Los Angeles, CA 91101

> Re:   **Kraft Foods Holdings, Inc. v. The Proctor & Gamble Company**
> **Case No. 07-C-0613-S**

Dear Mr. Davidson:

This letter will memorialize the conversation I had today with your associate Scott R. Maynard and my partner Martin S. Korey pursuant to Northern District of Illinois Local Rule 37.2. The call was in response to Mr. Maynard's letter to me dated March 10, 2008 regarding Plitek, LLC's Response and Objections to P&G's Subpoena that was served on you on February 22, 2008.

Plitek, LLC stands on its Response and Objections previously served upon you. As previously stated, Plitek, LLC does not possess any documents, whatsoever, regarding "vent valves becoming blocked." We dispute that Dick Boiteau of Plitek said anything to the contrary in his conversation with you or your associates. Further, the "555 Patent" discussed in Mr. Maynard's letter is not the product utilized in the 39 ounce plastic coffee container that is the subject of the above referenced litigation. Specifically, there are no "rails" on the vent valve utilized in the aforementioned coffee container. Therefore, any request with regard to the "555 Patent" is completely irrelevant.

While Plitek, LLC "makes vent valves" it has never engaged in any process to prevent those valves from becoming blocked and has no knowledge thereof. Any documents regarding prevention of valve blockage or payment for valves from Plitek must be obtained from Kraft Foods Holdings, Inc.

Very Respectfully,

STONE, POGRUND & KOREY

Dean J. Lurie

cc:   Scott R. Maynard via facsimile 949/721-6910
Karl K. Hoffman via email karl.hoffman@plitek.com

# Exhibit 12

**Maynard, Scott**

| | |
|---|---|
| **From:** | Davidson, Ben |
| **Sent:** | Monday, March 10, 2008 2:16 PM |
| **To:** | Maynard, Scott |
| **Subject:** | FW: Activity in Case 3:07-cv-00613-jcs Kraft Foods Holdings Inc v. Procter & Gamble Company The Text Only Order |

**From:** wiwd_ecf@wiwd.uscourts.gov [mailto:wiwd_ecf@wiwd.uscourts.gov]
**Sent:** Tuesday, March 04, 2008 3:15 PM
**To:** courtmail@wiwd.uscourts.gov
**Subject:** Activity in Case 3:07-cv-00613-jcs Kraft Foods Holdings Inc v. Procter & Gamble Company The Text Only Order

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

**U.S. District Court**

**Western District of Wisconsin**

**Notice of Electronic Filing**

The following transaction was entered on 3/4/2008 at 3:15 PM CST and filed on 3/4/2008
**Case Name:**        Kraft Foods Holdings Inc v. Procter & Gamble Company The
**Case Number:**    3:07-cv-613
**Filer:**
**Document Number:** 41(No document attached)

**Docket Text:**
\*\* TEXT ONLY ORDER \*\*
Order ACCEPTING and ENTERING [35] Stipulated MOTION for Protective Order, EXCEPT that the definitions of "Confidential" and "Attorney's Eyes Only" are modified to make them objective rather than subjective. In paragraph (2) the phrase "that the Producing Party in good faith considers to" is deleted and "constitute and contain" is changed to "constitutes and contains." In Paragraph (3) the phrase "the Producing Party reasonably believes" is deleted. Signed by Magistrate Judge Stephen L Crocker on 3/4/08. (krj)

**3:07-cv-613 Notice has been electronically mailed to:**
Paul F. Linn pflinn@michaelbest.com, amgelhaus@michaelbest.com, tlbudish@michaelbest.com
Anthony A. Tomaselli aat@quarles.com
Charles J. Crueger cjcrueger@michaelbest.com
Claude Michael Stern Claudestern@quinnemanuel.com
Evette Dionna Pennypacker Evettepennypacker@quinnemanuel.com, Claudestern@quinnemanuel.com,
Sandranichols@quinnemanuel.com, Tomwallerstein@quinnemanuel.com

Michael Daniel Powell Michaelpowell@quinnemanuel.com

**3:07-cv-613 Notice will be delivered by other means to::**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Unless otherwise expressly indicated, if this email, or any attachment
hereto, contains advice concerning any federal tax issue or
submission, please be advised that the advice was not intended or
written to be used, and that it cannot be used, for the purpose of
avoiding federal tax penalties.

The information contained in this communication may be confidential,
is intended only for the use of the recipient(s) named above, and may
be legally privileged.  If the reader of this message is not the
intended recipient, you are hereby notified that any dissemination,
distribution, or copying of this communication, or any of its
contents, is strictly prohibited.  If you have received this
communication in error, please return it to the sender immediately and
delete the original message and any copy of it from your computer
system.  If you have any questions concerning this message, please
contact the sender.

4/14/2008

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| KRAFT FOODS HOLDINGS, INC., | |
| Plaintiff, | |
| v. | Case No. 07C0613S |
| THE PROCTER & GAMBLE COMPANY, | |
| Defendant | |

### JOINT MOTION FOR PROTECTIVE ORDER

Plaintiff Kraft Foods Holdings, Inc. ("Kraft"), and Defendant, The Procter & Gamble Company ("P&G"), hereby move the Court under Federal Rule of Civil Procedure 26 for entry of the stipulated protective order attached to this motion. The Parties have both requested the production of materials and information that each protects as confidential and proprietary in the ordinary course of their businesses and that, if produced without restriction, could cause serious commercial harm to each party. Such information includes product research and development, non-public financial information and market analysis, current and future product cost and pricing information, non-public licensing information, and non-public patent or trademark prosecution information. Kraft and P&G believe that the attached stipulated protective order strikes an appropriate balance between protecting their confidential information and protecting the public interest in an open and assessable judicial system.

Based on the foregoing, Kraft and P&G respectfully request that Court enter the attached stipulated protective order.

February 20, 2008

By: s:/ Evette D. Pennypacker
 Anthony A. Tomaselli
 Quarles & Brady LLP
 33 East Main Street, Suite 900
 Madison, WI  53703


Of Counsel:
Claude M. Stern
Evette D. Pennypacker
Thomas E. Wallerstein
QUINN EMANUEL URQUHART
    OLIVER & HEDGES, LLP
555 Twin Dolphin Drive, Suite 560
Redwood Shores, California 94065-
    2129
Telephone: (650) 801-5000
Facsimile:  (650) 801-5100


Attorneys for Plaintiff
Kraft Foods Holdings, Inc.

February 20, 2008

By: s:/ Charles J. Crueger
 Paul F. Linn
 Charles J. Crueger
 Michael Best & Friedrich LLP
 100 East Wisconsin Avenue
 Suite 3300
 Milwaukee, WI  53202-4108

Of Counsel:
Mark D. Wegener
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, DC 20004
Telephone: (202) 383-0800
Facsimile: (202) 383-6610

William C. Rooklidge
Gregory S. Cordrey
Ben M. Davidson
HOWREY LLP
2020 Main Street, Suite 1000
Irvine, CA 92614
Telephone: (949) 721-6900
Facsimile: (949) 721-6910

Attorneys for Defendant The Procter &
Gamble Company

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

KRAFT FOODS HOLDINGS, INC.,

        Plaintiff

v.

THE PROCTER & GAMBLE COMPANY,

        Defendant        |    Case No. 07-C-0613-S


THE PROCTER & GAMBLE COMPANY,

        Counterclaim Plaintiff

v.

KRAFT FOODS HOLDINGS, INC.

        Counterclaim Defendant
and

KRAFT FOODS GLOBAL, INC.

        Third-Party Defendant

---

**STIPULATED PROTECTIVE ORDER**

---

    Upon stipulation of counsel for Plaintiff and Counterclaim Defendant Kraft Foods Holdings, Inc. ("KFH"), Defendant and Counterclaim Plaintiff Procter & Gamble Company ("P&G") and Third-Party Defendant Kraft Foods Global, Inc. ("KFG"), it appearing to the Court that a Protective Order under Rule 26(c) of the Federal Rules of Civil Procedure is

necessary and appropriate and will facilitate discovery,

IT IS HEREBY ORDERED THAT:

1.    Any Party or non-party producing material or information in this litigation ("Producing Party") may designate such material or information as "Confidential" or "Attorney's Eyes Only" in which case such material or information shall be treated in accordance with the terms of this Protective Order.

2.    The term "Confidential" may be applied only to material or information not known to the general public that is produced in this litigation by a Producing Party to any other Party ("Receiving Party"), that the Producing Party in good faith considers to constitute or contain trade secrets or other confidential research and development, know-how, proprietary data, financial results, other non-publicly available information, or commercial information within the meaning of Federal Rule of Civil Procedure 26(c)(7) or that the Producing Party is under an obligation to a third party to maintain as confidential.

3.    The term "Attorney's Eyes Only" may be applied only to such highly confidential materials or information that consist of or contain particularly sensitive information relating to, e.g., product or packaging research and development, marketing, pricing, manufacturing, customer data, financial information, and any pending or abandoned patent applications, foreign or domestic; as well as such other documents, information or materials that relate to other proprietary information within the meaning of Federal Rule of Civil Procedure 26(c)(7) that the Producing Party reasonably believes is of such nature and character that disclosure of such information would be harmful to the Producing Party or may cause the Producing Party to violate  federal laws and/or regulations.

4.    Any document or portion thereof that a Producing Party believes to contain Confidential or Attorney's Eyes Only information shall be so designated by stamping or otherwise applying on each page containing Confidential or Attorney's Eyes Only information the designation

"Confidential" or "Attorney's Eyes Only," in which case such designated document and the information contained therein shall be treated in accordance with the terms of this Protective Order. Nothing in this Protective Order constitutes an admission of a Party that any information designated as "Confidential" or "Attorney's Eyes Only" by a Producing Party does in fact constitute a trade secret or proprietary information or constitutes an agreement or admission with respect to the competency, relevance, or materiality of any such information.

5.     All Confidential or Attorney's Eyes Only information not reduced to documentary, tangible, or physical form or which cannot be conveniently designated pursuant to Paragraph 4 shall be designated by the Producing Party by informing all Receiving Parties in writing.

6.     "Qualified Person," as used herein, is limited to the following categories of persons provided that such persons are not currently, during the course of this litigation, and will not be for a period of one (1) year following the entry of a final non-appealable judgment or order or the complete settlement of all claims against all parties in this action, (i) drafting, or providing substantive input into the drafting of, any patent application and/or engaging in correspondence with the PTO or any other patent-issuing body, domestic or foreign  of any patent application (or portion thereof), whether design or utility, and either in the United States or abroad, relating to coffee product packaging; or (ii) having knowledge of and providing advice, counsel or suggestions regarding  specific claim scope and/or language, embodiment(s) for specific claim coverage, specific claim(s) for prosecution, or products or processes for coverage by specific claim(s) relating to coffee product packaging.  Notwithstanding the above, the prohibitions of this paragraph shall not apply to:  (1) a person employed by Kraft or P&G to review Attorney's Eyes Only information if that person's role in the patent review process within Kraft or P&G  is limited to general knowledge of his or her employer's pending patent application(s) covering the subject of coffee packaging, without specific knowledge of the content of any claims of such application, and having

input as to whether such application should be filed with any patent-issuing body, domestic or

foreign; or (2) Mr. Clinton Hallman, representing Kraft, and Mr. Roddy Bullock, representing

P&G.  The parties agree that, in the event the duties of Mr. Hallman are reassigned to another

attorney for Kraft, or in the event that the duties of Mr. Bullock are reassigned to another attorney

for P&G, the parties will not unreasonably withhold their consent to the new attorney having access

to Attorneys' Eyes Only information.

- a.    any attorney appearing of record or of counsel in this case, other than in-house counsel, together with other attorneys at the firm(s) of counsel of record, and their employees including paralegal, secretarial, photocopying, document imaging, data entry, data processing, drafting, graphics, stenographic reporting, or clerical personnel;

- b.    subject to the conditions set forth in paragraphs 10 and 11, any independent technical or financial expert, independent consultant, or independent testing personnel and their employees serving any attorneys identified in Paragraph 6(a) for the purposes of this case, who shall first have executed the UNDERTAKING annexed hereto as Exhibit A;

- c.    any independent paralegal, secretarial, photocopying, document imaging, data entry, data processing, drafting, graphics, stenographic reporting or clerical personnel serving such attorneys identified in Paragraph 6(a) for the purposes of this case;

- d.    any court reporter or videographer employed or retained by a party for the purposes of transcribing and/or recording a deposition or inspection of premises;

- e.    the Court and its personnel;

- f.    any person indicated on the face of a document as having written or received such document during the course of his or her employment or consultancy; and, at trial or deposition, any current or former employee of the Producing Party ("Witness"), provided that the Producing Party's document was written or received prior to or during the Witness's period of employment;

- g.    non-technical jury or trial consulting services retained by outside counsel, who shall first have executed the UNDERTAKING annexed hereto as Exhibit A ; and

- h.    Up to) two (2) in-house party counsel for P&G and one (1) in-house party counsel each for KFH and KFG, in addition to Mr. Hallman and Mr. Bullock, (and such in-house counsel's clerical staff), to be designated by each party by

written notice and provided that such party in-house counsel has executed the UNDERTAKING annexed hereto as Exhibit A.

    i.      Employees of KFG, KFH, and P&G.

7.    No other person shall become a Qualified Person without prior leave of Court or prior written consent of the Producing Party.  Documents, testimony or information designated by a Producing Party as "Confidential information" may be disclosed and copies may be provided by the Receiving Party only to Qualified Persons as specified in paragraph 6(a) through (i), shall be retained by them in strictest confidence, shall only be used for this action (including appeals) or any other proceeding involving P&G and KFG or KFH, and P&G's United States Patent Nos. 7,169,418 or 7,169,419, provided that a protective order is provided in that proceeding to protect the confidentiality of that information.  Confidential information shall not be disclosed to any person not specified in paragraph 6 without the prior written consent of the Producing Party or of the Court.  All Confidential information obtained by a Qualified Person shall be carefully maintained so as to preclude access by anyone who is not a Qualified Person.

8.    Documents, testimony or information designated by a Producing Party as "Attorney's Eyes Only" may be disclosed and copies may be provided by the Receiving Party only to Qualified Persons as specified in paragraph 6(a) through (h), shall be retained by them in strictest confidence, shall only be used for the purpose of this action (including appeals) or any other proceeding involving P&G and KFG or KFH, and P&G's United States Patent Nos. 7,169,418 or 7,169,419, provided that a protective order is provided in that proceeding to protect the confidentiality of that information.  Attorneys' Eyes Only information shall not be disclosed to any person not specified in paragraph 6(a) through (h) without the prior written consent of the Producing Party or of the Court.  All Attorney's Eyes Only information obtained by a Qualified Person under paragraph 6(a) through (h) shall be carefully maintained so as to preclude access by anyone who is not a Qualified Person under paragraph 6(a) through (h).

9.     Except as otherwise agreed to by the parties, Confidential or Attorney's Eyes Only information may not be used in, or to form the basis for, any other proceeding or litigation. However, such information may be used for any reason in any future proceeding or litigation or any other proceeding involving P&G and KFG or KFH, and P&G's United States Patent Nos. 7,169,418 or 7,169,419, provided that a protective order is provided in that proceeding to protect the confidentiality of that information.  Confidential or Attorney's Eyes Only information may be disclosed in response to a lawful subpoena issued in connection with grand jury proceedings, other criminal proceedings, or in civil proceedings, but only if notice and a copy of the subpoena are provided to the Producing Party by facsimile transmission or overnight mail at least five (5) business days in advance of such anticipated disclosure or, if the subpoena requires production of such documents in less than five days, as soon as reasonably possible.  Should the person seeking access to Confidential or Attorney's Eyes Only information take action against the Receiving Party or anyone else covered by this Protective Order to enforce such a subpoena, demand or other legal process, the Receiving Party shall respond, at a minimum, by setting forth the existence of this Protective Order.  Nothing herein shall be construed as requiring the Receiving Party or anyone else covered by this Protective Order to challenge or appeal any order requiring production of Confidential or Attorney's Eyes Only information covered by this Protective Order, or to subject itself to any penalties for noncompliance with any legal process or order, or to seek any relief from this Court.

10.     All Qualified Persons, other than those designated in paragraphs 6(a), (c), (d), (e), and (f), shall be given a copy of this Protective Order prior to being shown any Confidential or Attorney's Eyes Only information.  Each such person, prior to having access to said Confidential or Attorney's Eyes Only information, shall execute the UNDERTAKING annexed hereto as EXHIBIT A and thereby agree not to disclose any Confidential or Attorney's Eyes Only information to

anyone who is not a Qualified Person, shall agree not to make use of any such Confidential or

Attorney's Eyes Only information other than for the purposes of this litigation, and shall agree to be

subject to the jurisdiction of the United States District Court for the Western District of Wisconsin

with respect to any issue arising out of this Protective Order.

11.    Before Confidential or Attorney's Eyes Only information is disclosed to any proposed

Qualified Person identified in Paragraphs 6(b) , the Party seeking to disclose that information shall

notify all Producing Parties in writing of the identity of the proposed Qualified Person and provide

the proposed Qualified Person's executed UNDERTAKING and curriculum vitae by facsimile.  No

Confidential or Attorney's Eyes Only information may be shown to any proposed Qualified Person

under 6(b) so identified for four (4) business days following receipt by all Producing Parties of such

notice.  If a Producing Party objects to disclosure of Confidential or Attorney's Eyes Only

information to that proposed Qualified Person within that four (4) business day period, for

reasonable cause set forth in writing, the parties shall thereafter attempt in good faith to resolve the

objection.  Should the parties be unable to resolve the objection, the objecting party shall file a

motion for an Order that access to Confidential or Attorney's Eyes Only information be denied to

such proposed Qualified Person.  Failure to file a motion within five (5) business days after such

Producing Party's receipt of the notification of the objection shall be deemed approval, and such

proposed Qualified Person shall thereafter be qualified to have access to the Confidential or

Attorney's Eyes Only information pursuant to the terms and conditions of this Protective Order.

The proposing party shall not disclose any Confidential or Attorney's Eyes Only information to

proposed Qualified Persons during the period for objection nor during the pendency of any motion

filed in accordance with this paragraph.  No Party shall use its right to object to a proposed

Qualified Person to interfere with the ability of the other Party to reasonably prepare for trial, and

consent to the disclosure of information to proposed Qualified Persons shall not unreasonably be withheld.

12.    In the event that counsel for a Party deems it necessary to disclose any Confidential or Attorney's Eyes Only information of a Producing Party to any person not specified as a Qualified Person, said counsel shall notify counsel for the Producing Party in writing of (a) the information or documents to be disclosed, (b) the person(s) to whom such disclosure is to be made, and (c) the reason(s) for such disclosure, and shall attempt to reach agreement regarding such disclosure.  If agreement cannot be reached, the Party wishing to make such disclosure shall file an appropriate motion with the Court.  In the event of such motion, the Court shall rule as to whether such disclosure may be made at all and, if so, whether any restriction or limitation shall be placed on such disclosure.

13.    Should any Confidential or Attorney's Eyes Only information be disclosed, through inadvertence or otherwise, to any person not authorized pursuant to the terms of this Protective Order, the disclosing party shall (a) use its best efforts to obtain the return of any such Confidential or Attorney's Eyes Only information; (b) promptly inform such person of all provisions of this Protective Order; (c) identify such person immediately in writing to the Party or third party that designated the Confidential or Attorney's Eyes Only information; and (d) request such person to sign an UNDERTAKING in the form attached hereto as EXHIBIT A.  The executed UNDERTAKING shall promptly be served upon counsel of record for the Party or upon the third party that designated the Confidential or Attorney's Eyes Only information.  Execution of an UNDERTAKING under such circumstances shall in no way serve to convert the person signing such UNDERTAKING into a Qualified Person.

14.    Counsel for a Producing Party may redact specific material which the Producing Party believes, in good faith, is subject to the attorney-client privilege, work product immunity, or other

legally cognizable privilege or immunity.  Counsel for a Producing Party may also redact

information which would qualify for protection as Attorneys Eyes Only confidential, but which is

irrelevant to any issue in this case and not reasonably calculated to lead to the discovery of relevant

evidence.  The deletion of all material redacted shall be clearly indicated by visibly marking the

document with the word "REDACTED" or with a solid black line where material has been deleted.

Both parties reserve the right to challenge any redactions made by the Producing Party. All

documents of any nature that are filed with the Court for any purpose and that contain Confidential

or Attorney's Eyes Only information shall be filed in sealed envelopes or other sealed containers

that are marked with the caption of the litigation, that identify each document and thing contained

therein and that bear a statement substantially in the following form:

FILED UNDER SEAL<br>
CONTAINS CONFIDENTIAL INFORMATION<br>
SUBJECT TO A PROTECTIVE ORDER<br>
This envelope contains Confidential information<br>
and is not to be opened, nor the contents thereof<br>
displayed or revealed, except by order of the Court.

or

FILED UNDER SEAL<br>
CONTAINS CONFIDENTIAL INFORMATION – ATTORNEY'S EYES ONLY<br>
SUBJECT TO A PROTECTIVE ORDER<br>
This envelope contains Confidential information<br>
and is not to be opened, nor the contents thereof<br>
displayed or revealed, except by order of the Court.

15.    All deposition testimony automatically shall be treated as Attorney's Eyes Only for a

period of five (5) calendar days from the receipt of the final official transcript thereof.  After five

(5) calendar days, the information revealed during the deposition shall cease to be treated as

Attorney's Eyes Only unless orally, on the record at the deposition, or in writing before the five (5)

days have expired, the witness or the witness' employer or counsel informs the deposing party that

Confidential or Attorney's Eyes Only information of the witness or the witness' employer is set

forth in the transcript and identifies the portions of the transcript that disclose such information.  In the case of non-party witnesses, any Party or non-party witness may designate information revealed as Confidential or Attorney's Eyes Only information within five (5) calendar days of receipt of the final official deposition transcript by counsel.  Upon receipt of such notice that all or a portion of the deposition testimony is Confidential or Attorney's Eyes Only information, each party shall mark all copies of the transcript of the deposition within its possession, custody or control by placing the appropriate designation upon the cover of the transcript; however, failure to so mark transcript copies shall not be an actionable violation of this Protective Order.  Thereafter, deposition testimony designated as Confidential or Attorney's Eyes Only information on the record or in writing shall continue to be treated as Confidential or Attorney's Eyes Only information in accordance with the terms of this Protective Order.

16.    Nothing in this Protective Order shall preclude any party representative(s), including but not limited to persons identified under Paragraph 6 of this Protective Order, from either side from attending a deposition.  If and when any Confidential and/or Attorneys Eyes Only information is disclosed in deposition, and provided that such party representative(s) do not have authority to view such information under this protective order, the party representative shall leave the deposition for as long as the Confidential and/or Attorneys Eyes Only information is being discussed.

17.    If Confidential or Attorney's Eyes Only information is to be the subject of examination in deposition of a non-party witness who is not a Qualified Person, the following procedures shall apply.  Confidential or Attorney's Eyes Only information shall not be provided to any such person without the Producing Party's prior written consent or oral consent during a deposition on the record, or without permission by the Court upon motion and notice.  Confidential

or Attorneys Eyes Only information shall not be disclosed unless and until the non-party witness has signed the UNDERTAKING attached as Exhibit A.

18.    Nothing herein shall be construed (a) as preventing any Party from using or continuing to use any information that, at the time of the disclosure, is publicly known through no unauthorized act of such Party, or (b) as preventing a Party from using or continuing to use any information known or used by it if such information was lawfully obtained by the Party other than through discovery of the Producing Party.  Should a dispute arise as to any specific information or material, the burden shall be upon the Party claiming that such information or material is or was publicly known or was lawfully obtained other than through discovery of the Producing Party.

19.    Nothing herein shall prevent any Party from contending, during the progress of this litigation, that any or all material or information designated "Confidential" or "Attorney's Eyes Only" is not, in fact, confidential.  Grounds for such a contention may include that such designated Confidential or Attorney's Eyes Only information is or was publicly known at or prior to disclosure thereof in this litigation, that such designated Confidential or Attorney's Eyes Only information, after disclosure thereof, has become public knowledge as a result of lawful publication by an independent source who obtained the information lawfully, that such designated Confidential or Attorney's Eyes Only information was previously known by the Receiving Party, or that such designated Confidential or Attorney's Eyes Only information was later obtained in good faith by the Receiving Party from an independent source who obtained the information lawfully.  Any Party may request any Producing Party that designated information as Confidential or Attorney's Eyes Only information to remove that designation.  Such a request shall be in writing, stating the grounds therefor, and shall be served on counsel for the Producing Party who designated the information as Confidential or Attorney's Eyes Only information.  The requested change shall occur unless, within ten (10) calendar days after service of such notice, an objection for good cause is served on the

Party requesting removal of the Confidential or Attorney's Eyes Only information designation. That objection may thereafter be resolved by agreement or by the Court. The Producing Party shall have the burden of establishing the need for maintaining the "Confidential" or "Attorney's Eyes Only" designation.

20.    Nothing in this Protective Order shall require a Party to challenge the propriety of any "Confidential" or "Attorney's Eyes Only" designation at the time such designation is made, and failure to do so shall not preclude a subsequent challenge thereto.

21.    Notwithstanding the parties' designation of "Confidential" or "Attorney's Eyes Only" documents, testimony or information, any Court hearing that refers to or describes "Confidential" or "Attorney's Eyes Only" documents, testimony or information may be held in open court with records unsealed, provided the Producing Party is afforded reasonable notice of the Receiving Party's intent to disclose such documents, testimony or information  in open court, so that the confidentiality of such documents, testimony or information can be protected.  However, any party may request or the Court may order that the portion of such proceeding where use thereof is to be made be held *in camera* with access thereto limited to Qualified Persons under this Protective Order.  To the extent that the Court grants any such request, such Confidential or Attorney's Eyes Only information shall continue to be treated in accordance with the terms of this Protective Order.

22.    (a)    The inadvertent or unintentional failure by a Producing Party to designate specific documents or information as containing Confidential or Attorney's Eyes Only information shall not be deemed a waiver in whole or in part of the Producing Party's claim of confidentiality as to such documents or information.  Upon notice of such failure to designate, all Receiving Parties shall cooperate to restore the confidentiality of the inadvertently disclosed documents or information, without prejudice.

(b)    Per Fed. R. Civ. P. 26(b)(5), if a Producing Party produces any document or information that it believes is immune from discovery pursuant to any attorney-client privilege, attorney work product immunity or any other privilege or immunity from production, such production shall not be deemed a waiver, and the Producing Party may give written notice to all Receiving Parties that the document or information so produced is deemed privileged and that return of the document or information is requested.  Upon receipt of such written notice, all Receiving Parties shall immediately undertake to gather the original and all copies of the document or information and shall immediately return the original and all such copies to the Producing Party or certify in writing the destruction thereof.  Return of such documents or information to the Producing Party shall not preclude any Receiving Party from later moving to compel production of the returned documents or information.

23.    When a Party produces files and records for inspection, no marking need be made in advance of the inspection.  For purposes of the initial inspection, all documents in any produced files shall be considered marked as Attorney's Eyes Only.  Thereafter, upon selection of specified documents for copying and by the inspecting party, the Producing Party shall mark the copies of such documents with the appropriate confidentiality marking at the time that the copies are produced to the Receiving Party.

24.    Making documents or other information available for inspection shall not, by itself, constitute a waiver by the Producing Party of any claim of confidentiality, but delivery of documents and things to a Receiving Party without designating such as Confidential or Attorney's Eyes Only information shall not constitute waiver of any claim of confidentiality if such inadvertence or mistake is thereafter brought to the attention of the Receiving Party promptly after discovery by the Producing Party.  Upon such notice, the Receiving Party shall, at the election of the Producing Party, re-mark the documents and things with the appropriate level of confidentiality

or return said documents and things and not retain copies thereof for replacement by appropriately marked documents and things. Any summaries or notes of the inadvertently produced documents or things shall be treated as Confidential or Attorney's Eyes Only information, as designated by the Producing Party.

25.    The terms of this Protective Order shall be applicable to any third party that produces information that is designated by such third party or by a party hereto as Confidential or Attorney's Eyes Only information.

26.    On final determination of this litigation, each Party and other person subject to the terms hereof shall, within sixty (60) calendar days, assemble and, at its option, destroy or return to the Producing Party all materials, documents and things constituting Confidential or Attorney's Eyes Only information, all copies, summaries and abstracts thereof and all other materials, memoranda or documents constituting or containing Confidential or Attorney's Eyes Only information. If destroyed, such party or person shall certify to the Producing Party, within sixty (60) calendar days, the destruction of all such materials. Outside counsel for each Party may retain archive copies of pleadings, motion papers, written discovery responses, in addition to one set of documents produced by any Party or non-party and correspondence that include Confidential or Attorney's Eyes Only information.

27.    This Protective Order shall survive the termination of this litigation.

28.    Nothing in this Protective Order shall prevent any Party from applying to the Court for additional protection, for example, for particularly highly sensitive materials or information, such as technical, planning, manufacturing, marketing, and research and development materials and information relating to product development, that the Producing Party believes require such protection.

29.    Nothing in this Protective Order shall be construed as a waiver by any Party of its

right to object to the subject matter of any request for production of documents in this action, nor as

a waiver by any other Party of the first Party's obligation to make proper response to discovery

requests.

30.    Nothing in this Protective Order shall be construed as a waiver by any Party of any

objections that might be raised as to admissibility at trial of any evidentiary materials.

31.    Except as may be set forth in paragraph 6, above, it is not the intent of the Parties, nor

of the Court, that an attorney or law firm that acquires knowledge of, or is given access to,

Confidential or Attorney's Eyes Only information pursuant to this Protective Order should thereby

be disqualified from other representations adverse to the Producing Party solely because of such

knowledge or access.

32.    Any Party may, on motion for good cause shown, seek a modification of this

Protective Order.  No modification of this Protective Order that adversely affects the protection of

any document produced or given by a non-party in this case shall be made without giving to that

non-party appropriate notice and opportunity to be heard by the Court.


SIGNED and ENTERED this _____ day of _____, 2007


_____
Hon. John C. Shabaz
UNITED STATES DISTRICT JUDGE

APPROVED AS TO CONTENT AND FORM:

February 20, 2008                          February 20, 2008


By: s:/ Evette D. Pennypacker            By: s:/ Charles J. Crueger
Anthony A. Tomaselli                     Paul F. Linn
Quarles & Brady LLP                      Charles J. Crueger
33 East Main Street, Suite 900           Michael Best & Friedrich LLP
Madison, WI  53703                       100 East Wisconsin Avenue
                                         Suite 3300
Of Counsel:                              Milwaukee, WI  53202-4108
Claude M. Stern
Evette D. Pennypacker                    Of Counsel:
QUINN EMANUEL URQUHART
  OLIVER & HEDGES, LLP                   Mark D. Wegener
555 Twin Dolphin Drive, Suite 560        HOWREY LLP
Redwood Shores, California 94065-2129    1299 Pennsylvania Ave., N.W.
Telephone: (650) 801-5000                Washington, DC 20004
Facsimile:  (650) 801-5100               Telephone: (202) 383-0800
                                         Facsimile: (202) 383-6610

Attorneys for Plaintiff
Kraft Foods Holdings, Inc. and   Third-Party   William C. Rooklidge
Defendant Kraft Foods Global, Inc.        Gregory S. Cordrey
                                         Ben M. Davidson

                                         HOWREY LLP
                                         2020 Main Street, Suite 1000
                                         Irvine, CA 92614
                                         Telephone: (949) 721-6900
                                         Facsimile: (949) 721-6910

                                         Attorneys for Defendant The Procter &
                                         Gamble Company

**EXHIBIT A**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

KRAFT FOODS HOLDINGS, INC.,

      Plaintiff

v.

THE PROCTER & GAMBLE COMPANY,

      Defendant

Case No. 07-C-0613-S

THE PROCTER & GAMBLE COMPANY,

      Counterclaim Plaintiff

v.

KRAFT FOODS HOLDINGS, INC.

      Counterclaim Defendant
and

KRAFT FOODS GLOBAL, INC.

      Third-Party Defendant

---

**UNDERTAKING**

---

I, _____ declare that

my address is _____.

My current employer is _____.

My current occupation is _____.

1.      I have received a copy of the Stipulated Protective Order in this action.  I have carefully read and understand the provisions of the Stipulated Protective Order.

2.      I will comply with all of the provisions of the Stipulated Protective Order.  I will hold in confidence, will not disclose to anyone not qualified under the Stipulated Protective Order, and will use only for purposes of this action any Confidential or Attorney's Eyes Only information that is disclosed to me.

3.      Promptly upon termination of this action, I will return all Confidential and Attorney's Eyes Only materials that came into my possession, and all documents and things that I have prepared relating thereto, to the outside attorney for the party by whom I am employed or retained, or who noticed my deposition.

4.      I hereby submit to the jurisdiction of this Court for the purpose of enforcement of the Stipulated Protective Order in this action.


I declare under penalty of perjury that the foregoing is true and correct.


Dated: _____     Signed: _____

## **CERTIFICATE OF SERVICE**

       I, Ekaterena G. Berezutskaya, an attorney, certify that I caused a copy of The Proctor & Gamble Company's Motion to Enforce Plitek, LLC's Compliance with Rule 45 Subpoena; Memorandum in Support of Motion, Declaration of Scott R. Maynard with Exhibits, Civil Cover Sheet, and Attorney Appearance to be served via messenger upon:

               Dean J. Lurie
               Stone, Pogrund & Korey
               221 N. LaSalle Street, 32nd Floor
               Chicago, Illinois  60601
               (312) 782-3636

Dated: April 28, 2008

                                 s/ Ekaterena G. Berezutskaya
                                 Ekaterena G. Berezutskaya